# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **LATOYA GILLIAM** and **KAYLA McCROBIE**, individually and on behalf of all others similarly situated, | : : : : : | |
| Plaintiffs, | : : | Case No. 2:20-cv-03504-JMY |
| v. | : : : | |
| **UNITED STATES DEPARTMENT OF AGRICULTURE** and **GEORGE ERVIN PERDUE III**, in his official capacity as Secretary of the United States Department of Agriculture, | : : : : : : | |
| Defendants. | : : : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

July 27, 2020

John P. Lavelle, Jr. (PA I.D. No. 54279)
Kenneth M. Kulak (PA I.D. No. 75509)
Timothy J. Geverd (PA I.D. No. 324802)
(*application for admission forthcoming*)
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA  19103-2921
Tel: (215) 963-5000
Fax: (215) 963-5001
john.lavelle@morganlewis.com
ken.kulak@morganlewis.com
timothy.geverd@morganlewis.com

Jonelle Saunders (*application for pro hac vice admission forthcoming*)
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, DC 2004-2541
Telephone:  (202) 739-3000
Facsimile: (202) 739-3001
Jonelle.Saunders@morganlewis.com

Louise Hayes (PA I.D. No. 78581)
Amy Hirsch (PA I.D. No. 42724)
**COMMUNITY LEGAL SERVICES OF PHILADELPHIA**
1410 W. Erie Avenue
Philadelphia, PA 19140
Telephone: (215) 227-2400
Facsimile: (215) 227-2435
LHayes@clsphila.org
AHirsch@clsphila.org

Elizabeth Soltan (PA I.D. No. 327510)
(*admission pending*)
**COMMUNITY LEGAL SERVICES OF PHILADELPHIA**
1424 Chestnut Street
Philadelphia, PA 19102
Telephone: (215) 981-3700
Facsimile: (267) 765-6481
ESoltan@clsphila.org

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................. 1

II.     BACKGROUND ............................................................................................. 2

    A.   Congress Intends SNAP to Safeguard the Health and Well-Being of America's Low-Income Households .................................................. 2

    B.   The COVID-19 Public Health Emergency Has Increased Food Insecurity .......... 5

    C.   Congress Responds to Increased Food Insecurity Caused by the COVID-19 Public Health Emergency by Requiring USDA to Provide SNAP Households With "Emergency Allotments" .......................................... 7

    D.   USDA's Guidance Implementing Section 2302 of the FFCRA Denies "Emergency Allotments" to Households Receiving Maximum SNAP Benefits ..................................................................................... 8

    E.   USDA Relied on Its Guidance to Deny Pennsylvania's Request to Provide Plaintiffs "Emergency Allotments" to Meet Their Temporary Food Needs ....... 10

III.    LEGAL STANDARD ..................................................................................... 12

    A.   Plaintiffs Are Likely to Succeed on the Merits of Their Challenge to USDA's Unlawful Guidance Regarding FFCRA "Emergency Allotments" ...... 12

        1.   USDA's Guidance is a Final Agency Action ......................................... 13

        2.   USDA's Guidance is Arbitrary and Capricious..................................... 14

        3.   USDA'S Contravenes Congress's Unambiguously Expressed Intent ............................................................................................... 17

        4.   *Hall* Did Not Address Whether USDA's Guidance is Arbitrary and Capricious and Was Otherwise Wrongly Decided .......................... 20

    B.   Plaintiffs Will Continue to Suffer Irreparable Harm Absent Injunctive Relief ........................................................................................... 22

    C.   Injunctive Relief is in the Public Interest........................................... 24

    D.   Plaintiffs Should Not be Required to Post a Bond................................. 25

IV.     CONCLUSION.............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Mun. Power-Ohio, Inc. v. F.E.R.C.*,
    863 F.2d 70 (D.C. Cir. 1988) ................................................................16

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..........................................................................13

*Bostock v. Clayton Cnty., Ga.*,
    140 S. Ct. 1731 (2020) ...................................................................20, 22

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ..........................................................................12

*City of Phila. v. Sessions*,
    280 F. Supp. 3d 579 (E.D. Pa. 2017) ......................................................12

*D.C. v. U.S. Dep't of Agric.*,
    --- F. Supp. 3d ----, 2020 WL 1236657 (D.D.C. Mar. 13, 2020), *appeal
    docketed*, No. 20-5136 (D.C. Cir. May 14, 2020) .......................................23

*Daubert v. NRA Grp., LLC*,
    861 F.3d 382 (3d Cir. 2017) .................................................................20

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ...................................................................14, 17

*Elliot Coal Mining Co. v. Dir., Office of Workers' Compensation Programs*,
    17 F.3d 616 (3d Cir. 1994) ...............................................................17, 18

*Garnett v. Zeilinger*,
    313 F. Supp. 3d 147 (D. C. Cir. 2018) ....................................................24

*Geisinger Cmty. Med. Ctr. v. Sec'y U.S. Dep't of Health & Hum. Servs.*,
    794 F.3d 383 (3d Cir. 2015) .................................................................19

*Goldberg v. Kelly*,
    397 U.S. 254 (1970) ......................................................................22, 24

*Hall v. U.S. Dep't of Agric.*,
    No. 20-cv-03454-HSG, 2020 WL 3268539 (N.D. Cal. June 17, 2020), *appeal
    docketed* No. 20-16232 (9th Cir. June 24, 2020) ................................20, 21, 22

*Haskins v. Stanton*,
    794 F.2d 1273 (7th Cir. 1986) ..............................................................23

i

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Jacksonville Port Auth. v. Adams*,
  556 F.2d 52 (D.C. Cir. 1977) ................................................................................................24

*Maldonado v. Houstoun*,
  177 F.R.D. 311 (E.D. Pa. 1997) ...........................................................................................23

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
  512 U.S. 218 (1994) ..............................................................................................................19

*Minard Run Oil Co. v. U.S. Forest Serv.*,
  670 F.3d 236 (3d Cir. 2011) ...........................................................................................13, 14

*Moore v. Miller*,
  579 F. Supp. 1188 (N.D. Ill. 1983) .......................................................................................23

*Nat. Res. Def. Council v. E.P.A.*,
  489 F.3d 1364 (D.C. Cir. 2007) ............................................................................................17

*Nken v. Holder*,
  556 U.S. 418 (2009) ..............................................................................................................12

*Physicians for Soc. Responsibility v. Wheeler*,
  956 F.3d 634 (D.C. Cir. 2020) ..............................................................................................12

*Pittson Coal Grp. v. Sebben*,
  488 U.S. 105 (1988) ..............................................................................................................20

*Prometheus Radio Project v. Fed. Commc'ns Comm'n*,
  939 F.3d 567 (3d Cir. 2019), *cert. petition docketed* No. 19-1241 (U.S. Apr.
  17, 2020) ................................................................................................................................15

*Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*,
  783 F.3d 156 (3d Cir. 2015) ...........................................................................................17, 20

*Simcox v. Del. Cnty.*,
  Civ. A. No. 91-6874, 1992 WL 97896 (E.D. Pa. May 5, 1992) ...........................................25

