**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

Latoya Gilliam and Kayla McCrobie,
individually and on behalf of all others similarly
situated,

Plaintiffs,

v.

United States Department of Agriculture and
George Ervin Perdue III, in his official capacity
as Secretary of the United States Department of
Agriculture,

Defendants.

Case No. 20-cv-3504

**DEFENDANTS' RESPONSE TO PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Introduction ........................................................................................................................ 1

Background ......................................................................................................................... 4

    I.      Statutory and regulatory background. ............................................................... 4

    II.     Procedural history. ............................................................................................ 7

Legal Standard ................................................................................................................... 7

Argument ............................................................................................................................ 8

I.      Plaintiffs are unlikely to prevail on the merits of their APA claims ................................... 8

    A.  Plaintiffs fail to establish standing. ................................................................... 8

    B.  USDA's Guidance is not contrary to law. ........................................................ 9

    C.  USDA's Guidance is not arbitrary and capricious. ......................................... 16

II.     Plaintiffs cannot establish any non-speculative, irreparable harm ................................... 18

III.    The balance of equities counsel against Plaintiffs' requested relief. ............................... 19

IV.    To the extent the Court provides relief, the relief should be limited in scope. ................. 20

Conclusion ........................................................................................................................ 21

i

# TABLE OF AUTHORITIES

## CASES

*Adams v. Freedom Forge Corp.*,
  204 F.3d 475 (3d Cir. 2000)................................................................... 18, 19

*Ali v. Fed. Bureau of Prisons*,
  552 U.S. 214 (2008)................................................................................ 9

*Am. Fed'n of Gov't Employees, AFL-CIO, Local 1647 v. Fed. Labor Relations Auth.*,
  388 F.3d 405 (3d Cir. 2004)................................................................... 19

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974)............................................................................... 18

*Bragdon v. Abbott*,
  524 U.S. 624 (1998)............................................................................... 13

*Camp v. Pitts*,
  411 U.S. 138 (1973)............................................................................... 17

*Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984)............................................................................... 15

*Christensen* v. *Harris Cty.*,
  529 U.S. 576 (2000)............................................................................... 15

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)............................................................................... 8

*Davis v. Smith*,
  607 F.2d 535 (2d Cir. 1978)................................................................... 21

*Delaware Riverkeeper Network v. United States Army Corps of Engineers*,
  869 F.3d 148 (3d Cir. 2017)................................................................... 17

*Dolan v. U.S. Postal Serv.*,
  546 U.S. 481 (2006)............................................................................... 9

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)......................................................................... 16, 17

*Grove City Coll. v. Bell*,
  465 U.S. 555 (1984)............................................................................... 12

*Hagans v. Comm'r of Soc. Sec.*,
    694 F.3d 287 (3d Cir. 2012)...................................................................... 16

*Hall v. U.S. Dep't of Agric.*,
    No. 20-CV-03454-HSG, 2020 WL 3268539, (N.D. Cal. June 17, 2020)........................ *passim*

*Hohe v. Casey*,
    868 F.2d 69 (3d Cir. 1989)...................................................................... 18

*Horner v. Andrzjewski*,
    811 F.2d 571 (Fed. Cir. 1987).................................................................. 19

*J.C. Penney Life Ins. Co. v. Pilosi*,
    393 F.3d 356 (3d Cir. 2004).................................................................... 9

*Lorillard v. Pons*,
    434 U.S. 575 (1978)............................................................................ 13

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)............................................................................ 21

*NationsBank of N.C., N.A.* v. *Variable Annuity Life Ins. Co.*,
    513 U.S. 251 (1995)............................................................................ 15

*New Jersey Bd. of Pub. Utilities v. F.E.R.C.*,
    744 F.3d 74 (3d Cir. 2014)..................................................................... 17

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................ 7

*Office of Pers. Mgmt. v. Richmond*,
    496 U.S. 414 (1990)............................................................................ 19

*POM Wonderful LLC v. Coca-Cola Co.*,
    573 U.S. 102 (2014)............................................................................ 12

*Skidmore v. Swift & Co.*,
    323 US 134 (1944)........................................................................ 15, 16

*Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*,
    735 F.3d 131 (3d Cir. 2013).................................................................... 8

*United States v. Am. Trucking Ass'ns*,
    310 U.S. 534 (1940)........................................................................ 9, 11

*United States v. Fontaine*,
   697 F.3d 221 (3d Cir. 2012)..................................................................................... 13

*United States v. Mead Corp.*,
   533 U.S. 218 (2001).................................................................................................. 16

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)........................................................................................................ 7

**STATUTES**

7 U.S.C. § 2011 *et seq.*........................................................................................... 4, 14

7 U.S.C. § 2012 ....................................................................................................... 4, 11

7 U.S.C. § 2013 ........................................................................................................... 4

7 U.S.C. § 2014 ....................................................................................................... 4, 14

7 U.S.C. § 2017 ........................................................................................................... 4

7 U.S.C. § 2027 .......................................................................................................... 20

Pub. L. No. 116-127, 134 Stat. 178 (Mar. 18, 2020) ............................................... 5, 9

Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020) .................................................. 6

**OTHER AUTHORITIES**

Disaster SNAP Guidance, USDA Food and Nutrition Service, https://fns-
   prod.azureedge.net/sites/default/files/D-SNAP_handbook_0.pdf (July 2014)...................... 4, 5