*Smith v. City of Jackson, Miss.*,
  544 U.S. 228 (2005) ..............................................................................................................19

*Temple Univ. v. White*,
  941 F.2d 201 (3d Cir. 1991) ..................................................................................................25

*U.S. Army Corps. of Eng'rs v. Hawkes Co.*,
  136 S. Ct. 1807 (2016) ..........................................................................................................13

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................................12

**Statutes**

5 U.S.C. § 704...............................................................................................................12

5 U.S.C. § 706...............................................................................................................12

7 U.S.C. § 2011...................................................................................................2, 16, 18

7 U.S.C. § 2013.................................................................................................................2

7 U.S.C. § 2014...................................................................................................3, 15, 19

7 U.S.C. § 2027.............................................................................................................22

Families First Coronavirus Response Act,
    Pub. L. No. 116-127, 134 Stat. 178 (Mar. 18, 2020) .................................... *passim*

Food and Nutrition Act of 2008................................................................... *passim*

**Other Authorities**

7 C.F.R. § 273.10(e)(1)(ii)(A) ........................................................................................3

7 C.F.R. § 280.1.....................................................................................................15, 19

116 Cong. Rec. H1, 688 (statement of Rep. Johnson)..................................................8

I.     INTRODUCTION

Plaintiffs Latoya Gilliam and Kayla McCrobie are Pennsylvanians who receive maximum monthly Supplemental Nutrition Assistance Program ("SNAP") benefits for their household size. This means, after accounting for necessary expenses, Plaintiffs have no disposable income left over to meet their households' monthly food needs.  They are therefore entirely dependent on their SNAP benefits to purchase food.  In ordinary times, maximum SNAP benefits alone are insufficient to meet a household's food needs.  These, however, are not ordinary times.

The COVID-19 pandemic caused by SARS-CoV-2 has resulted in an unprecedented national public health emergency with devastating social and economic impacts.  Disruptions to America's food supply chains have increased the price of food, and restrictions on travel and the operation of businesses have limited its availability altogether.  As a result, the purchasing power of already inadequate SNAP benefits has decreased and SNAP households, like Plaintiffs', cannot meet their monthly food needs.

Congress recognized this plight and, on March 18, 2020, passed Section 2302 of the Families First Coronavirus Response Act ("FFCRA") to strengthen SNAP benefits for low-income families.  This section *requires* the Secretary of the United States Department of Agriculture ("USDA"), upon a properly supported state request, to provide "emergency allotments" to *all* SNAP households to meet "temporary food needs" caused by the COVID-19 public health emergency.  USDA, however, issued guidance limiting emergency allotments authorized under Section 2302 to the difference in value between a household's regular SNAP benefit and the maximum benefit for that household's size.  In doing so, USDA asserted that "emergency allotments" authorized under Section 2302 are "similar to supplements authorized during disasters under" the Food and Nutrition Act of 2008 ("FNA").  USDA, however, provided

1

no explanation for its interpretation of "emergency allotments" that is contrary to Congress's unambiguously expressed intent in Section 2302.

Plaintiffs have suffered irreparable harm as a result of USDA's unlawful guidance, involuntarily forgoing necessary food.  Without judicial intervention, Plaintiffs will continue to suffer irreversible harm.  Plaintiffs, in their individual capacities, therefore seek preliminary injunctive relief to prohibit USDA from relying on its unlawful guidance interpreting "emergency allotments" so that they may receive the emergency subsistence benefits to meet their temporary food needs, which Pennsylvania has requested – and, based on Pennsylvania Governor Tom Wolf's letters to USDA, likely will request again – under FFCRA Section 2302.

## II.    BACKGROUND

### A.    Congress Intends SNAP to Safeguard the Health and Well-Being of America's Low-Income Households

In enacting SNAP, Congress recognized that America's low-income households possess "limited food purchasing power" which "contributes to hunger and malnutrition among members of such households."  7 U.S.C. § 2011.  SNAP thus seeks to increase the "food purchasing power" of those "low-income households" to enable them "to obtain a more nutritious diet through normal channels of trade" by providing non-cash nutritional support in the form of benefits – referred to as "allotments" – redeemable for SNAP-eligible foods at SNAP-eligible retailers.  7 U.S.C. §§ 2011, 2013(a).

It is well established that a nutritious and adequate diet is essential to healthy living and child development, and SNAP benefits contribute to preserving recipients' overall health. Ex. 4, Cullen Decl. ¶¶ 10, 11, 14; Ex. 8, Gregory Decl. ¶ 9; Ex. 3, Turchi Decl. ¶ 12.  SNAP participation reduces food insecurity among children; birth weight is higher among infants born to mothers receiving SNAP, compared to infants of similar mothers who do not; and SNAP

receipt is associated with better child health and reduced child hospitalizations.  Ex. 2, Chilton Decl. ¶ 4.  As the primary means of promoting food security for low-income people, SNAP benefits play a crucial role in protecting the nation's health.  Ex. 1, Bauer Decl. ¶ 8.

To be eligible to receive any SNAP benefits, a household's net income must generally be at or below the federal poverty level.  7 U.S.C. § 2014(c)(1).  Monthly allotments for eligible households are equal to "the maximum SNAP allotment for the household's size reduced by 30 percent of the household's net monthly income."  7 C.F.R. § 273.10(e)(1)(ii)(A).  A SNAP household's "net monthly income" is the household's "gross monthly income earned by all household members" less eligible expense deductions for basic necessities other than food.  *See id.* § 273.10(e)(1).  Accordingly, households receiving maximum monthly SNAP benefits have zero net income after deducting expenses for necessities other than food.  Put differently, without SNAP benefits, households receiving maximum monthly SNAP benefits have no money to buy food unless they forgo other necessities.

The current maximum monthly allotment for an individual is $194.  As the household size increases, so does the maximum monthly allotment, as illustrated in the table below:[1]

| Family Size | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Each Additional |
|---|---|---|---|---|---|---|---|---|---|
| Maximum | $194 | $355 | $509 | $646 | $768 | $921 | $1,018 | $1,164 | Add $146 |

However, even in normal times, it is widely understood that maximum benefits are inadequate to meet monthly food needs.  Ex. 1, Bauer Decl. ¶¶ 27-29; Ex., 2, Chilton Decl. ¶ 5; Ex. 12, Neale Decl. ¶¶ 5, 7; Ex. 14, Scully Decl. ¶ 5; Ex. 10, Jann Decl. ¶ 8; Ex. 8, Gregory Decl. ¶ 8; Ex. 5, Fisher Decl. ¶ 6; Ex. 7, Gladstein Decl. ¶ 7.  SNAP allotments are based on the

---

[1] Pa. Dep't of Human Servs., The Supplemental Nutrition Assistance Program, dhs.pa.gov, https://www.dhs.pa.gov/Services/Assistance/Pages/SNAP.aspx (last visited July 27, 2020).