Emergency Allotments Guidance, USDA Food and Nutrition Service, https://fns-
   prod.azureedge.net/sites/default/files /resource-files/SNAP-COVID-
   EmergencyAllotmentsGuidance.pdf (Mar. 20, 2020)................................................. 5

OED, Third Edition,
   https://www.oed.com/view/Entry/2209?rskey=sN7zCC&result=2&isAdvanced=false#eid
   (Nov. 2010) ....................................................................................................... 10

Updated Emergency Allotments Guidance, USDA Food and Nutrition Service, https://fns-
   prod.azureedge.net/sites/default/files/resource-files/SNAP-COVID-
   EmergencyAllotmentsPhase2 Guidance.pdf (Apr. 21, 2020)....................................... 6

**Introduction**

This case is not about whether critical food benefits will be distributed to needy families, but rather *how* these benefits will be *apportioned* among needy families. Congress has appropriated a finite amount of funds to the U.S. Department of Agriculture ("USDA") to distribute emergency Supplemental Nutrition Assistance Program ("SNAP") benefits, such that if additional benefits go to one household, fewer benefits must necessarily go to another. Plaintiffs contend that in a recent statute, Congress required USDA to distribute emergency benefits in an amount that may allow certain families to receive twice the maximum level of SNAP benefits typically allowed—rapidly draining available resources for emergency benefits to the detriment of all other needy families. Plaintiffs' claim lacks merit, and thus the Court should deny their request for emergency relief.

In 2008, Congress established the SNAP program and capped the SNAP benefits a household may receive at an amount which, in Congress's view, is sufficient to cover "the diet required to feed a family," including the families with the lowest incomes and the most need. More recently, due to the COVID-19 pandemic—and its impact on household incomes—Congress enacted the Families First Coronavirus Response Act ("FFCRA") to make additional SNAP benefits available. But in so doing, it did not state that it was lifting, or eliminating, the traditional, statutory cap on the SNAP benefits a household may receive. Instead, Section 2302 of the FFCRA instructs USDA to issue, in appropriate circumstances, "emergency allotments" to "address temporary food needs not greater than the applicable maximum monthly allotment." Shortly after, USDA announced that, pursuant to this mandate, it would issue allotments that may bring all eligible families' aggregate SNAP benefits up to the statutory maximum. Thus, a household that initially received only partial SNAP benefits could now quickly secure emergency assistance if,

for example, it has suffered a loss of income due to the pandemic. However, if a household already receives maximum benefits—which, in Congress's view, is sufficient to cover the household's dietary needs—it does not qualify for further allotments. Following USDA's announcement, Congress passed another law appropriating enough money to fund the COVID-related SNAP allotments for six months based on USDA's reading of section 2302.

Nevertheless, Plaintiffs bring suit, claiming that section 2302 requires USDA to issue emergency allotments to potentially *any* eligible household, even if the household ultimately receives aggregate SNAP benefits exceeding the statutory cap. In Plaintiffs' view, the only relevant limitation in section 2302 is that the emergency allotment, in itself, cannot exceed the statutory cap—allowing certain households to receive both a maximum monthly allotment and an emergency allotment for the same amount. In support, Plaintiffs recycle the Administrative Procedure Act ("APA") claims that were found insufficient for preliminary relief in *Hall v. U.S. Dep't of Agric.*, No. 20-CV-03454-HSG, 2020 WL 3268539, (N.D. Cal. June 17, 2020). Plaintiffs' claims lack merit.

*First*, as a threshold matter, Plaintiffs lack standing. Plaintiffs suggest that, but for USDA's position on section 2302, Plaintiffs would receive emergency allotments. But USDA does not distribute emergency allotments directly to SNAP beneficiaries. Upon application, USDA distributes the funds to States, which in turn issue emergency allotments to beneficiaries based upon an appropriate methodology. Plaintiffs have not established that a favorable ruling here would redress any injury since there is no indication that Pennsylvania would then re-apply for emergency allotments, secure those allotments, and then distribute them to a class of persons including Plaintiffs. Accordingly, Plaintiffs have failed to establish standing to pursue their claims.

*Second*, Plaintiffs' claims fail on the merits. Plaintiffs assert, incorrectly, that USDA misreads section 2302, and thus its implementation of section 2302 is "contrary to law" under the APA. But multiple factors confirm USDA's reading. Most fundamentally, although the FFCRA requires the disbursal of emergency allotments, it does not expressly lift the statutory cap on SNAP benefits. If Congress sought to permit SNAP benefit allotments in excess of the statutory cap, it presumably would have done so explicitly. Further, multiple other indicators suggest that Congress intended for, and agrees with, USDA's reading of section 2302. Just days after enacting the FFCRA, USDA publicized its reading of section 2302 and provided Congress with a cost estimate based on this reading. Rather than express disapproval of USDA's reading, Congress instead appropriated funds sufficient to support the emergency allotments for six months based on USDA's cost estimate.

Plaintiffs also assert that USDA's reading of section 2302 is "arbitrary and capricious" under the APA. But USDA based its reading on the relevant statutory language and other indicia of Congressional intent. This is certainly enough to satisfy the deferential "arbitrary and capricious" standard of review. To support their claim, Plaintiffs take issue with certain extraneous comments USDA made concerning section 2302, and also question whether USDA's reading of section 2302 is politically desirable. But the "arbitrary and capricious" inquiry asks whether the relevant agency action is reasonable, not whether it is flawless, or preferable as a policy matter.