Thrifty Food Plan (TFP), a calculation of a "market basket" of food items based on the Consumer Price Index.  Ex. 2, Chilton Decl. ¶ 5.  While USDA claims that the maximum SNAP allotments are designed to cover *all* food costs for households with no net income after expenses for other basic necessities, USDA has determined "that *the median weekly amount that <u>food secure</u> families spend on food is <u>31% higher than the maximum amount of TFP</u>*."  *Id.* (emphasis in original).  Indeed, USDA found even the most food insecure households spent 8 percent more than the maximum TFP allotment.  *Id.*  Since food is more expensive in Pennsylvania relative to the rest of the country, the maximum SNAP benefit has even less purchasing power in Pennsylvania.  Ex. 1, Bauer Decl. ¶ 28.

These findings are unsurprising.  For instance, an individual receiving the maximum SNAP benefit of $194 for a 31-day month has only $6.25 to spend on food per day and only $2.08 to spend per meal.  As family size increases, the spending power of maximum SNAP benefits decreases.  Thus, a household of five receiving the maximum SNAP benefit of $768 for a 31-day month has only $4.95 to spend on food per day for each member of the household and only $1.65 to spend per meal for each household member.

Given the inadequacy of SNAP benefits, households receiving maximum SNAP benefits have turned to several strategies to maximize the purchasing power of those benefits.  These include: (1) comparison shopping for the best prices, Ex. 1, Bauer Decl. ¶ 35, Ex. 14, Scully Decl. ¶ 6; (2) reducing the quality and size of meals, skipping meals in order to feed their children, or not eating for a whole day, Ex. 2, Chilton Decl. ¶ 6, Ex. 4, Cullen Decl. ¶ 4; (3) not paying other essential bills, such as rent or utility bills, which may lead to other forms of severe hardship such as eviction or utility shutoffs or forgoing needed medical care, Ex. 2, Chilton Decl. ¶ 6; (4) seeking emergency food, despite its poor quality and the stigma of doing so, Ex. 2,

Chilton Decl. ¶ 6; Ex. 12, Neale Decl. ¶ 4, Ex. 5, Fisher Decl. ¶ 6; and (5) use of other food

programs, including school meals for children, WIC for pregnant women and children under 5,

and meals offered at some child care centers and senior centers, Ex. 12, Neale Decl, ¶ 6, Ex. 14,

Scully Decl. ¶ 6; Ex. 10, Jann Decl. ¶¶ 5, 7, 8**.**

  **B.**  **The COVID-19 Public Health Emergency Has Increased Food Insecurity**

  The COVID-19 public health emergency and its attendant economic consequences have

exacerbated the inadequacy of SNAP benefits.  Ex. 7, Gladstein Decl. ¶ 8.  In April 2020, the

price of groceries grew 2.6% according to the Bureau of Labor Statistics, which was the biggest

increase in grocery prices from one month to the next since 1974.[2]  Ex. 1, Bauer Decl. ¶¶ 31-34.

The price of groceries has continued to grow since.  Households receiving maximum SNAP

benefits, which already were diverting money from necessities to meet their monthly food needs,

have been forced to forgo further necessities to meet their monthly food needs in the midst of a

global pandemic.  Ex. 12, Neale Decl. ¶ 9; Ex. 14, Scully Decl. ¶ 8; Ex. 10, Jann Decl. ¶ 6; Ex. 4,

Cullen Decl. ¶¶ 6-8.

  Recent nationally representative surveys conducted since the onset of the pandemic

emergency have consistently found dramatic increases in food insecurity, with rates having

effectively doubled.  Ex. 1, Bauer Decl. ¶ 20.  Overall, studies find household food insecurity

rates above 20 percent; more than one in three households with children are food insecure.  *Id.* ¶

19.  In addition, 17.4 percent of mothers with children 12 and under reported their children were

experiencing food insecurity, a 460 percent increase from 2018.  *Id.* ¶¶ 19, 22.  This evidence

suggests today's food insecurity rates are higher than at any point in the Great Recession.  *Id.*

---

[2] Consumer Price Index for All Urban Consumers (CPI-U): U.S. city average, by expenditure
category, 1-month analysis table, *available at* https://www.bls.gov/news.release/cpi.t01.htm (last
visited July 27, 2020).

In Pennsylvania, COVID-19 spread rapidly throughout the state after the first presumptive positive cases were reported on March 6, 2020.  On that same day, Governor Wolf issued a Proclamation of Disaster Emergency for the Commonwealth of Pennsylvania.  Shortly thereafter, Pennsylvania began implementing measures to mitigate the spread of COVID-19.  These measures included the mandatory shuttering of non-essential businesses, a statewide stay-home order, requiring Pennsylvania residents to shelter in place other than for essential travel, and reduced public transportation availability.  COVID-19 also increased food insecurity in Pennsylvania.  Researchers at Penn State estimated that one in three Pennsylvanians was food insecure at the end of March 2020.  Ex. 1, Bauer Decl. ¶ 21.  The COVID Impact Study found in May 2020 that 15 percent of Pittsburgh households were food insecure, meaning "the food that we bought just didn't last, and we didn't have money to get more," and that one in five Pittsburgh households were "worried our food would run out before we got money to buy more." *Id.*

These fundamental changes in Pennsylvanians' daily lives have forced SNAP households to alter their shopping habits and to abandon many strategies employed to conserve their SNAP benefits.  *See* Ex. 2, Chilton Decl. ¶¶ 8-9; Ex. 12, Neale Decl. ¶ 10; Ex. 14, Scully Decl. ¶ 9; Ex. 10, Jann Decl. ¶¶ 7-8; Ex. 8, Gregory Decl. ¶ 6; Ex.5, Fisher Decl. ¶¶ 7-8; Ex. 13, Sanders Decl. ¶¶ 5-6; Ex. 3, Turchi Decl. ¶ 10; Ex. 4, Cullen Decl. ¶ 13; Ex. 6, Gilliam Decl. ¶ 8; Ex. 11, McCrobie Decl. ¶¶ 6-10.  These same changes have led to a dramatic increase in the need for emergency food resources, at the same time that many local pantries – frequently run by elderly volunteers – have shut their doors.  Ex. 5, Fisher Decl. ¶¶ 9-12.  Food pantries have struggled to meet the demand.  Ex. 1, Bauer Decl. ¶ 36, Ex. 12, Neale Decl. ¶ 10, Ex. 14, Scully Decl. ¶ 10.

The pandemic and associated economic crisis have made it harder for Plaintiffs to access and afford food.  Plaintiff Latoya Gilliam receives the maximum SNAP benefit for a two-person household of $355 per month and has seen prices go up during the pandemic, making it harder to obtain nutritious food for herself and her two-year-old son.  When she went to a food pantry hoping to obtain a box of food that would provide several meals, she found that the pantry was distributing only snacks.  Ex. 6, Gilliam Decl. ¶¶ 6, 7.  Plaintiff Kayla McCrobie is skipping meals during the pandemic and has not been able to continue her normal practice of traveling to farther away stores to find lower prices.  A food pantry where she was able to obtain foods including produce, eggs, and other staples before the pandemic now only provides canned goods and other non-perishables.  She is anemic and has suffered from fatigue and weakness during the pandemic because she cannot afford an adequate diet. Ex. 11, McCrobie Decl. ¶¶ 7-11.