*Third*, the balance of equities counsels against Plaintiffs' requested emergency relief. USDA, like other federal agencies, may only use the funds appropriated by Congress. Once the appropriated funds are spent, USDA, by law, must discontinue its benefit allotments. Here, Congress appropriated funds sufficient to support the emergency allotments for roughly six months, but only under USDA's reading of section 2302. Plaintiffs' reading of this provision could

sharply increase the payment requests by States that must be approved by USDA, rapidly depleting SNAP resources to the detriment of all other SNAP-eligible households. Accordingly, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

## Background

I.   **Statutory and regulatory background.**

**A.** In 2008, Congress enacted the Food and Nutrition Act ("FNA"), which set up the SNAP program for eligible low-income households. *See* 7 U.S.C. § 2011 *et seq*. SNAP is jointly administered by USDA and participating States, whereby the federal government funds, and the States distribute, "allotments" that eligible households may redeem at qualifying retail food stores. *See* 7 U.S.C. § 2013(a). The maximum allotment eligible households may receive is "equal to the cost to such households of the thrifty food plan," 7 U.S.C. § 2017(a), which is the "diet required to feed a family of four," 7 U.S.C. § 2012(u). In calculating a household's allotment based on the thrifty food plan, USDA must also "make household-size adjustments." 7 U.S.C. § 2012(u)(1). Further, an eligible household's allotment must be "reduced by an amount equal to [30%] of [its] income," 7 U.S.C. § 2017(a), which includes any income received minus a standard deduction and any funds from exempt sources, *see* 7 U.S.C. § 2014(d)-(e). Thus, if a household has no income, or sufficiently low income, it may receive a maximum monthly allotment which, in Congress's view, is presumed to cover the household's dietary needs.

Furthermore, the FNA directs USDA to "establish temporary emergency standards of eligibility" for "households who are victims of a disaster" if, among other things, "such households are in need of temporary food assistance." 7 U.S.C. § 2014(h)(1). USDA therefore established the Disaster-SNAP ("D-SNAP") Program which "provides temporary food assistance" during natural disasters. Disaster SNAP Guidance, USDA Food and Nutrition Service, https://fns-

prod.azureedge.net/sites/default/files/D-SNAP_handbook_0.pdf, at 1 (July 2014). Under D-SNAP, "households who may not normally qualify for or participate in SNAP" may receive "a full month's allotment," and households that already receive SNAP benefits may receive "supplement[s]" to their "regular SNAP benefits . . . to bring them up to the maximum allotment." *Id.* at 8.

    **B.**  On March 18, 2020, and in response to the COVID-19 pandemic, Congress enacted the FFCRA, which includes a section titled "Additional SNAP Flexibilities in a Public Health Emergency." Pub. L. No. 116-127, § 2302, 134 Stat. 178, 188 (Mar. 18, 2020). This section states that if certain conditions are satisfied, then "at the request of a state agency," USDA "shall provide . . . for emergency allotments to households participating in [SNAP] . . . to address temporary food needs not greater than the applicable maximum monthly allotment for the household size." *Id.* § 2302(a). The FFCRA, however, allocated no additional funds to finance these emergency allotments.

    Two days later, on March 20, 2020, USDA published a guidance document stating that, under section 2302, States could only seek "emergency allotment[s] to address temporary food needs to households to bring all households up to the maximum benefit." Emergency Allotments Guidance, USDA Food and Nutrition Service, https://fns-prod.azureedge.net/sites/default/files /resource-files/SNAP-COVID-EmergencyAllotmentsGuidance.pdf, at 2 (Mar. 20, 2020). Thus, households that previously did not receive the maximum monthly allotment for their household size are permitted emergency allotments to account for, say, the effects of COVID-19 on income-levels. However, households may not receive emergency allotments if they already receive the maximum monthly allotment (which, under the FNA, are presumed to cover all of the households' dietary needs).

USDA then calculated the additional funds needed based on this reading of section 2302 (just over $2 billion per month), and conveyed this amount to Congress. *See* Declaration of David Burr, *Hall v. U.S. Dep't of Agric.*, No. 20-CV-03454-HSG, ECF No. 26-1, ¶ 12 (N.D. Cal. June 4, 2020). Congress then enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act on March 27, 2020—just nine days after the FFCRA was enacted—and allocated $15.51 billion for SNAP benefits tied to COVID-19, enough to fund the emergency allotments, and other anticipated changes in SNAP program costs, for six months (based on USDA's reading of section 2302). *See id.* ¶ 13; Pub. L. No. 116-136, 134 Stat. 281, § 6002 (Mar. 27, 2020) (appropriating $15.51 billion to SNAP to "to prevent, prepare for, and respond to coronavirus, domestically or internationally").

Later, on April 21, 2020, USDA published an updated guidance document clarifying that a "household's [emergency allotment] cannot increase the current monthly household SNAP benefit allotment beyond 'the applicable maximum monthly allotment for the household size.'" Updated Emergency Allotments Guidance, USDA Food and Nutrition Service, https://fns-prod.azureedge.net/sites/default/files/resource-files/SNAP-COVID-EmergencyAllotmentsPhase2 Guidance.pdf, at 2 (Apr. 21, 2020) (both guidance documents are hereinafter collectively referred to as the "Guidance").