### C. Congress Responds to Increased Food Insecurity Caused by the COVID-19 Public Health Emergency by Requiring USDA to Provide SNAP Households With "Emergency Allotments"

Congress recognized that existing SNAP benefits are inadequate to meet SNAP households' monthly food needs amidst the public health emergency and its attendant effects on the price of food nationwide.  Therefore, on March 18, 2020, Congress passed Section 2302 of the FFCRA,[3] providing for emergency subsistence benefits for SNAP households referred to as "emergency allotments."

"Emergency allotments" are available to states in order "to address temporary food needs" of SNAP households upon (1) the Secretary of Health and Human Services declaring a public health emergency and (2) the state issuing an emergency or disaster declaration based on a COVID-19 outbreak.  After the occurrence of these two preconditions, Section 2302 requires

---

[3] Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 178 (Mar. 18, 2020).

USDA to provide "emergency allotments" to all SNAP households upon receipt of a state's properly supported request.

The "emergency allotments" authorized under Section 2302 are meant "to support families and the most vulnerable" by providing "funding and flexibility for emergency nutritional aid for senior citizens, women, children, and low-income families."[4]  Therefore, while Section 2302 authorizes USDA to issue guidance determining what data is necessary to support a request for "emergency allotments," it does not authorize USDA to determine which SNAP households receive "emergency allotments" and which do not.  It directs USDA to provide all SNAP households "emergency allotments" sufficient in value to meet their "temporary food needs," as supported by data states provide with their requests, pursuant to USDA guidance. FFCRA § 2302(a)(1).

### D. USDA's Guidance Implementing Section 2302 of the FFCRA Denies "Emergency Allotments" to Households Receiving Maximum SNAP Benefits

USDA issued guidance documents improperly limiting emergency allotments under Section 2302 of the FFCRA to the difference between a SNAP household's regular SNAP benefit and the maximum SNAP benefit for the household's size.[5]  Specifically, USDA has stated that "emergency allotments" authorized under Section 2302 of the FFCRA "are supplements to a household's SNAP benefits, similar to supplements authorized during disasters under Sec. 5(h)(3)(A) of the Food and Nutrition Act of 2008 (FNA)," that "are added on to a

---

[4] Press Release, President Donald J. Trump is Supporting American Businesses, Workers, and Families Impacted by the Coronavirus (Mar. 18, 2020), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-supporting-american-businesses-workers-families-impacted-coronavirus/; *see also* 116 Cong. Rec. H1, 688 (statement of Rep. Johnson) ("For families' food security, we have strengthened nutrition security initiatives, including SNAP … .").

[5] USDA also issued guidance specifying what "data" state agencies must submit with their requests for emergency allotments.  Plaintiffs are not challenging that portion of USDA's guidance concerning the data state agencies are required to submit.

household's monthly benefit so the total household benefit amount may equal the maximum

benefit amount for their household size."[6]  USDA also has asserted that a household's

"emergency allotment" cannot "increase the current monthly household SNAP benefit allotment

beyond 'the applicable maximum monthly allotment for the household size" and has maintained

that households already receiving maximum SNAP benefits are "not eligible" to receive

"emergency allotments."[7]

  This guidance denies emergency allotments to the poorest SNAP households receiving

maximum monthly benefits and, instead, targets emergency subsistence benefits toward SNAP

households with substantially more disposable income to devote to food needs.  Thus, a

household of one person with an entire food budget of $2.08 per meal receives no emergency

subsistence benefits, while a household of one person with considerably higher income

qualifying for the minimum SNAP benefit of $16 per month receives $178 per month in

emergency subsistence benefits.

---

[6] Memorandum re Supplemental Nutrition Assistance Program – Questions and Answers, COVID-19, Set #1 from J. Shahin, USDA, Associate Administrator, Supplemental Nutrition Assistance Program to SNAP State Agencies (Apr. 11, 2020), *available at* https://fns-prod.azureedge.net/sites/default/files/resource-files/SNAP-COVID-QA1.pdf; *see also* Memorandum from J. Shahin, USDA, Associate Administrator, Supplemental Nutrition Assistance Program to SNAP State Agencies (Mar. 20, 2020), *available at* https://fns-prod.azureedge.net/sites/default/files/resource-files/SNAP-COVID-EmergencyAllotmentsGuidance.pdf (similar).
[7] Memorandum from J. Shahin, USDA, Associate Administrator, Supplemental Nutrition Assistance Program to SNAP State Agencies (Apr. 21, 2020), *available at* https://fns-prod.azureedge.net/sites/default/files/resource-files/SNAP-COVID-EmergencyAllotmentsPhase2Guidance.pdf.

**E.     USDA Relied on Its Guidance to Deny Pennsylvania's Request to Provide Plaintiffs "Emergency Allotments" to Meet Their Temporary Food Needs**

On January 31, 2020, the Secretary of Health and Human Services declared a public health emergency for the entire United States based on the COVID-19 outbreak.[8]  And, as noted above, Governor Wolf issued a Proclamation of Disaster Emergency based on the COVID-19 outbreak within Pennsylvania.[9]  Then, on March 13, 2020, Pennsylvania submitted a waiver request to USDA requesting the ability to provide all SNAP households benefits equal to 50 percent of the maximum SNAP allotment for their household size.  Ex. 9, Hayes Decl. ¶ 1 & Ex. A.  After USDA issued its first guidance document setting forth its interpretation of "emergency allotments," Governor Wolf sent USDA a letter urging the agency to reconsider its interpretation of the FFCRA, explaining that the FFCRA "authorizes USDA to provide an *additional* emergency allotment to all households, up to the maximum benefit for their household size" and Pennsylvania's concern "that the poorest households, particularly those with very young children, would not be eligible to receive anything under [USDA's]…reading of the law."[10]  On March 31, 2020, Pennsylvania submitted a second waiver request, reiterating its disagreement with USDA's narrow interpretation of "emergency allotments" available under Section 2302 of the FFCRA.  *Id.* ¶ 2 & Ex. B.

---

[8] Press Release, *Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus*, hhs.gov (Jan. 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html.

[9] Proclamation of Disaster Emergency (Mar. 6, 2020), *available at* https://www.governor.pa.gov/wp-content/uploads/2020/03/20200306-COVID19-Digital-Proclamation.pdf.

[10] 3/25/2020 Ltr. from Tom Wolf to Hon. S. Perdue, *available at* https://www.governor.pa.gov/wp-content/uploads/2020/03/2020.3.25-TWW-Perdue-emergency-food-assistance-COVID-19.pdf.

USDA granted Pennsylvania's March 31, 2020 waiver request on April 2, 2020, permitting issuance of "emergency allotments" only to bring all SNAP households up to the maximum allotment for their household size.[11]  On April 10, 2020 USDA denied *en masse* all state requests, like Pennsylvania's original request, that would result in "[p]roviding emergency allotments that exceeded the maximum benefit for a household's size."[12]  In response, on April 27, Governor Wolf again wrote to USDA disagreeing with its interpretation of the FFCRA, noting that it leaves the approximately 40% of Pennsylvania SNAP households who already receive the maximum SNAP benefit "unable to fill their pantries as recommended."[13]

Pennsylvania issued emergency allotments to SNAP households receiving less than maximum SNAP benefits for the months of March, April, May, June, July and has approval to issue emergency allotments for August.[14]  During this time, households of one receiving the minimum benefit of $16 receive emergency allotments of $178 per month, bringing them up to the maximum benefit of $194.  Far poorer households already receiving the maximum allotment get no emergency allotments.