Meanwhile, Pennsylvania initially sought emergency allotments pursuant to section 2302 for "all SNAP households," including those already receiving the maximum monthly allotment for their household size. *See* Compl. ¶ 33. However, in light of USDA's Guidance, Pennsylvania submitted a new request consistent with USDA's construction of section 2302, and USDA approved this application, "allowing [Pennsylvania] to issue emergency allotments to bring all SNAP households up to the maximum allotment amount." Compl. ¶¶ 53-54.

## II.      Procedural history.

Shortly after USDA issued its Guidance, a group of plaintiffs brought suit in the U.S. District Court for the Northern District of California arguing, like Plaintiffs here, that section 2302 requires USDA to provide emergency allotments in an amount sufficient to push the aggregate SNAP benefits of certain households above the allotment cap. The *Hall* plaintiffs filed a motion for a preliminary injunction, which the court denied, holding that USDA's Guidance is consistent with section 2302. *See* 2020 WL 3268539.

Plaintiffs here—Pennsylvania residents who have not received emergency allotments because they already receive their maximum monthly allotment—now renew the claims from *Hall*, asserting that USDA's reading of section 2302 is "contrary to law" and "arbitrary and capricious" under the APA. Even though Congress has appropriated a finite amount of money to USDA for COVID-related allotments (based upon a cost estimate derived from USDA's reading of section 2302), Plaintiffs seek a preliminary injunction generally "prohibiting USDA from relying" upon its reading of section 2302.

## <u>Legal Standard</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that [she] is likely to succeed on the merits, that [she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Id.* at 20. When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Additionally, "when mandatory injunctive relief is sought," seeking to compel affirmative conduct rather than simply preserve the status quo, "the burden on the moving

party is particularly heavy" and the "right to relief must be indisputably clear." *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013).

**Argument**

**I.      Plaintiffs are unlikely to prevail on the merits of their APA claims.**

     A.   *Plaintiffs fail to establish standing.*

Plaintiffs fail to establish standing since they do not show that they will receive emergency allotments if they prevail in this case. "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).[1]

Here, Plaintiffs have failed to establish that a favorable decision will redress any alleged injury. Plaintiffs will not necessarily receive benefits if this Court orders USDA to alter its understanding of section 2302. For Plaintiffs to benefit, Pennsylvania will then have to again apply for emergency allotments, provide sufficient data to USDA to support the request, secure the allotments, and then distribute them to a class of persons that include Plaintiffs. *See Hall*, 2020 WL 3268539, at *8 ("But as Plaintiffs acknowledge, even if the USDA were to adopt their interpretation of the FFCRA, Plaintiffs do not have the ability to request emergency allotments under SNAP from the USDA directly. . . . Rather, California, an independent sovereign, must renew its request for emergency allotments and decide to provide such allotments to Plaintiffs."). Plaintiffs have provided no evidence to support this causal chain. *See id.* ("The Court simply has no basis to say what California would do if the Court entered Plaintiffs' requested preliminary injunction. Under these circumstances, redressability appears speculative."). Accordingly, Plaintiffs have failed to establish standing.

---

[1] Internal quotation marks are omitted from citations throughout this brief, unless otherwise stated.

B.   _USDA's Guidance is not contrary to law._

Plaintiffs claim, incorrectly, that section 2302 requires USDA to provide emergency allotments to eligible households that already receive the maximum statutory allotment, with some potentially receiving up to two times the allotment cap. "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). A statutory phrase must be read in a manner that "ensure[s] that the statutory scheme is coherent and consistent." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008). Ultimately, "[i]n the interpretation of statutes, the function of the courts is . . . to construe the language so as to give effect to the intent of Congress." *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940). Here, the relevant statutory text, its structure, and other indicia of Congressional intent make clear that USDA's Guidance is consistent with section 2302

Statutory language and structure.   Section 2302 states, in relevant part, that if certain conditions are satisfied, USDA "shall provide . . . for emergency allotments to households participating in the [SNAP program] . . . to address *temporary food needs not greater than the applicable maximum monthly allotment for the household size*." § 2302(a)(1) (emphasis added). Two key textual features together confirm the soundness of USDA's position. First, Plaintiffs incorrectly suggest that the relevant limiting language in section 2302—"not greater than the [allotment cap]"—applies to the term "emergency allotments," such that the emergency allotment, in itself, can equal the full allotment limit. However, "[a] general rule of statutory construction, the 'doctrine of last antecedent,' teaches that qualifying . . . clauses are to be applied to the words or phrase immediately preceding and are not to be construed as extending to and including others more remote." *See J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 365 (3d Cir. 2004). Here, of

course, the "phrase immediately preceding" the limiting clause is "temporary food needs," not "emergency allotments." Thus, under section 2302, the "temporary food needs" at issue must come within the statutory cap.

Second, the FFCRA does not require USDA to issue emergency allotments that, in themselves, may *fully cover* these temporary food needs; instead, the allotments need only "address" the temporary food needs. The Oxford English Dictionary defines "address" to simply mean "[t]o direct" towards "some task, goal, or purpose." OED, Third Edition, https://www.oed.com/view/Entry/2209?rskey=sN7zCC&result=2&isAdvanced=false#eid (Nov. 2010). Accordingly, if the relevant conditions are satisfied, USDA need only issue emergency allotments that are "directed" towards temporary food needs that come within the statutory cap. USDA's Guidance is fully consistent with this command. If a household was receiving only partial SNAP benefits, USDA may issue emergency allotments which "address" the remaining "temporary food needs" within the allotment cap. If a household is already receiving the maximum monthly allotment, then its food needs within the statutory cap are presumed satisfied, and thus emergency allotments are impermissible.