---

[11] Pennsylvania: COVID-19 Waivers & Flexibilities, fns.usda.gov, https://www.fns.usda.gov/disaster/pandemic/covid-19/pennsylvania (last visited July 27, 2020).
[12] Memorandum re Supplemental Nutrition Assistance Program (SNAP) – Denial of Certain Requests to Adjust SNAP Regulations from J. Shahin, USDA, Associate Administrator, Supplemental Nutrition Assistance Program, to Requesting State Agencies (Apr. 10, 2020), *available at* https://fns-prod.azureedge.net/sites/default/files/resource-files/SNAP-COVID19-Multiple-Adjustment-Denials.pdf.
[13] Ltr. from Tom Wolf to Hon. S. Perdue (Apr. 27, 2020), *available at* https://www.governor.pa.gov/wp-content/uploads/2020/04/20200428-TWW-FNS-Reconsideration-Letter.pdf.
[14] Pa. Dep't of Human Servs., SNAP Extra Payments, https://www.dhs.pa.gov/Services/Assistance/Pages/SNAP-CARES-Act.aspx (last visited July 27, 2020); Pennsylvania: COVID-19 Waivers & Flexibilities, fns.usda.gov, https://www.fns.usda.gov/disaster/pandemic/covid-19/pennsylvania (last visited July 27, 2020).

III.     **LEGAL STANDARD**

Courts should grant preliminary injunctive relief upon a movant's showing that (1) it is likely to succeed on the merits of its claims, (2) it likely will suffer irreparable harm absent preliminary injunctive relief, (3) the harm it is likely to suffer outweighs the harm any other interested parties will suffer from the grant of preliminary injunctive relief, and (4) preliminary injunctive relief is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the government is a party to the litigation, "the last two factors in the preliminary injunction analysis merge[,]" such that a movant is entitled to injunctive relief upon a showing of its likely success on the merits, the irreparable harm it is likely to suffer, and that injunctive relief is in the public interest. *See, e.g.*, *City of Phila. v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Plaintiffs are entitled to preliminary injunctive relief because (1) they are likely to succeed on the merits of their challenge to USDA's unlawful guidance, (2) they will continue to suffer substantial irreparable harm absent preliminary injunctive relief, and (3) preliminary injunctive relief is in the public interest.

A.     **Plaintiffs Are Likely to Succeed on the Merits of Their Challenge to USDA's Unlawful Guidance Regarding FFCRA "Emergency Allotments"**

Reviewing courts must "hold unlawful and set aside" final agency actions that are "in excess of statutory … authority" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A), (C). Reviewing courts "must reject administrative constructions" of statutes that contravene Congress's intent and ensure that agencies adequately explain their decisions. *See, e.g.*, *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) (collecting cases); *Physicians for Soc. Responsibility v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020).

USDA's guidance regarding "emergency allotments" under the FFCRA is unlawful, final agency action because USDA did not explain its interpretation of "emergency allotments" and the guidance contravenes Congress's unambiguously expressed intent.

### 1.    USDA's Guidance is a Final Agency Action

Final agency action (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) determines "rights or obligations" or has "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations and quotation marks omitted).  Whether agency action has "legal consequences" requires a "pragmatic" inquiry into the effect on the entities or individuals to whom the action applies.  *E.g.*, *U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (citations omitted).  The Third Circuit has "identified" the following "pragmatic considerations":

> (1) whether the decision represents the agency's definitive position on the question; (2) whether the decision has the status of law with expectation of immediate compliance; (3) whether the decision has immediate impact on the day-to-day operations of the party seeking review; (4) whether the decision involves a pure question of law that does not require factual development; and (5) whether immediate judicial review would speed enforcement of the relevant act.

*Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 249 (3d Cir. 2011) (quotation omitted).  Each of these "pragmatic considerations" demonstrates USDA's guidance is final agency action.

*First*, USDA's guidance represents its final position on the "emergency allotments" authorized under Section 2302(a)(1) of the FFCRA.  USDA issued its guidance advising SNAP State agencies that households receiving maximum SNAP benefits were ineligible for FFCRA emergency allotments in response to requests from states for "emergency allotments" under Section 2302(a)(1) of the FFCRA.[15]  USDA has declined to rescind or otherwise amend its

---

[15] *E.g.*, Memorandum re Supplemental Nutrition Assistance Program (SNAP) – Denial of Certain Requests to Adjust SNAP Regulations from J. Shahin, USDA, Associate Administrator, Supplemental Nutrition Assistance Program, to Requesting State Agencies (Apr. 10, 2020),

FFCRA "emergency allotment" guidance.[16]  USDA's guidance therefore is its "definitive position" on emergency allotments authorized under Section 2302 of the FFCRA.  *See Minard Run Oil Co.*, 670 F.3d at 249.

> **Second**, USDA's guidance has the "status of law with the expectation of immediate compliance" and has had an "immediate impact on" Plaintiffs.  USDA's denial of Pennsylvania's request to provide all SNAP households emergency allotments has precluded Plaintiffs from receiving emergency allotments to which they are entitled under the FFCRA.

> **Third**, USDA's guidance implicates purely legal questions of administrative procedure law and statutory interpretation that does not require any factual development.

> **Fourth**, the Court's review of Plaintiff's claims "will facilitate prompt and efficient resolution of questions" from several states regarding the scope of emergency allotments available under Section 2302(a)(1).  *See Minard Run Oil Co.*, 670 F.3d at 249.

### 2.      USDA's Guidance is Arbitrary and Capricious

USDA failed to explain its interpretation of "emergency allotments" authorized under Section 2302 of the FFCRA as "supplements."  Its guidance therefore is arbitrary and capricious.

Agency action stands or falls on "the grounds that the agency invoked when it took the action."  *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (internal citation and quotation marks omitted).  An agency must engage in reasoned decisionmaking that "articulate[s] a satisfactory explanation for its action" and demonstrates that

---

*available at* https://fns-prod.azureedge.net/sites/default/files/resource-files/SNAP-COVID19-Multiple-Adjustment-Denials.pdf.

[16] *See, e.g.*, Ltr. from Tom Wolf to Hon. S. Perdue (Mar. 25, 2020), *available at* https://www.governor.pa.gov/wp-content/uploads/2020/03/2020.3.25-TWW-Perdue-emergency-food-assistance-COVID-19.pdf ("We strongly urge USDA to reconsider its interpretation to avoid imposing a restriction on the emergency benefit at a time of such extraordinary crisis.").

it considered "important aspect[s] of the problem" presented.  *Prometheus Radio Project v. Fed. Commc'ns Comm'n*, 939 F.3d 567, 577, 585 (3d Cir. 2019), *cert. petition docketed* No. 19-1241 (U.S. Apr. 17, 2020) (internal citations and quotation marks omitted).  USDA's guidance does neither.