Additionally, the relevant statutory structure supports USDA's position. As Plaintiffs emphasize, section 2302 is part of the SNAP statutory scheme. *See* PI Mot., at 16 ("Congress made Section 2302 of the FFCRA part of SNAP"). In that scheme, Congress established a firm cap on SNAP allotments based on its thrifty food plan formula, which reflects the estimated cost of covering an eligible family's *complete* dietary needs. *See supra* at 4. If Congress sought to permit eligible households to receive SNAP benefits in excess of the allotment cap, it presumably would have done so expressly. And more specifically, if Congress sought to increase the allotment cap based on an increase in food prices, it presumably would have addressed the precise statutory

term—"thrifty food plan"—that represents food price estimates. But Congress did neither, leaving the allotment cap and thrifty food plan formula intact. *See Hall*, 2020 WL 3268539, at *6 ("Section 2302(a)(1) . . . does not explicitly raise [the statutory] maximum" nor "does it alter the 'thrifty food plan' on which this statutory maximum is based. Yet under SNAP, the thrifty food plan— and the maximum monthly allotment—is assumed by definition to constitute the total cost needed to feed a household for a month."); *Am. Trucking*, 310 U.S. at 544 ("A few words of general connotation appearing in the text of statutes should not be given a wide meaning, contrary to a settled policy, excepting as a different purpose is plainly shown."). Indeed, in situations where Congress has sought to permit eligible families to receive aggregate SNAP benefits in excess of the allotment cap, it has *expressly* raised the allotment cap. *See Hall*, 2020 WL 3268539, at *7 (The HEROES Act, passed by the House "increase[s] 'the value of [SNAP] benefits' to '115 percent of the . . . value of the thrifty food plan' and to appropriate an additional $10 billion for SNAP." (quoting HEROES Act)).

Furthermore, in the FNA, Congress entrusts USDA with the task of periodically calculating changes in food prices, and adjusting the thrifty food plan accordingly. *See* 7 U.S.C. § 2012(u) (At certain specified intervals, "the Secretary [of the USDA] shall re-evaluate and publish the market baskets of the thrifty food plan based on" among other things, "current food prices" and "food composition data."). Thus, if Congress sensed that a change in food prices merited an adjustment in the allotment cap, it likely would have again called upon *USDA* to make the required calculation (rather than directly increasing the allotment cap, across the board, by 100%). Accordingly, the relevant statutory language and context strongly suggest that Congress intended for section 2032 to generally permit eligible households to receive aggregate benefits up to the allotment cap during the COVID-19 pandemic.

<u>Additional indicia of Congressional intent.</u>   A number of other factors confirm that Congress intended USDA's interpretation of section 2302. First, merely days after enacting the FFCRA, USDA provided Congress a cost estimate for the SNAP emergency allotments based upon USDA's reading of section 2302, and based on that estimate, Congress allocated sufficient funds to cover emergency allotments for roughly six months. *See supra* at 6. This "strongly implies" that USDA's reading reflects Congressional intent. *See Grove City Coll. v. Bell*, 465 U.S. 555, 567–68 (1984) ("Congress' failure to disapprove" of an agency's interpretation may "strongly impl[y] that the" interpretation "accurately reflect[s] congressional intent," especially when "Congress has . . . acted consistently with it."). Further, as the court found in *Hall*, "providing emergency allotments equivalent to the maximum monthly allotment for all SNAP households, [a possibility under the plaintiff's] interpretation, would cost an additional $6.7 to $7 billion per month, and would quickly outpace SNAP's appropriated funds." 2020 WL 3268539, at *7. Plaintiffs thus ask the Court to believe the unbelievable: that Congress potentially doubled the allotment cap for all SNAP-eligible households in the FFCRA, but then immediately hobbled that legislation by providing woefully inadequate funding in the CARES Act. *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 115 (2014) ("When two statutes complement each other, it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other.").

Second, Congress effectively ratified USDA's interpretation of the relevant language in section 2302. USDA's reading of section 2302 is consistent with its construction of a comparable provision, section 2014(h)(1), which requires USDA to establish "temporary emergency standards of eligibility" for "households who are victims of a disaster" if, among other things, "such households are in need of *temporary food assistance*" (analogous to the term "temporary food

needs" in section 2302). Under USDA's D-SNAP program, which implements section 2014(h)(1), SNAP beneficiaries may only receive supplemental disaster benefits in an amount that brings their aggregate benefit total up to the allotment cap. Congress "can be presumed to have had knowledge of" this regulatory background, and it enacted a similar provision with similar language (section 2302) without expressly disapproving of USDA's standard policy with respect to disaster benefits—further confirming that it intended for USDA's reading of section 2302. *Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978) (When "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law" and to "adopt that interpretation" in the new law.); *see also Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative" regulations "have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate" its settled "interpretations as well.").