***First***, USDA's guidance concludes, without explanation, that "emergency allotments" authorized under 2302 of the FFCRA are "similar to supplements authorized during disasters under Sec. 5(h)(3)(A) of the [FNA] … added on to a household's monthly benefit."  But the FNA does not authorize "supplements" added on to regular SNAP benefits.  It authorizes "emergency allotments," benefits issued to SNAP households "to ***replace*** food destroyed in a disaster."  7 U.S.C. § 2014(h)(3)(A) (emphasis added).  These replacement benefits are separate from, and not reduced by, regular SNAP benefits.  *See* 7 U.S.C. § 2014(h)(3)(A); 7 C.F.R. § 280.1.  Under the FNA, SNAP households that normally receive maximum benefits are eligible to receive a *second* maximum allotment, in the form of an "emergency allotment," to replace destroyed food.

Contrary to the premise of USDA's guidance, "supplements" are fundamentally different than "emergency allotments" authorized under the FNA.  USDA provides "supplements" in connection with the Disaster Supplemental Nutrition Assistance Program ("D-SNAP"), which USDA administers under the its Robert T. Stafford Act authority, ***not*** its FNA authority.[17]  D-SNAP provides one month of emergency subsistence benefits, "equal to the maximum monthly

---

[17] U.S. Dep't of Agric., Food & Nutrition Serv., Supplemental Nutrition Assistance Program (SNAP): Disaster SNAP Guidance 4 (July 2014), *available at* https://fns-prod.azureedge.net/sites/default/files/D-SNAP_handbook_0.pdf (hereinafter Disaster SNAP Guidance) ("FNS has elected to approve the operation of D-SNAP under ***Stafford Act authority*** when affected areas have received a Presidential disaster declaration for individual assistance." (emphasis added)).

[SNAP] allotment," to households "who may not normally qualify for or participate in SNAP" but live in a disaster area for which the President declares Major Disaster Assistance.[18]  Under D-SNAP, SNAP households are entitled to two forms of emergency subsistence benefits.  SNAP households are entitled to "replacement benefits" to replace "food purchased with their benefits" that is destroyed in a disaster.[19]  In addition to "replacement benefits," D-SNAP authorizes payment of "supplements" to existing SNAP households in disaster areas to bring those households up to the maximum allotment "in order [to] provide parity between new D-SNAP households" and existing SNAP households during the time D-SNAP households receive the maximum monthly allotment.[20]

USDA's invocation of Section 5(h)(3)(A) of the FNA to interpret FFCRA "emergency allotments" as "supplements," authorized under its Stafford Act authority and unavailable to households receiving maximum monthly benefits, instead of "emergency allotments" authorized under the FNA and available to recipients of maximum monthly SNAP benefits, clearly requires explanation.  USDA's guidance, however, provides none.  This failing alone is fatal.  *See Am. Mun. Power-Ohio, Inc. v. F.E.R.C.*, 863 F.2d 70, 73 (D.C. Cir. 1988).

**Second**, Congress made Section 2302 of the FFCRA part of SNAP and SNAP seeks to raise "levels of nutrition among low-income households."  7 U.S.C. §§ 2011 & 2011 note (SNAP Waivers).  Therefore, an "important aspect" of the problem before the USDA in interpreting Section 2302 was raising the "levels of nutrition among low-income households" amidst the COVID-19 public health emergency.  Without explanation or acknowledgement, however, USDA's guidance deprives the lowest-income households of emergency subsistence benefits

---

[18] Disaster SNAP Guidance 8.
[19] Disaster SNAP Guidance 37.
[20] Disaster SNAP Guidance 35.

necessary to meet their monthly food needs during the COVID-19 public health emergency, while providing emergency subsistence benefits to households with relatively higher incomes, frustrating the purpose of SNAP. USDA's utter failure "to consider [that] important aspect of the problem" presented "renders [its guidance] arbitrary and capricious." *Regents of Univ. of Cal.*, 140 S. Ct. at 1913 (first alteration in original).

### 3.    USDA'S Guidance Contravenes Congress's Unambiguously Expressed Intent

Even if USDA had provided some explanation to support its interpretation of FFCRA "emergency allotments," its guidance still would be unlawful. It denies emergency subsistence benefits to households, like Plaintiffs', receiving maximum monthly SNAP benefits, contravening Congress's "clear and unambiguous" intent. *Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*, 783 F.3d 156, 167 (3d Cir. 2015).

Ascertaining Congress's intent begins with the text of the statute. *See Elliot Coal Mining Co. v. Dir., Office of Workers' Compensation Programs*, 17 F.3d 616, 629 (3d Cir. 1994) (internal citations and quotation marks omitted). Courts "carefully scrutinize the plain text of the statute and apply traditional tools of statutory construction" and "consider the broader statutory context," *Shalom Pentecostal Church*, 783 F.3d at 164-65 (citations omitted), taking into account "the problem Congress sought to solve." *Nat. Res. Def. Council v. E.P.A.*, 489 F.3d 1364, 1373 (D.C. Cir. 2007). Applying these principles, it is clear that Congress intended USDA to provide "emergency allotments" to *all* SNAP households, not just "supplements" to those SNAP households receiving less than the maximum monthly benefit.

*First*, "from a grammatical standpoint," Congress's intent is clear. *See Elliot Coal Mining Co.*, 17 F.3d at 629. Congress intended that USDA provide "emergency allotments to households participating in the supplemental nutrition assistance program … to address

temporary food needs not greater than the applicable maximum monthly allotment for the household size." FFCRA § 2302(a)(1). The adjective phrase "not greater than the applicable maximum monthly allotment for the household size" does not suggest that Congress intended that the **combined value** of regular SNAP benefits and "emergency allotments" be limited to "the applicable maximum monthly allotment for the household size." Instead, the **only** thing the adjective phrase can modify is "emergency allotments." Therefore, Congress clearly expressed its intent that USDA provide "emergency allotments" to SNAP households in an amount up to the maximum SNAP benefit. Any other construction would fly "in the face of common sense in grammar hardened into law." *See Eliot Coal Mining Co.*, 17 F.3d at 629 (quotation omitted).

**Second**, Section 2302 of the FFCRA is part of the SNAP statutory scheme. Congress designed SNAP to raise "levels of nutrition among low-income households," providing the most benefits to households with the least income. *See* 7 U.S.C. § 2011. By providing relatively generous emergency allotments – approaching the maximum benefit amount – to the least-poor SNAP recipients while providing no emergency allotments to the most poor, USDA undermines this statutory scheme.

**Third**, the problem Congress sought to solve is "temporary food needs" caused by the COVID-19 public health emergency. This public health emergency increases SNAP households' need for additional food assistance in several ways, including raising the price of food in general, limiting availability of low-cost shopping options for SNAP households, and reducing access to the emergency food system. Ex. 1, Bauer Decl. ¶¶ 19-22; Ex. 2, Chilton Decl. ¶¶ 8-9. Such "temporary food needs" affect all SNAP households and necessarily are over and above SNAP households' ordinary "food needs."