Third, and finally, it is simply unlikely that Congress intended to effectively *double* the statutory cap for SNAP benefits, even if only temporarily, without saying so clearly. *See United States v. Fontaine*, 697 F.3d 221, 227 (3d Cir. 2012) (a statute should be given "sensible construction," rather than one that "defies rationality"). Plaintiffs argue that Congress intended to raise the allotment cap due to a momentary hike in food prices. But Plaintiffs assert that grocery prices have risen by 2.6%, *see* PI Mot., at 5, yet their position would allow for a benefit increase of *100%*.[2] Indeed, even the House's HEROES Act seeks to increase the allotment cap by only

---

[2] Even if, under Plaintiffs' reading, persons may not ultimately receive benefits equal to 200% of the allotment cap, the sheer possibility of this outcome renders Plaintiffs' reading implausible. *See Hall*, 2020 WL 3268539, at *7 ("Plaintiffs point out that their interpretation does not require all SNAP households to receive 200% of the maximum monthly allotments in emergency allotments . . . [n]evertheless, the Court thinks it important to consider the practical import of the parties' two interpretations.").

15%. *See supra* at 11. Accordingly, multiple indicia of Congressional intent confirm that Congress intended for USDA's reading of section 2302.

    Plaintiffs' responses.   Plaintiffs protest that USDA's position only benefits those with relatively higher incomes (who presumably did not previously receive maximum monthly allotments, and thus may collect emergency allotments under section 2302). But Plaintiffs assume, with no support, that persons with relatively higher incomes prior to the pandemic (but still low enough to be eligible for SNAP) enjoy similar advantages today. Under USDA's position, all SNAP beneficiaries may potentially receive emergency allotments bringing their aggregate benefits up to the allotment cap on the assumption that the pandemic has widely impacted income-levels. Additionally, Plaintiffs are incorrect that USDA's reading of section 2302 bestows benefits on those who need it the least. Any party that seeks, and is given, an emergency allotment presumably needs that allotment due to COVID-19, and is already at a low enough income-level that would entitle them to SNAP benefits in the first place. Emergency allotments under section 2302 are available only to households that are eligible for SNAP benefits, and are thus necessarily "low-income households." 7 U.S.C. § 2011. Plaintiffs relatedly argue that USDA's position undermines SNAP's general policy of "rais[ing] 'levels of nutrition among low-income households.'" PI Mot., at 16 (quoting 7 U.S.C. § 2011). But of course, even under USDA's reading, the emergency allotments will still go to low-income households in need, and USDA will issue all of the funds Congress appropriated for these allotments. The question is *how* (not *if*) these funds will be apportioned among low-income households.

    Plaintiffs then note that Congress used the phrase "emergency allotments" in another provision of the FNA, 7 U.S.C. § 2014(h)(3)(A), where persons may secure benefits to "replace food destroyed in a disaster" even if those persons have already received a maximum monthly

14

allotment. But there is a critical difference: unlike section 2302, section 2014(h)(3)(A) does not include language limiting the application of emergency allotments to "temporary food needs not greater than the applicable maximum monthly allotment for the household size." Additionally, section 2014(h)(3)(A) addresses a highly unique scenario. An eligible household may only receive benefits under this section to *replace* food that had been previously purchased using SNAP benefits, but destroyed in a disaster (*e.g.*, a power outage). Thus, even though section 2014(h)(3)(A) may allow certain households, with supporting documentation, to receive an additional allotment to replace food actually lost, these households still end up with a monetary value of food that is less than or equal to the statutory cap on SNAP benefits (calculated based on the thrifty food plan). A replacement allotment simply replaces benefits lost in a disaster. Accordingly, unlike Plaintiffs' position with respect to section 2302, section 2014(h)(3)(A) does *not* conflict with Congress's judgment that benefits calculated under the thrifty food plan formula are sufficient to cover a household's dietary needs.

<u>Deference.</u>   Finally, to the extent the Court still finds section 2302 ambiguous, the Secretary's reading of the statute is, at minimum, a reasoned and reasonable interpretation entitled to judicial deference. The Supreme Court has accorded deference under *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) to statutory interpretations made by agencies in the course of informal adjudications, such as USDA's adjudication of Pennsylvania's requests for emergency allotments. *See*, *e.g., NationsBank of N.C., N.A.* v. *Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256-58 (1995) (according *Chevron* deference to letter from Comptroller of the Currency granting bank's application to sell annuities); *Christensen* v. *Harris Cty.*, 529 U.S. 576, 590 (2000) (Scalia, J., concurring) ("[W]e have accorded *Chevron* deference not only to agency regulations, but to authoritative agency positions set forth in a variety of other

formats." (cataloguing cases)). And even apart from *Chevron*, the Supreme Court has held that an agency's considered interpretation of a statutory provision may merit deference under *Skidmore v. Swift & Co.*, 323 US 134 (1944), "given [the agency's] specialized experience" and "the value of uniformity in its administrative . . . understandings of what a national law requires." *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001). As this Court has held, "a relatively high level of deference is warranted" when, for example, "the agency's interpretation is issued contemporaneous[ly] with a statute," calls upon the agency's "relative expertise . . . in administering a complex statutory scheme," and is consistent with "the agency's longstanding, unchanging policy regarding [the] issue" at hand. *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 304-05 (3d Cir. 2012).