**Fourth,** Congress sought to assist all "households participating in the supplemental nutrition assistance program."  If Congress wanted to provide emergency subsistence benefits only to "households participating in the supplemental nutrition assistance program" receiving less than the maximum monthly benefit, it could have said so.  It did not.

**Fifth**, Congress used the term "emergency allotments," not "supplements."  "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Geisinger Cmty. Med. Ctr. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 794 F.3d 383, 391 (3d Cir. 2015) (quotation omitted).  "Emergency allotments" is the same term Congress used in Section 5(h)(3)(A) of the FNA, authorizing USDA to provide "emergency allotments" to address a different problem – replacing "food destroyed in a disaster."  7 U.S.C. § 2014(h)(3)(A).  Under the FNA, "emergency allotments" are benefits separate from, and not reduced in value by, SNAP households' regular SNAP benefits.  *See* 7 U.S.C. § 2014(h)(3)(A); 7 C.F.R. § 280.1.  Congress chose the same means – "emergency allotments" – to address the problem of "temporary food needs" caused by the COVID-19 public health emergency.  There is a presumption that "when Congress uses the same language in two statutes having similar purposes … Congress intended that text to have the same meaning in both statutes."  *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005) (citation omitted).  Therefore, "emergency allotments" authorized under the FFCRA must be separate from, and not reduced in value by, SNAP households' regular SNAP benefits.

USDA's guidance "goes beyond the meaning that the statute can bear." *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994) (internal citation omitted).  Since USDA "crosse[d] the line from permissible statutory interpretation … to *ultra vires* regulation contrary

to the clear intent of Congress," its guidance is unlawful.  *See Shalom Pentecostal Church*, 783 F.3d at 158.

### 4.   *Hall* Did Not Address Whether USDA's Guidance is Arbitrary and Capricious and Was Otherwise Wrongly Decided

Plaintiffs acknowledge that one district court has denied preliminary injunctive relief to plaintiffs challenging USDA's guidance, reasoning that Section 2302 is not "unambiguous on its face."  *Hall v. U.S. Dep't of Agric.*, No. 20-cv-03454-HSG, 2020 WL 3268539, at *6, *8 (N.D. Cal. June 17, 2020), *appeal docketed* No. 20-16232 (9th Cir. June 24, 2020).  The Court, however, need not tarry with that decision for several reasons.

*First*, the decision of a court in the Northern District of California "is not binding precedent" in this Court.  *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 395 (3d Cir. 2017).

*Second*, plaintiffs in *Hall* did not expressly argue, and the court therefore did not address whether, USDA's guidance was arbitrary and capricious.  *Hall*, 2020 WL 3268539, at *5.

*Third*, the *Hall* court wrongly found plaintiffs failed to demonstrate the requisite likelihood of success on the merits by finding ambiguity in the FFCRA with reference to post-enactment, extratextual statements.  But only the words in the FFCRA "constitute the law adopted and approved by the President."  *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, at 1738 (2020).  Courts should not consider "postenactment statements," as the *Hall* court did, because those statements did not inform Congress's enactment of the FFCRA.  *Pittson Coal Grp. v. Sebben*, 488 U.S. 105, 118-19 (1988).

*Fourth*, the *Hall* court inappropriately interpreted a bill subsequently adopted in the House of Representatives to call plaintiffs' interpretation of Section 2302 into doubt.  It believed a provision of the proposed HEROES Act increasing the maximum monthly SNAP allotment by 15% undermined plaintiffs' interpretation of Section 2302(a), because such an increase "would

seem unnecessary if the FFCRA already increased this maximum by 100% in the form of emergency allotments."[21]  *Hall*, 2020 WL 3268539, at *7.  The HEROES Act, however, does not reference the FFCRA, nor suggest FFCRA did not provide for "emergency allotments" to all SNAP households.  Rather, the HEROES Act addresses a different problem.  Whereas the FFCRA provides emergency subsistence benefits to SNAP households in states where public health emergencies have been declared, the HEROES Act provides an increase in subsistence benefits for all SNAP households, regardless of  emergency declarations.  The HEROES Act therefore confirms Congress's recognition that regular SNAP benefits are inadequate to meet SNAP households' food needs, regardless of whether the prerequisites for ***additional*** benefits in the form of "emergency allotments" are met.  To be sure, even if the FFCRA could be interpreted as increasing the maximum SNAP benefit by 100% – it cannot – the HEROES Act still would not call the *Hall* plaintiffs' arguments into question.  Congress could simply have determined an additional 15% increase is necessary to stimulate the economy.[22]

    ***Fifth***, the *Hall* court did not contend with the absurdity of providing SNAP households with the most income the greatest emergency benefits, while providing SNAP households with the lowest income no emergency benefits.  The court did not resolve how the USDA's guidance, which provides the poorest SNAP households the least benefit and the most well-off the most benefit, could be squared with the broader SNAP program that does, and has always done, just the opposite.  Instead, it questioned whether Congress had appropriated sufficient funds in

---

[21] Importantly, the HEROES Act has not yet been considered by the Senate, and has not been enacted.
[22] *See., e.g.,* Stacy Dean, Center on Budget & Policy Priorities, *Temporary SNAP Benefit Bump a No-Brainer for More Economic Stimulus* (Apr. 8, 2020), *available at* https://www.cbpp.org/blog/temporary-snap-benefit-bump-a-no-brainer-for-more-economic-stimulus.

subsequent legislation to support providing "emergency allotments" to all SNAP households. However, "it is ultimately the provisions" of Congress's "legislative commands 'rather than the principal concerns of our legislators,'" such as budget constraints, that control. *See Bostock*, 140 S. Ct. 1750 (internal citation and quotation marks omitted).  And, even if budgetary constraints are a concern, the *Hall* court failed to appreciate that the SNAP statutory scheme includes provisions to address budgetary shortfalls, *see* 7 U.S.C. §§ 2027(b)-(d), and that Congress inevitably will face budgetary shortfalls even under USDA's interpretation of "emergency allotments" as the COVID-19 public health emergency persists month after month.

**B.      Plaintiffs Will Continue to Suffer Irreparable Harm Absent Injunctive Relief**

Denying subsistence benefits to eligible individuals risks depriving those individuals "of the very means by which to live[.]"  *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970).  Plaintiffs are members of households that depend on SNAP benefits to meet their monthly food needs.  Under the plain language of Section 2302 of the FFCRA, Plaintiffs are entitled to receive "emergency allotments" up to the maximum benefit amount for their household size to address their "temporary food needs" caused by the COVID-19 public health emergency.  USDA's guidance however, denies them subsistence benefits necessary for them to meet their monthly food needs during the unprecedented crisis occasioned by the COVID-19 pandemic.

Plaintiffs have had to go without food during the pandemic because they did not receive emergency allotments.  Ms. McCrobie skips meals when she does not have enough food. Ex. 11, McCrobie Decl. ¶ 10.  She is anemic and has suffered from fatigue and weakness during the pandemic because she cannot afford an adequate, nutritious diet.  *Id.*  ¶¶ 8-11.  Ms. Gilliam has found it even harder to get food for herself and her two-year-old son during the pandemic than it was before.  *See* Ex. 6, Gilliam Decl. ¶¶ 5-6.  She has encountered difficulties accessing WIC benefits for her son, making it even harder to provide him with nutritious food.  *Id.* ¶ 8.