Here, USDA's reading of section 2302 merits "a relatively high level of deference" pursuant to the aforementioned factors: *(i)* USDA issued its first guidance document on March 20, 2020, just *two days* after FFCRA was enacted, and thus its section 2302 interpretation was adopted "contemporaneously" with the FFCRA, *(ii)* its interpretation drew on its unique "expertise" in "administering [the] complex statutory scheme" for SNAP benefits, and *(iii)* its interpretation is consistent with its "longstanding, unchanging policy regarding" emergency SNAP benefits (reflected in its D-SNAP Program). *See supra* at 4-5. Further, deference is especially appropriate here given that Congress has already allocated funds for emergency SNAP benefits based on a cost-estimate derived from USDA's interpretation. *See supra* at 6. Accordingly, the Court should conclude that USDA's Guidance is consistent with section 2302.

C. *USDA's Guidance is not arbitrary and capricious.*

Plaintiffs claim that USDA's guidance is arbitrary and capricious under the APA. For an APA arbitrary and capricious claim, the Court asks only whether the agency "examine[d] the

relevant data and articulate[d] a satisfactory explanation for its action." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). The Court "is not to substitute its judgment for that of the agency . . . and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 513–14 (internal quotation marks omitted). At bottom, the Court must ask whether USDA's Guidance has "a rational basis." *New Jersey Bd. of Pub. Utilities v. F.E.R.C.*, 744 F.3d 74, 100 (3d Cir. 2014). This is a "deferential standard of review." *Delaware Riverkeeper Network v. United States Army Corps of Engineers*, 869 F.3d 148, 161 (3d Cir. 2017).

Here, the Guidance is not arbitrary and capricious since it sets forth USDA's reasonable legal interpretation of section 2302. *See supra* at 9-14. As noted in the accompanying declaration, USDA adopted its interpretation of section 2302 based on its review of the relevant statutory language and framework, and because its interpretation is consistent with standard USDA practice with respect to emergency benefits.[3] *See* Declaration of Jessica Shahin, Associate Administrator for SNAP for the Food and Nutrition Service of USDA, ¶ 9 (Aug. 10, 2020). This is certainly enough to satisfy the applicable, "deferential standard of review."

In response, Plaintiffs argue that USDA referred to section 2014(h)(3)(A)—which provides replacement benefits for food destroyed in a disaster—when explaining USDA's construction of section 2302, and Plaintiffs reiterate their argument that this provision undermines USDA's position. *See* PI Mot., at 15-16; *supra* at 14-15. But even assuming Plaintiffs are correct, it is unclear how this renders USDA's Guidance arbitrary and capricious. Irrespective of any reference to section 2014(h)(3)(A), the Guidance may be independently defended on the grounds stated

---

[3] This is not a *post hoc* rationalization. Rather, the Shahin Declaration identifies the actual justifications that motivated USDA to adopt its position concerning section 2302. *See Camp v. Pitts*, 411 U.S. 138, 143 (1973) (An agency may provide "through affidavits" its "explanation of the reasons for the agency decision.").

above (*e.g.*, that the relevant statutory language and structure support USDA's interpretation). USDA need only show that there is at least one reasonable justification for the agency action at issue. *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 287 (1974) (The Court rejected one of the agency's justifications, but nonetheless found that the relevant agency action was not arbitrary and capricious because the agency's "second reason . . . provides support for the" agency action.). Plaintiffs cite to no authority indicating that, for an agency action to survive arbitrary and capricious review, a court must be satisfied with each and every justification and statement proffered in support of the action.[4]

Plaintiffs then reiterate their earlier argument that USDA's reading of section 2302 allegedly undermines SNAP's underlying policies, and benefits those with higher incomes. *See* PI Mot., at 16-17. But again, USDA's position still ensures that all of the funds allocated to USDA for COVID-19-related emergency allotments will go to low-income households in need. *See supra* at 14. Accordingly, Plaintiffs are unlikely to prevail on their claim that USDA's interpretation of section 2302, as reflected in the Guidance, is arbitrary and capricious.[5]

## II.     Plaintiffs cannot establish any non-speculative, irreparable harm.

For emergency relief, Plaintiffs have "the burden of proving a *clear showing* of immediate irreparable injury." *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989) (emphasis added).

---

[4] Further, as noted in *supra* at 14-15, Plaintiffs are incorrect in asserting that section 2014(h)(3)(A) undermines USDA's reading of section 2302. Unlike section 2302, section 2014(h)(3)(A) does *not* include the limiting language "temporary food needs not greater than the applicable maximum monthly allotment for the household size." Additionally, 2014(h)(3)(A) addresses a highly unique scenario, and thus provides little guidance on the proper interpretation of section 2302.

[5] Plaintiffs note, incorrectly, that this issue was not litigated in *Hall*. The plaintiffs there asserted an arbitrary and capricious claim, and referenced it in their preliminary injunction papers. *See* PI Mot., *Hall v. U.S. Dep't of Agric.*, 20-cv-3454, ECF No. 5, at 13, 17 (May 21, 2020). Thus, although the court did not expressly discuss this claim in its order denying preliminary relief, it must have implicitly rejected this argument.

"[E]stablishing a risk of irreparable harm is not enough." *Id.* "This is not an easy burden." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485 (3d Cir. 2000). Here, as discussed in the standing sub-section, *see supra* at 8, Plaintiffs may only secure emergency allotments upon a favorable ruling if Pennsylvania takes the necessary steps to apply for, and distribute, benefits that ultimately benefit Plaintiffs. Plaintiffs, however, have not submitted any concrete evidence indicating that Pennsylvania would indeed re-apply for emergency allotments, that Plaintiffs would be included within the scope of such a hypothetical emergency-allotments request, or that the difference (if any exists) between Plaintiffs' present SNAP benefits and their hypothetical benefits rises to the level of an "irreparable injury." Accordingly, even if the Court finds Plaintiffs' injury and redressability allegations sufficient for standing, these allegations cannot satisfy the strict "clear showing" standard for irreparable harm.