Plaintiffs are eating less food and less nutritious food because their SNAP benefits do not have as much purchasing power during the pandemic and emergency food sources have limited resources available.  Ex. 6, Gilliam Decl. ¶¶ 7-8; Ex. 11, McCrobie Decl. ¶¶ 10-11.

"Going without food is an irreparable harm."  *D.C. v. U.S. Dep't of Agric.*, --- F. Supp. 3d ----, 2020 WL 1236657, at *30 (D.D.C. Mar. 13, 2020), *appeal docketed*, No. 20-5136 (D.C. Cir. May 14, 2020).  Such harm cannot be remedied by monetary damages at some later date.  "[T]he deprivation of food is extremely serious and is quite likely to impose lingering, if not irreversible, hardships upon recipients."  *E.g.*, *Haskins v. Stanton*, 794 F.2d 1273, 1276-77 (7th Cir. 1986) (internal citation and quotation marks omitted).

That Plaintiffs are receiving their regular SNAP benefits during this time does not alter the irreparable nature of the harm USDA's guidance has caused.  For those – like Plaintiffs – "in the grip of poverty, living on the financial edge, even a small decrease in payments can cause irreparable harm."  *Moore v. Miller*, 579 F. Supp. 1188, 1192 (N.D. Ill. 1983) (quotation omitted).[23]  Even in times not affected by public health emergencies, Plaintiffs' SNAP benefits are inadequate to meet their monthly food needs.  Increases in grocery prices caused by the COVID-19 public health emergency have reduced the purchasing power of Plaintiffs' regular SNAP benefits even further.  Put simply, Plaintiffs' already inadequate regular SNAP benefits do not put the same amount of food on the table during these extraordinary times. In addition, other sources of food such as emergency food sites are under enormous strain, meaning fewer resources are available to Plaintiffs to meet food needs that their regular monthly SNAP allotment does not.

---

[23] *See also Maldonado v. Houstoun*, 177 F.R.D. 311, 333 (E.D. Pa. 1997) ("[A] reduction in subsistence benefits constitutes irreparable harm to person on the 'margin of subsistence.'" (collecting cases)).

Plaintiffs therefore already have been irreparably harmed as a result of USDA's guidance.  Absent injunctive relief enjoining USDA from relying on its unlawful guidance, Plaintiffs will continue to suffer irreparable harm due to their continued inability to meet their monthly food needs.

### C.      Injunctive Relief is in the Public Interest

The public interest in this case heavily favors granting Plaintiffs' requested injunctive relief for two primary reasons.

**First,** Section 2302 of the FFCRA requires that USDA provide "emergency allotments" to all SNAP households to meet temporary food needs.  Enjoining USDA from ignoring the requirements of the FFCRA serves the public interest.  *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977).  Such an injunction prohibiting USDA from violating the FFCRA also imposes no inappropriate burden on USDA, because Congress, not the Court, "imposes the burden" of making "emergency allotments" available to all households participating in SNAP. *See Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 159 (D. C. Cir. 2018) (collecting cases).

**Second,** enjoining USDA from relying on its unlawful guidance promotes "important governmental interests[.]" *Goldberg*, 397 U.S. at 264.  Courts and society long have recognized that forces beyond Plaintiffs' control contribute to their need for SNAP benefits.  *See id.* at 265. It is beyond dispute that forces beyond Plaintiffs' control have caused their temporary need for additional benefits to meet the economic exigencies of the COVID-19 public health emergency. An injunction prohibiting USDA from relying on the unlawful portion of its guidance capping the amount of emergency allotments, therefore, would serve the most important of public interests, promoting "the general Welfare, and secur[ing] the Blessings of Liberty to ourselves and our Posterity."  *Id.* (quotation marks omitted).

### D.      Plaintiffs Should Not be Required to Post a Bond

Requiring a plaintiff to post a bond under Federal Rule of Civil Procedure 65(c) is "inappropriate" when (1) posting a bond would impose a burden on the movant that outweighs any "possible loss to the enjoined party" and (2) movants seek "to enforce important federal rights or public interests, arising 'out of comprehensive federal health and welfare statutes." *Temple Univ. v. White*, 941 F.2d 201, 219-20 (3d Cir. 1991) (internal citation and quotation marks omitted).  This case falls squarely within the *White* exception and Plaintiffs, therefore, should not be required to post a bond.

***First,*** Plaintiffs are indigent individuals currently receiving SNAP benefits based upon their low incomes.  Requiring Plaintiffs to post "a bond in exchange for an order would amount to denial of the order."  *Simcox v. Del. Cnty.*, Civ. A. No. 91-6874, 1992 WL 97896, at *6 (E.D. Pa. May 5, 1992).  On the other hand, requiring USDA to comply with Section 2302 of the FFCRA would impose on USDA only the burden Congress placed on it.

***Second,*** Plaintiffs bring this action to "enforce important federal rights" arising out of SNAP.  *See White*, 941 F.2d at 219-20.  Requiring Plaintiffs to post a bond in this case would "send a strong signal that judicial enforcement of an important federal right such as the right" to necessary subsistence benefits "is available only to those who can afford the relief."  *Simcox*, 1992 WL 97896, at *6.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court issue a preliminary injunction prohibiting USDA from relying on the unlawful portion of its guidance interpreting "emergency allotments" under the FFCRA.

July 27, 2020

Respectfully submitted,

*/s/ John P. Lavelle, Jr.*

John P. Lavelle, Jr. (PA I.D. No. 54279)
Kenneth M. Kulak (PA I.D. No. 75509)
Timothy J. Geverd (PA I.D. No. 324802)
*(application for admission forthcoming)*
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA  19103-2921
Tel: (215) 963-5000
Fax: (215) 963-5001
john.lavelle@morganlewis.com
ken.kulak@morganlewis.com
timothy.geverd@morganlewis.com

Jonelle Saunders (*application for pro hac vice admission forthcoming*)
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, DC 2004-2541
Telephone:  (202) 739-3000
Facsimile: (202) 739-3001
Jonelle.Saunders@morganlewis.com

Louise Hayes (PA I.D. No. 78581)
Amy Hirsch (PA I.D. No. 42724)
**COMMUNITY LEGAL SERVICES OF PHILADELPHIA**
1410 W. Erie Avenue
Philadelphia, PA 19140
Telephone: (215) 227-2400
Facsimile: (215) 227-2435
LHayes@clsphila.org
AHirsch@clsphila.org

Elizabeth Soltan (PA I.D. No. 327510)
(*admission pending*)
**COMMUNITY LEGAL SERVICES OF PHILADELPHIA**
1424 Chestnut Street
Philadelphia, PA 19102
Tel: (215) 981-3700
Facsimile: (267) 765-6481
Esoltan@clsphila.org

*Attorneys for Plaintiffs*

26