**III.     The balance of equities counsel against Plaintiffs' requested relief.**

Plaintiffs' requested relief would be detrimental to all SNAP beneficiaries in the long-run. USDA, like other federal agencies, operates with only the funds appropriated by Congress. The Constitution "place[s] authority to dispose of public funds firmly in the hands of Congress, rather than the Executive." *Am. Fed'n of Gov't Employees, AFL-CIO, Local 1647 v. Fed. Labor Relations Auth.*, 388 F.3d 405, 408–09 (3d Cir. 2004). Executive agencies can only use those funds appropriated by Congress.[6] *See Horner v. Andrzjewski*, 811 F.2d 571, 574 (Fed. Cir. 1987) ("the Antideficiency Act . . . prohibits an agency from expending or obligating funds that have not been

---

[6] Courts likewise may not impede upon Congress's power of the purse, and therefore cannot order an agency to expend funds without an adequate and applicable appropriation. *See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990) (Congress's power of the power limits the "relief available in a judicial proceeding seeking payment of public funds" because "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury.").

appropriated."). Here, specifically, the FNA expressly limits USDA's SNAP disbursements "to an amount not in excess of the appropriation for such fiscal year." 7 U.S.C. § 2027(b). Thus, if USDA "finds that the requirements of participating States will exceed the appropriation," it must direct States to reduce SNAP allotments as necessary to stay within the bounds of appropriated funds for that year. 7 U.S.C. § 2027(b).

Congress allocated a set amount of money to support COVID-related allotments. *See supra* at 6. As noted earlier, USDA initially estimated that this amount would be sufficient to finance these emergency allotments for roughly six months, but only under USDA's reading of section 2302. *See id.* Since then, due to increased SNAP enrollment, USDA projects that these funds likely will not last even six months. *See* Shahin Decl. ¶ 16. Plaintiffs' reading of section 2302—which could cost USDA between $40 to $50 billion over a six-month period—would thus rapidly deplete relevant SNAP resources, potentially forcing USDA to soon discontinue further emergency allotments altogether. *See* Declaration of David Burr, *Hall v. U.S. Dep't of Agric.*, No. 20-CV-03454-HSG, ECF No. 26-1, ¶ 17 (N.D. Cal. June 4, 2020). Consequently, fewer families would benefit from emergency allotments in the long-run. To be clear, USDA does not deny that Plaintiffs here face unique hardships, and that additional allotments would certainly be helpful. USDA does not question the veracity of Plaintiffs' representations concerning their circumstances. But any and every household seeking emergency allotments presumably needs assistance. USDA was allocated only a fixed sum of money for these allotments, and Plaintiffs' reading of section 2302 could ultimately obstruct USDA's ability to assist all SNAP beneficiaries in the long-run.

**IV.    To the extent the Court provides relief, the relief should be limited in scope.**

For the reasons set forth above, the Court should not award relief in this case. To the extent the Court does order relief, however, the relief should be limited to Pennsylvania. Broader relief

would be unnecessary to remedy any harms to Plaintiffs—both Pennsylvania residents—in particular. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) ("If a less drastic remedy" is "sufficient to redress respondents' injury, no recourse" to "additional and extraordinary relief" is "warranted."). Further, Plaintiffs seek to represent a class of certain persons "living in Pennsylvania," Compl. ¶ 20, confirming that the alleged injuries in this case neither require nor merit broader relief.[7]

Further, any relief ordered should be prospective, affecting any relevant emergency allotment application from Pennsylvania moving forward. Retroactive relief here for benefits that Plaintiffs claimed should have been paid could, in itself, sap most or all of the remaining funds allocated for the emergency allotments. *See* Shahin Decl. ¶ 15. Accordingly, for the reasons set forth in this memorandum, the Court should not issue any relief. And to the extent it does, the relief should be highly circumscribed to address only the alleged prospective injuries to the Plaintiffs in this case.

## Conclusion

The Court should deny Plaintiffs' Motion for a Preliminary Injunction.

---

[7] Plaintiffs have not moved for class certification thus far, and so USDA does not address the issue here. However, USDA notes that class certification would be unnecessary since relief under the APA may be tailored to benefit all relevant persons in Pennsylvania. *See*, *e.g.*, *Davis v. Smith*, 607 F.2d 535, 540 (2d Cir. 1978) (When "injunctive relief will benefit all members of a proposed class to such an extent that the certification of a class would not further the implementation of the judgment, a district court may decline certification.").

Dated: August 10, 2020

Respectfully submitted,


ETHAN P. DAVIS
Acting Assistant Attorney General

JOHN R. GRIFFITHS
Branch Director, Federal Programs Branch


*/s/* Kuntal Cholera
KUNTAL V. CHOLERA
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
kuntal.cholera@usdoj.gov

*Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 10, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all users receiving ECF notices for this case.

<u>/s/ Kuntal Cholera</u>

Kuntal V. Cholera
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005

Attorney for Defendants