**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LATOYA GILLIAM, ET AL.,** | : | |
| | : | Case No. 20-cv-3504-JMY |
| *Plaintiffs* | : | |
| | : | |
| v. | : | |
| | : | |
| **UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,** | : | |
| | : | |
| *Defendants* | : | |

**MEMORANDUM**

**YOUNGE, J.**                                                                        **September 11, 2020**

## I.      INTRODUCTION

Plaintiffs Latoya Gilliam and Kayla McCrobie bring this putative class action against Defendants United States Department of Agriculture ("USDA") and current USDA Secretary George Ervin Perdue III, challenging USDA's interpretation and implementation of Section 2302(a)(1) of the Families First Coronavirus Response Act ("FFCRA"), Pub. L. No. 116-127, § 2302(a)(1), 134 Stat. 178, 188 (Mar. 18, 2020).  (*See* "Compl." ¶¶ 1-12, ECF No. 1.)  FFCRA Section 2302, titled "Additional SNAP Flexibilities in a Public Health Emergency[,]" provides, in Section 2302(a)(1), for emergency allotments under the supplemental nutrition assistance program ("SNAP") in the event of an emergency declaration by Federal and State authorities based on an outbreak of coronavirus disease 2019 ("COVID-19").  FFCRA § 2302(a)(1).

Plaintiffs bring this suit under the Administrative Procedures Act ("APA"), 5 U.S.C. § 500 *et seq*., alleging that Defendants' interpretation of Section 2302(a)(1) is both contrary to the statute's directive and arbitrary and capricious.  (Compl. ¶¶ 5-8.)  Plaintiffs assert that Defendants' unlawful interpretation denies "emergency allotments" to the neediest SNAP

households and, in Pennsylvania, prevents the State Department of Human Services ("DHS") from providing any "emergency allotments" to nearly 40 percent of Pennsylvania's SNAP households.  (*Id.* ¶¶ 1, 4.)  Plaintiffs' Complaint seeks declaratory and injunctive relief, as well as their litigation costs.  (*Id.* ¶¶ 114-115.)

Presently before the Court is Plaintiffs' Motion for Preliminary Injunction.  ("Mot.," ECF No. 4.)  The Court conducted a hearing on the Motion on August 20, 2020.  (*See* Order for Hr'g, ECF No. 10; Hr'g Tr., ECF No. 21.)  At the core of this preliminary injunction proceeding, the Court is tasked with determining what was the intent of Congress as expressed in Section 2302(a)(1).  Did Congress intend, as Plaintiffs maintain, to require USDA to assess Pennsylvania's requests for emergency allotments, to determine whether such requests are supported by sufficient data (as determined by the Secretary through guidance), and if USDA concludes they are, to provide the requested emergency allotments without regard to the amount of a household's regular SNAP allotment?  Or, as Defendants contend, did Congress intend to specify the process for assessment and provision of emergency allotments, understanding and intending that USDA's implementation of Section 2302(a)(1) would deny any emergency allotments to approximately 40 percent of—and the poorest among—Pennsylvania's SNAP households?

With this in mind, and as detailed further below, the Court finds that Plaintiffs have established that a preliminary injunction is warranted and will accordingly grant their motion.

## II.    BACKGROUND & PROCEDURAL HISTORY[1]

To place the issues before the Court in context, we begin with a summary of the circumstances that led to Congress's enactment of the FFCRA.  The remaining background addresses the SNAP statutory scheme, including the disaster relief provisions that pre-date FFCRA § 2302; the text of Section 2302(a)(1) and USDA's interpretation of that provision; and, finally, Pennsylvania's request for emergency allotments under Section 2302(a)(1).

### A.    COVID-19 and the FFCRA

The United States, including the Commonwealth of Pennsylvania, is confronted with an unprecedented public health emergency caused by the COVID-19 pandemic.  (*See* Joint Stipulation of Uncontested Facts ("SUF") ¶¶ 5-6, ECF No. 17 ("In response to COVID-19, the Secretary of Health and Human Services declared a public health emergency . . . [which] has been renewed, most recently on July 23, 2020, and is currently in effect through October 23, 2020.").)  As a fellow member of this Court aptly summarized:  "The world is in the midst of an unprecedented public health crisis.  The deadliest pandemic in over a century has swept across the globe and has upended the lives of the American people in previously unimaginable ways."  *HAPCO v. City of Phila.*, No. 20-cv-3300, 2020 WL 5095496, at *1 (E.D. Pa. Aug. 28, 2020) (Rufe, J.).

As of the date of this Memorandum, 137,803 Pennsylvania residents have tested positive for COVID-19, and 7,820 Pennsylvanians have died.  *See COVID-19 Data for Pennsylvania*, Pennsylvania Department of Health, https://www.health.pa.gov/topics/disease/

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system, which does not always match a document's internal pagination.

coronavirus/Pages/Cases.aspx (last visited September 11, 2020); *see also South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) ("COVID-19 [is] a novel severe acute respiratory illness that has killed . . . more than [190,262] nationwide.  At this time, there is no known cure, no effective treatment, and no vaccine."); *Coronavirus Disease 2019: Cases and Deaths in the U.S.*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases-updates%2Fcases-in-us.html#cases (last visited September 11, 2020).

        The legislation at the heart of this litigation, the FFCRA, is one of several measures Congress has taken to provide relief to Americans and to promote public health.  By any measure, the FFCRA is an aggressive legislative response to the wide-ranging needs, including increased food insecurity, faced by families as a result of the COVID-19 pandemic.  Since the COVID-19 pandemic began, a picture of widespread hardship has emerged—including accounts of households unable to afford basic necessities and long lines at food pantries and other private charities.  An indication of the increase in food insecurity since the start of the pandemic is found in one study, utilizing data collected through the U.S. Census Bureau's Household Pulse Survey, which noted that "food insecurity has doubled overall, and tripled among households with children."  *See How Much Has Food Insecurity Risen? Evidence from the Census Household Pulse Survey*, Northwestern Institute for Policy Research, https://www.ipr.northwestern.edu/documents/reports/ipr-rapid-research-reports-pulse-hh-data-10-june-2020.pdf (last visited September 7, 2020); *see also Measuring Household Experiences During the Coronavirus (COVID-19) Pandemic*, United States Census Bureau, https://www.census.gov/data/experimental-data-products/household-pulse-survey.html (last visited September 7, 2020).  Furthermore, data collected by the U.S. Census Bureau from July

16, 2020 to July 21, 2020, indicates that in Pennsylvania, 11.3% of adults live in a household "where there was either sometimes or often not enough to eat in the last 7 days." *Household Pulse Survey Interactive Tool*, United States Census Bureau, https://www.census.gov/data-tools/demo/hhp/#/?measures=FIR&s_state=00042&mapPeriodSelector=4&mapAreaSelector=st&s_metro= (last visited September 7, 2020).

      **B.**      **SNAP and Disaster Relief Provisions**

           1.      *SNAP Administration*

Congress enacted the Food and Nutrition Act of 2008 ("FNA") to "rais[e] levels of nutrition among low-income households" through a "supplemental nutrition assistance program" that allows "low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power." 7 U.S.C. § 2011. "It is well established that a nutritious and adequate diet is essential to healthy living and child development, and SNAP benefits contribute to preserving recipients' overall health." (Mot. at 8 (citing ECF Nos. 4-5, 4-6, 4-10).)

SNAP operates as a federally funded, state administered program under which state agencies request and distribute monthly allotments for all eligible households in their state, as defined by the FNA. 7 U.S.C. § 2013(a). Households that receive SNAP allotments then redeem these allotments to purchase food at qualifying retail stores. *Id*. The FNA limits the value of the monthly allotment that households may receive to the cost of the "thrifty food plan" reduced by thirty percent of the household's income. *Id*. § 2017(a). The "thrifty food plan" is defined as the cost required to feed a family of four, adjusted by household size, and is the basis for the maximum monthly allotment a household can receive. *Id*. §§ 2012(u), 2017(a). Current maximum monthly benefit amounts from October 2019 through September 2020 are as follows:

| Family Size | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Each Additional |
|---|---|---|---|---|---|---|---|---|---|
| Maximum | $194 | $355 | $509 | $646 | $768 | $921 | $1,018 | $1,164 | Add $146 |

*See SNAP Facts*, Pennsylvania Department of Human Services,

https://www.dhs.pa.gov/Services/Assistance/Pages/SNAP.aspx (last visited September 7, 2020).[2]

The FNA expressly limits the overall value of SNAP allotments issued in each fiscal year "to an amount not in excess of the appropriation for such fiscal year."  7 U.S.C. § 2027(b). Accordingly, if USDA "finds that the requirements of participating States will exceed the appropriation," it must direct the States to reduce SNAP allotments as necessary to stay within the bounds of appropriated funds for that year.  *Id.*  If USDA is obliged to reduce SNAP allotments, it must still ensure "to the maximum extent practicable," that the reductions reflect "the ratio of household income" to "the income standards of eligibility."  *Id.* § 2027(c).

---

[2] Plaintiffs maintain that "even in normal times, it is widely understood that maximum benefits are inadequate to meet monthly food needs."  (Mot. at 9 (citing ECF Nos. 4-3, 4-4, 4-7, 4-9, 4-10, 4-12, 4-14, 4-16).)  "The price of food varies widely across different locations.  This geographic variation in food prices enhances or diminishes SNAP's purchasing power, *i.e.*, the value of the SNAP benefit in real terms at the local level . . . Because Pennsylvania has higher food costs, that value of the thrifty food plan based maximum SNAP benefit, which is the same across the continental United States, is lower . . . This means that relative to parts of the country with lower food costs, the national SNAP maximum benefit has lower purchasing power in Pennsylvania."  (Decl. of Lauren Bauer ¶¶ 27-28, ECF No. 4-3.)  Plaintiffs further assert that given the "inadequacy of SNAP benefits, households receiving maximum SNAP benefits [in Pennsylvania] have turned to several strategies to maximize the purchasing power of those benefits.  These include: (1) comparison shopping for the best prices; (2) reducing the quality and size of meals, skipping meals in order to feed their children, or not eating for a whole day; (3) not paying other essential bills, such as rent or utility bills, which may lead to other forms of severe hardship such as eviction or utility shutoffs or forgoing needed medical care; (4) seeking emergency food, despite its poor quality and the stigma of doing so; and (5) use of other food programs, including school meals for children, WIC for pregnant women and children under 5, and meals offered at some child care centers and senior centers."  (Mot. at 10-11 (citing ECF Nos. 4-3, 4-4, 4-6, 4-7, 4-12, 4-14, 4-16).)

However, before this occurs, USDA must alert Congress of the anticipated need to reduce allotments so that Congress may appropriate additional funds as needed.[3]  *Id.* § 2027(d).

2.    *FNA Disaster Relief Provisions*

The FNA directs USDA to "establish temporary emergency standards of eligibility" in disaster response situations that are separate from the usual eligibility standards set forth in the FNA.  7 U.S.C. § 2014(h)(1).  These temporary standards may last "for the duration of the emergency" for all "households who are victims of a disaster" if they "are in need of temporary food assistance[.]"  *Id.*  Under this authority, USDA established the Disaster Supplemental Nutrition Assistance Program ("D-SNAP").  *See Disaster SNAP Guidance*, USDA Food and Nutrition Service, https://fns-prod.azureedge.net/sites/default/files/D-SNAP_handbook_0.pdf (last visited September 7, 2020).  Under USDA's D-SNAP Guidance, "households who may not normally qualify for or participate in SNAP" may receive "a full month's allotment," and households that already receive SNAP benefits may receive "supplement[s]" to their "regular SNAP benefits . . . to bring them up to the maximum allotment."  *Id.* at 8.  In addition to the temporary eligibility standards that allow for D-SNAP benefits, the FNA directs USDA to provide "emergency allotments" to "eligible households to replace food destroyed in a disaster." 7 U.S.C. § 2014(h)(3)(A).  These emergency allotments provide "for replacement of the value of

_____

[3] At the preliminary injunction hearing, the Court asked defense counsel if USDA has ever had to implement an across-the-board allotment reduction because Congress declined or was unable to provide supplemental appropriations to prevent an allotment reduction.  (Hr'g Tr. at 44-46.)  Counsel responded that he did not know.  (*Id.*)  However, according to Robert Greenstein, a former administrator with the USDA's Food and Nutrition Service ("FNS"), it appears that "[t]hroughout the modern history of the food stamp program and SNAP," only once, in 1980, did FNS determine that current appropriations were inadequate and "Congress provided additional funds to prevent allotment reductions."  (Decl. of Robert Greenstein ¶¶ 8, 13, ECF No. 14-1.)  Moreover, "[s]ince then, regardless of the political party controlling the White House or Congress, regardless of economic conditions, and regardless of the relative popularity or unpopularity of the Food Stamp Program or SNAP, Congress, USDA, and the President have worked together to prevent allotment reductions."  (*Id.* at ¶ 16.)

food actually lost" but may not exceed the "maximum monthly allotment for the household size." *Id*.

### C.    FFCRA and USDA's Interpretation of Section 2302(a)(1)

Congress enacted the FFCRA on March 18, 2020.  *See* 134 Stat. 178.  As noted *supra*, the FFCRA is a wide-ranging piece of legislation designed to provide various forms of immediate relief to Americans during the COVID-19 pandemic.[4]  The particular provision at issue here, Section 2302, titled "Additional SNAP Flexibilities in a Public Health Emergency[,]" states as follows:

> In the event of a public health emergency declaration by the Secretary of Health and Human Services under section 319 of the Public Health Service Act based on an outbreak of coronavirus disease 2019 (COVID–19) and the issuance of an emergency or disaster declaration by a State based on an outbreak of COVID–19, the Secretary of Agriculture—shall provide, at the request of a State agency . . . that provides sufficient data (as determined by the Secretary through guidance) supporting such request, for emergency allotments to households participating in the supplemental nutrition assistance program under the Food and Nutrition Act of 2008 to address temporary food needs not greater than the applicable maximum monthly allotment for the household size[.]

FFCRA § 2302(a)(1).

In the FFCRA, Congress did not appropriate funds for SNAP "emergency allotments." On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, a stimulus package of approximately $2.3 trillion to provide financial relief, and other assistance, to Americans suffering from the COVID-19 pandemic and its economic fallout.  Pub. L. No. 116-136, § 6002, 134 Stat. 281, 508 (Mar. 27, 2020).  The CARES Act

---

[4] *See*, *e.g.*, FFCRA § 2202 (providing food assistance benefits for children losing school lunches due to closures); *Id*. §§ 3102, 5101-02 (expanding family and medical leave and emergency paid sick leave); *Id*. §§ 4102-05 (extending unemployment compensation); *Id*. §§ 6001-04 (providing coverage for COVID-19 testing).

included an allocation of $15.81 billion for SNAP "to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally."[5]  *Id.*

On March 20, 2020, USDA issued initial guidance to the States regarding implementation of Section 2302(a)(1).  *See March 20, 2020 Guidance to States*, USDA Food and Nutrition Service, https://fns-prod.azureedge.net/sites/default/files/resource-files/SNAP-COVID-EmergencyAllotmentsGuidance.pdf (last visited September 7, 2020) (hereinafter, "March 20 Guidance"); (SUF ¶ 7(a).)  USDA's March 20 Guidance included a three-page form, titled "Request to Provide Emergency Allotments (Supplements) to SNAP Households," for States to submit when requesting emergency allotments under the FFCRA.  *Id.* at 2-4.  This form provides that States may "propose to provide an emergency allotment to address temporary food needs to households to bring all households up to the maximum benefit due to pandemic related economic conditions for up to 2 months."  *Id.* at 2.  Regarding eligibility information to be provided by States, the form provides:

> These households are eligible for temporary emergency allotments because:
>
> - There is a public health emergency declared by the Secretary of Health and Human Services and there is a State-wide emergency or disaster declaration (copy attached); and
>
> - Due to Covid-19 [check all that apply]:
>
>   — Residents of the State are confirmed to have contracted Covid-19
>
>   — Some or all areas of the State are containment or quarantine zones

---

[5] Defendants assert that USDA provided a cost estimate based on the agency's interpretation of Section 2302(a)(1), which was "sent directly via email to staff members of the House and Senate Appropriations Committees on March 19, 2020."  (Decl. of Evan Lee ¶ 2, ECF No. 23-2 (noting that "37% of households in [Fiscal Year] 2018 . . . would not receive a benefit increase under this proposal").)  While the Court certainly recognizes Defendants' contention that the SNAP allocation in the CARES Act signifies Congress's implicit ratification of USDA's interpretation of Section 2302(a)(1), the Court nevertheless respectfully disagrees with this contention.  A thorough review of the evidence before the Court reveals that there is zero indication that members of Congress reviewed and considered this e-mail correspondence (and excel spreadsheet attachment thereto) and that such correspondence directly informed the $15.81 billion appropriations amount.

> — Businesses have closed or significantly reduced their hours
>
> —The State's residents have experienced economic impacts due to job
>   suspensions or losses
>
> — The State's residents have been directed to practice social distancing

(*Id.*)  This form also advised that "[c]ontingent upon the availability of funding and ongoing need, USDA may approve additional months of emergency issuance with an extension request from the State."  (*Id.*)

On April 11, 2020, USDA issued a "SNAP—Questions and Answers, COVID-19[,]" memorandum, in which the agency provided its answers to several questions regarding emergency allotments, including:

1.    **What are emergency allotments?**

      The emergency allotments authorized under Sec. 2302 of the Families First Coronavirus Response Act (FFCRA) are supplements to a household's SNAP benefits, similar to supplements authorized during disasters under Sec. 5(h)(3)(A) of the Food and Nutrition Act of 2008 (FNA). These supplements address temporary food needs and are added on to a household's monthly benefit so the total household benefit amount may equal the maximum benefit amount for their household size. Households that already receive the maximum benefit for their household size may not receive an additional emergency allotment.

                                    * * *

8.    **How are emergency allotment amounts calculated**?

      Emergency allotments, combined with the household's monthly SNAP benefit, would equal up to the maximum benefit amount for their household size based on the number of eligible household members in the household. This is to be calculated in the same way that States calculate supplements during a disaster. All types of households would have their emergency allotment calculated in the same manner, with no exceptions.

*April 11, 2020 Q&A Memorandum*, USDA Food and Nutrition Service, https://fns-prod.azureedge.net/sites/default/files/resource-files/SNAP-COVID-QA1.pdf (last visited September 7, 2020) (emphasis in original); (SUF ¶ 7(c).)

Thereafter, on April 21, 2020, USDA issued a memorandum attaching updated guidance to State agencies regarding emergency allotments.  *See April 21, 2020 Guidance to States*, USDA Food and Nutrition Service, https://fns-prod.azureedge.net/sites/default/files/resource-files/SNAP-COVID-EmergencyAllotmentsPhase2Guidance.pdf (last visited September 7, 2020) (hereinafter, "April 21 Guidance"); (SUF ¶ 7(d).)  The April 21 Guidance clarifies that "[a] household's [emergency allotment] cannot increase the current monthly household SNAP benefit allotment beyond 'the applicable maximum monthly allotment for the household size.' Accordingly, SNAP households that already receive the maximum monthly allotment for their household size are not eligible for [emergency allotments]."  *Id*. at 1.  Like the March 20 Guidance, the April 21 Guidance requires States to confirm, *inter alia*, that "[t]he State's residents have experienced economic impacts due to job suspensions or losses."  (*Id.*)

> **D.    Pennsylvania's Response to COVID-19 and
>          Request for SNAP Emergency Allotments**

On March 6, 2020, Pennsylvania Governor Tom Wolf proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa. C.S. § 7301(c).  *See Statewide Stay at Home Order*, Commonwealth of Pennsylvania Office of the Governor, https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf (last visited September 7, 2020); (SUF ¶ 8.)  This disaster proclamation has subsequently been renewed for three 90-day periods and remains in effect until November 30, 2020.  *See Second Amendment to Proclamation of Disaster Emergency*, Commonwealth of Pennsylvania Office of the Governor, https://www.governor.pa.gov/wp-content/uploads/2020/09/20200831-TWW-amendment-to-COVID-disaster-emergency-proclamation.pdf (last visited September 7, 2020).  On March 23, 2020, in an effort to mitigate the spread of COVID-19 across the Commonwealth, Governor Wolf issued a mandatory stay at

11

home order directing individuals to remain at home except as needed to access, support, or provide life-sustaining business, emergency, or government services. *Id*.

On March 13, 2020, already recognizing an increase in food insecurity across the Commonwealth due to the pandemic, Pennsylvania's DHS submitted a waiver request to USDA "requesting the ability to issue all SNAP households an additional, emergency SNAP allotment equal to 50 percent of the maximum SNAP allotment for their household sizes." (SUF ¶ 9; *see also* ECF No. 4-11 at 5-6.) On March 25, 2020, in response to the USDA's March 20 Guidance, Governor Wolf sent USDA a letter urging the Agency to reconsider its interpretation of the FFCRA, explaining that the "legislation authorizes USDA to provide an additional emergency allotment to all households, up to the amount of the maximum benefit for their household size. Unfortunately, USDA is interpreting [S]ection 2302 to allow states to raise SNAP benefits for each household up to the maximum benefit for the household size, without any additional allotment . . . If USDA maintains this interpretation, households already at the maximum benefit, which make up nearly 40 percent of SNAP households and those with the lowest incomes, will not receive any additional assistance . . . We are deeply concerned that the poorest households, particularly those with very young children, would not be eligible to receive anything under this reading of the law." *Governor Wolf March 25, 2020 Letter*, Commonwealth of Pennsylvania Office of the Governor, https://www.governor.pa.gov/wp-content/uploads/2020/03/2020.3.25-TWW-Perdue-emergency-food-assistance-COVID-19.pdf (last visited September 7, 2020); (SUF ¶ 10.)

On March 30, 2020, Pennsylvania submitted a second waiver request in compliance with the USDA's March 20 Guidance—but reiterated its position that the FFCRA authorizes payments more broadly than as interpreted by USDA and that Pennsylvania "reserves the right to

challenge [USDA's] implementation of the Act."  (ECF No. 4-11 at 8; SUF ¶ 11.)  USDA granted this revised waiver request on April 2, 2020, only permitting the issuance of emergency allotments in accordance with USDA's interpretation.  *See Pennsylvania Request to Provide Emergency Allotments (Supplements) to SNAP Households*, USDA Food and Nutrition Services, https://fns-prod.azureedge.net/sites/default/files/resource-files/PA-SNAP-COV-EmergencyAllotments-Approval2.pdf (last visited September 7, 2020); (SUF ¶ 12.).  To date, the Pennsylvania waiver requests approved by USDA have not authorized any emergency allotments under FFCRA § 2302(a)(1) to address the emergency food needs of approximately 40 percent of Pennsylvania SNAP households—those that, pre-COVID-19, were receiving the applicable maximum monthly allotment for the household size.

On April 10, 2020, USDA issued a blanket denial of all state waiver requests, including Pennsylvania's original request, that "seek to adjust SNAP eligibility requirements by: . . . [p]roviding emergency allotments that exceed the maximum benefit for a household's size."  *See SNAP—Mass Denial of Certain Requests to Adjust SNAP Regulations*, USDA Food and Nutrition Services, https://fns-prod.azureedge.net/sites/default/files/resource-files/SNAP-COVID19-Multiple-Adjustment-Denials.pdf (last visited September 7, 2020); (SUF ¶ 7(b).)  On April 27, 2020 in response to the USDA mass denial letter, Governor Wolf wrote to USDA again disagreeing with the agency's interpretation of the FFCRA, noting that "40 percent of [SNAP households] in Pennsylvania received no additional funding and, therefore, are unable to fill their pantries as recommended."  *Governor Wolf April 27, 2020 Letter*, Commonwealth of Pennsylvania Office of the Governor, https://www.governor.pa.gov/wp-content/uploads/2020/04/20200428-TWW-FNS-Reconsideration-Letter.pdf (last visited September 7, 2020); (SUF ¶ 13.)

On August 25, 2020, Teresa D. Miller, Secretary of Pennsylvania's DHS, sent a letter to

Secretary Perdue, reiterating the Wolf Administration's and DHS's disagreement with the

"[USDA] guidance limiting states' ability to provide Emergency Allotments to all [SNAP]

recipients" and referencing Governor Wolf's April 27, 2020 letter.  (ECF No. 22 at 5-6.)

Secretary Miller's letter further stated:

> [Governor Wolf's letter] is still the position of the Wolf
> Administration and DHS.  <u>If permitted, DHS intends to issue
> Emergency Allotments for all Pennsylvania SNAP households,
> including the poorest SNAP households who receive the maximum
> regular SNAP allotments because of their very low income.</u>  As the
> nation continues to face the COVID-19 pandemic with no end in
> sight, access to essential needs like food is more important than ever
> to help keep people healthy and mitigate co-occurring health risks.
> On behalf of the families that we serve, we ask that you reconsider
> your previous guidance on this matter.

(ECF No. 22 at 6 (emphasis in original).)

## E.    Procedural History

Plaintiffs filed this putative class action on July 16, 2020, and concurrently sought leave

to proceed *in forma pauperis* ("IFP").  (Compl.; ECF No. 2.)  The Court granted Plaintiffs' IFP

request on July 21, 2020, and directed the U.S. Marshals Service to serve the Complaint and

Summonses on Defendants.  (ECF No. 3.)  In their Complaint, Plaintiffs assert two causes of

action under the APA, alleging that USDA's interpretation and implementation of the FFCRA is

both: (1) "arbitrary and capricious[,]" (Count I),  and (2) "not in accordance with law" (Count

II).  (Compl. ¶¶ 101-110); *see also* 5 U.S.C. §§ 706(2).  Plaintiffs seek to represent a class

defined as:

> All persons living in Pennsylvania who are, were[,] or will be
> eligible for SNAP benefits during the period for which Congress has
> authorized the issuance of emergency allotments during the
> COVID-19 emergency and who were not provided an emergency
> allotment, or are receiving, have received, or will receive a smaller

emergency allotment than Congress intended due to Defendants'
improper interpretation of Section 2302(a)(1) of the FFCRA.

(Compl. ¶ 20.)

On July 27, 2020, Plaintiffs filed the instant motion, in which they seek a preliminary
injunction enjoining Defendants "from relying on the unlawful portion of their guidance
interpreting 'emergency allotments' authorized under Section 2302(a)(1) of the FFCRA as
'supplements,' limited in value to the difference between the regular monthly benefit SNAP
households receive and the maximum monthly benefit for a given household's size." (ECF No.
4-2 at 2-3.) Defendants filed a response in opposition on August 10, 2020 ("Opp.," ECF No.
11), and Plaintiffs replied on August 14, 2020 ("Reply," ECF No. 14). On August 19, 2020, the
parties submitted their joint stipulation of uncontested facts. (*See* SUF.) The Court held a
hearing on Plaintiffs' Motion on August 20, 2020 (*see* ECF No. 10). With the Court's
permission, the parties submitted supplementary evidence and responses thereto, respectively, on
August 25, 2020 and August 27, 2020. (*See* ECF Nos. 22, 23, 24, 25).

## III.   LEGAL STANDARD

Before granting a preliminary injunction, a district court must find that the plaintiff has
established four factors:

> (1) the likelihood that the plaintiff will prevail on the merits at final
> hearing; (2) the extent to which the plaintiff is being irreparably
> harmed by the conduct complained of; (3) the extent to which the
> defendant will suffer irreparable harm if the preliminary injunction
> is issued; and (4) [that] the public interest [weighs in favor of
> granting the injunction].

*Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020)

(alterations in original) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42

F.3d 1421, 1427 (3d Cir. 1994)); *see also Winter v. NRDC*, 555 U.S. 7, 20 (2008). The first two

factors are the "most critical," and "[i]f these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017); *accord Fulton v. City of Phila.*, 922 F.3d 140, 152 (3d Cir. 2019).

Because  Plaintiffs seek a mandatory injunction that would alter the status quo insofar as they are seeking an order that would require USDA to modify its current interpretation of Section 2302(a)(1), Plaintiffs face a "particularly heavy" burden.[6] *Feering Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 219 n.13 (3d Cir. 2014); *see also Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994) ("A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity."). However, while this standard is heightened, it is *not* unattainable.  *See*, *e.g.*, *Booth v. McManaman*, 830 F. Supp. 2d 1037, 1045 (D. Haw. 2011) (granting preliminary injunction requiring state to take affirmative steps to process SNAP applications and issue benefits within statutory timeframes); *K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254, 1268 (S.D. Fla. 2011) (granting mandatory preliminary injunction requiring agency to provide Medicaid coverage); *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 236-47 (D.D.C. 2014) (granting preliminary injunction enjoining the Centers for Medicare and Medicaid Services from enforcing an agency rule that "was promulgated in violation of the [APA] and that [was] contrary to the Medicaid Act.").

---

[6] During the hearing the parties agreed that while the requested injunctive relief is phrased with prohibitory language, it is nonetheless mandatory in nature as it would affirmatively require USDA to alter its current interpretation of "emergency allotments" and corresponding implementation of the SNAP program under the FFCRA.  The Court agrees and, thus, applies the more exacting standard applicable to mandatory injunctions.

## IV.    DISCUSSION

### A.    Article III Standing

The Court's analysis begins with its jurisdiction, specifically, the Plaintiffs' standing to sue. *See generally Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  To establish standing Plaintiffs must demonstrate:  (1) "an injury in fact . . . [that is] concrete and particularized [and] actual or imminent, not conjectural or hypothetical," (2) that the injury is "fairly traceable to the challenged action," and (3) that it is "likely . . . that the injury will be redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

The final component—redressability—is the only one contested here.[7]  *See Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) ("[R]edressability looks forward (will a favorable decision alleviate the harm?)").  Defendants argue that Plaintiffs have failed to provide evidence demonstrating that Plaintiffs will "necessarily receive benefits if this Court orders USDA to alter its understanding of [S]ection 2302."  (Opp. at 13.)  Defendants further contend that "[f]or Plaintiffs to benefit, Pennsylvania will have to again apply for emergency allotments, provide sufficient data to USDA to support the request, secure the allotments, and then distribute them to a class of persons that include Plaintiffs."[8]  (*Id.*)

---

[7] There is no dispute that Plaintiffs Latoya Gilliam and Kayla McCrobie satisfy the injury in fact and causation requirements for Article III standing.  Both have been denied SNAP emergency allotments that would mitigate their temporary food needs related to the COVID-19 pandemic.  (*See* ECF Nos. 4-8, 4-13; *see also* SUF ¶¶ 1-2.)

[8] Defense counsel also argued at the hearing that it is "conceivable" that the Commonwealth might choose not to seek emergency allotments for all SNAP households for fear it would bankrupt the available SNAP appropriation—thereby necessitating an across-the-board reduction of allotments to all SNAP households.  (Hr'g Tr. at 17-18.)  Specifically, defense counsel posited:
> It is conceivable that the State of Pennsylvania[,] which did not [choose] to file its own lawsuit, which did not join this lawsuit, is conceivable that [Pennsylvania] thought look, we don't want to contribute to the bankruptcy of the fund because if we do that, all recipients of emergency allotments are worse off. . . .

Plaintiffs have provided substantial evidence that a favorable decision will alleviate the harm to them resulting from USDA's current interpretation of Section 2302(a)(1).  In particular, Pennsylvania DHS Secretary Miller's letter to Secretary Purdue of August 25, 2020, unequivocally commits that "[i]f permitted, DHS intends to issue [e]mergency [a]llotments for all Pennsylvania SNAP households, including the poorest SNAP households who receive the maximum regular SNAP allotment because of their very low income."  (ECF No. 22 at 6 (emphasis in original).)  This unambiguous affirmation of the Commonwealth's intent more than satisfies the Third Circuit's standard for redressability.  *See Toll Bros., Inc.*, 555 F.3d at 143 ("Redressability is not a demand for mathematical certainty.  It is sufficient for the plaintiff to establish a 'substantial likelihood that the requested relief will remedy the alleged injury in fact.'" (quoting *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000))).  This conclusion is further bolstered by the fact that DHS previously sought approval to issue a special supplemental issuance to all SNAP households (*see* ECF No. 4-11 at 5-6; SUF ¶ 9); and the fact that, on multiple occasions, Governor Wolf and DHS officials advised USDA of the Commonwealth's position that Section 2302(a)(1) authorizes payments more broadly than as

---

(*Id.*; *see also* Decl. of Jessica Shahin, FNS Associate Administrator for SNAP, ¶ 15, ECF No. 11-1 (suggesting that issuance of emergency allotments at the maximum would cause an appropriation deficiency and trigger benefit reductions).)

    In the Court's view, this argument is highly speculative as there is *no* evidence indicating that this was or is a concern to the Commonwealth.  It is further undermined, if not entirely refuted, by evidence that *is* in the record.  (*See* ECF No. 22 (August 25, 2020 letter from Pennsylvania DHS Secretary Miller to USDA, advising that, if permitted, Pennsylvania will seek emergency allotments for all SNAP households); *see also* SUF ¶¶ 9-11, 13 (detailing Pennsylvania's waiver submissions and requests that USDA reconsider its interpretation of the FFCRA).)

    Moreover, Defendants' dire speculation about an appropriations bankruptcy is a straw man argument resting on a dubious premise—the "sheer possibility" that Plaintiffs' interpretation of Section 2302(a)(1) could theoretically allow all SNAP households to "receive benefits equal to 200% of the allotment cap."  (Opp. at 19, n.2.)  The record contains no evidence that Pennsylvania (or any other state) has requested or will request 200% of the allotment cap; that such a request, if made, would be supported by sufficient data (as determined by the USDA through guidance) to require approval; or that the emergency allotments Pennsylvania will seek if permitted would cause an appropriation deficiency.

interpreted by USDA, and requested that USDA reconsider its interpretation.  (*See* ECF No. 4-11 at 8; SUF ¶¶ 10-11, 13.)  The evidence before the Court amply demonstrates a substantial likelihood that with a favorable ruling, the Commonwealth will seek emergency allotments for all SNAP households, including Plaintiffs; and that this action will remedy Plaintiffs' injury in fact.  *See Toll Bros., Inc.*, 555 F.3d at 143.  Plaintiffs have established their standing.

Having resolved the issue of jurisdiction, the Court proceeds to the requisite elements for a preliminary injunction.

### B.  Likelihood of Success on the Merits

To satisfy the threshold requirement of likelihood of success on the merits, the movant "must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not).  *Reilly*, 858 F.3d at 179.  "On this factor, a sufficient degree of success for a strong showing exists if there is a reasonable chance or probability, of winning" on their APA claims.  *Ramsay v. Nat'l Bd. of Med. Examiners*, 968 F.3d 251, 256 (3d Cir. 2020).  Under the APA, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction [or] authority."  5 U.S.C. § 706(2)(A), (C). Ultimately, the question under these provisions is "whether the agency has gone beyond what Congress has permitted it to do[.]"  *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 298 (2013). Although Plaintiffs contend that USDA's guidance violates the APA for several reasons, we focus on the argument that the guidance is unlawful because it is contrary to the FFCRA and inconsistent with congressional intent and the SNAP statutory scheme.[9]

---

[9] The Court further observes that the challenged USDA guidance constitutes final agency action subject to APA review because it "mark[s] the consummation of the agency's decision-making process[.]"  *Bennet v. Spear*, 520 U.S. 154, 177-78 (1997).  In other words, USDA's guidance is its

     1.    *Legal Framework*

The Court evaluates challenges to an agency's interpretation of a statute within the familiar two-step *Chevron* deference framework.[10]  *See Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  "Under *Chevron* step one, [the Court] determine[s] if the statute is silent or ambiguous with respect to the specific issue of law in the case."  *Da Silva v. Att'y Gen. United States*, 948 F.3d 629, 634 (3d Cir. 2020) (internal quotation marks and citation omitted); *see also Chevron*, 467 U.S. at 843 n.9 ("The judiciary is the final authority on issues of statutory construction[.]").  "If the statute is unambiguous, there are no statutory gaps for the agency to fill, and our inquiry ends.  Only where the statute is ambiguous do we move to step two and determine if the agency's interpretation of the statute is reasonable and thus entitled to deference."  *Da Silva,* 948 F.3d at 629; *see also, e.g., Pereira v. Sessions*, 138 S. Ct. 2105, 2120 (2018) (chiding lower courts for "engag[ing] in cursory analysis" in *Chevron* step one and rushing to "reflexive deference"); *Kingdomware Technologies, Inc. v. U.S.*, 136 S. Ct. 1969, 1979 (2016) (reversing lower court's *Chevron*-based decision because the statute was unambiguous).

Accordingly, the threshold issue here is whether Congress has directly spoken to the intended meaning of FFCRA § 2302(a)(1) and the scope of "emergency allotments" provided for therein.  For the reasons detailed below, we conclude the Section 2302(a)(1) is neither "silent

---

"definitive position" on emergency allotments authorized under Section 2302(a)(1).  *See Minard v. Run Oil Co.*, 670 F.3d 236, 249 (3d Cir. 2011).

    [10] If the Court were to find Section 2302(a)(1) ambiguous, the parties dispute the level of deference afforded to USDA's interpretation and implementation of the statute.  Defendants cite to *Chevron*, whereas, Plaintiffs assert that *Skidmore* deference applies.  *See Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 302 (3d Cir. 2012) (recognizing that *Skidmore* deference applies as opposed to *Chevron* deference when the agency action lacks the "force of law" (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))).  As set forth below, we need not resolve this dispute.

[nor] ambiguous" with respect to this issue.[11]  Because we believe the intent of Congress is clear, "*Chevron* leaves the stage" and we then proceed to the dispositive question of whether the USDA's interpretation of Section 2302(a)(1) is contrary to law and exceeds its statutory authority.  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018).

> 2.  *USDA's Interpretation of Section 2302(a)(1) Is Inconsistent with Congressional Intent and Is Contrary to Law*

This Court concludes that Section 2302(a)(1) and Congress's intent in enacting this provision are unambiguous.  This conclusion is based on the Court's analysis of the statutory language and the structure and purpose of the SNAP statutory scheme.  Our analysis is consistent with the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation marks and citation omitted).  "A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into [a] harmonious whole." *Id.* (internal quotation marks and citation omitted).

As the Third Circuit has counseled, the "point of departure" for this analysis is the text of the statute.  *City of Phila. v. Att'y Gen. of United States*, 916 F.3d 276, 284 (3d Cir. 2019), *reh'g denied* (June 24, 2019) (citing *Gov't of Virgin Islands v. Knight*, 989 F.2d 619, 633 (3d Cir. 1993).)  "We are also guided by any relevant, well-established canons of statutory

---

[11] The Court recognizes that in *Hall v. U.S. Dep't of Agric.*, No. 20-3454, 2020 WL 3268539, at *6-8 (N.D. Cal. June 17, 2020) the court there was previously tasked with this determination.  *See id.* (denying plaintiffs' motion for preliminary injunction, finding statute ambiguous, and accepting USDA's interpretation of § 2302(a)(1)).  At the hearing in this case, the parties confirmed that, apart from the litigation in the Northern District of California, they are not aware of any other litigation challenging agency action regarding Section 2302(a)(1).

interpretation." *Id.* (citing *Schaar v. Lehigh Valley Health Servs., Inc.*, 598 F.3d 156, 160 (3d Cir. 2010).

a. <u>Section 2302(a)(1) and the SNAP Statutory Framework</u>

Because the text of the statute is the touchstone of our analysis, we again recite the relevant language of Section 2302(a)(1):

> (a) In the event of a public health emergency declaration by the Secretary of Health and Human Services under section 319 of the Public Health Service Act based on an outbreak of coronavirus disease 2019 (COVID–19) and the issuance of an emergency or disaster declaration by a State based on an outbreak of COVID–19, the Secretary of Agriculture—
>
>> (1) shall provide, at the request of a State agency . . . that provides sufficient data (as determined by the Secretary through guidance) supporting such request, for emergency allotments to households participating in . . . [SNAP] under the [FNA] to address temporary food needs not greater than the applicable maximum monthly allotment for the household size[.]

FFCRA § 2302(a)(1). *See also City of Phila.*, 916 F.3d at 284; *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987) ("It is well settled that the starting point for interpreting a statute is the language of the statute itself." (internal quotation marks and citation omitted).)

By its terms, the provision at issue here is indisputably part of the overall SNAP statutory scheme established under the FNA. *See also* FFCRA §§ 2302(a)(2), (b), (c) (referring to the provisions of and requirements under the FNA). We further observe that Section 2302(a)(1) employs terms or phrases that incorporate or are presumptively intentional modifications of terms defined in the FNA. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (noting that statutes "should not be read as a series of unrelated and isolated provisions, and "that 'identical words used in different parts of the same act are intended to have the same meaning.'" (quoting *Dep't of Revenue of Ore. v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994))); *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is

22

generally read the same way each time it appears.").  Particularly relevant here, the FNA defines

"allotment" as "the total value of <u>benefits</u> a household is authorized to receive during each

month."  7 U.S.C. § 2012(b) (emphasis added).  In turn, "benefit" is defined, in relevant part, as

"the value of supplemental nutrition assistance provided to a household."  *Id.* § 2012(d).  Finally,

"food" is defined in the FNA very broadly and is not limited to food purchased at a retail food

store.  *Id.* § 2012(k) (defining "food" to include meals prepared and served by public/private

shelters or other community resources).

Moreover, and although the FFCRA does not contain a statement of policy, the SNAP-

related provisions of Section 2302 must be construed in accordance with the expressly stated

purpose of the FNA, which provides, in relevant part, that:

> It is declared to be the policy of Congress, in order to promote the general welfare,
> to safeguard the health and well-being of the Nation's population by raising levels
> of nutrition among low-income households. Congress finds that the limited food
> purchasing power of low-income households contributes to hunger and
> malnutrition among members of such households. . . . To alleviate such hunger and
> malnutrition, a supplemental nutrition assistance program is herein authorized
> which will permit low-income households to obtain a more nutritious diet through
> normal channels of trade by increasing food purchasing power for all eligible
> households who apply for participation.

*Id.* § 2011.  *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the

plain meaning of [a] statute, the court must look to the particular statutory language at issue, as

well as the language and design of the statute as a whole."); *see also N.L.R.B. v. Brown,* 380 U.S.

278, 291-92 (1965) ("Reviewing courts are not obliged to stand aside and rubberstamp their

affirmance of administrative decisions that they deem inconsistent with a statutory mandate or

that frustrate the congressional policy underlying a statute."); *Robinson v. Block*, 869 F.2d 202,

213 (3d Cir. 1989) ("[A] reviewing court . . . must reject an administrative construction of a

statute if it is 'inconsistent with the statutory mandate or . . . frustrate[s] the policy that Congress

sought to implement.'" (quoting *Sec. Indus. Ass'n v. Bd. of Governors of the Fed. Reserve Sys.*, 468 U.S. 137, 143 (1984))).

          b.       <u>USDA's Guidance Nullifies, Renders Superfluous, and Imports Other Terms Into, the Language of Section 2302(a)(1)</u>

USDA's most recently issued Guidance states that, under Section 2302(a)(1):

A household's [emergency allotment] cannot increase the current monthly household SNAP benefit allotment beyond "the applicable maximum monthly allotment for the household size." Accordingly, SNAP households that already receive the maximum monthly allotment for their household size are not eligible for [an] emergency allotment.

*See* April 21 Guidance. Defendants contend that this Guidance is consistent with the language of Section 2302(a)(1) "because [Congress] did not state that it was lifting, or eliminating, the traditional, statutory cap on the SNAP benefits a household may receive." (Opp. at 6.) Instead, according to Defendants, Section 2302(a)(1) only requires USDA to issue emergency allotments that are "'directed' towards temporary food needs that come within [a household's regular maximum allotment][,]" and that "[i]f a house is already receiving the maximum monthly allotment, then its food needs within the statutory cap are presumed satisfied, and . . . emergency allotments are impermissible." (*Id.* at 15; *see also id.* at 6.) Distilling this tortured argument to its essence, Defendants' construe Section 2302(a)(1) as permitting USDA to deny any "emergency allotment" to households that, pre-COVID, were receiving the maximum monthly allotment for their household size, because, according to Defendants, those households do not, by definition, have any COVID-related "temporary food needs" that need to be addressed by an "emergency allotment." Defendants' construction is foreclosed by the clear language of Section 2302(a)(1) and the express purpose of the SNAP statutory scheme for several reasons.

First, Section 2302(a)(1) directs that USDA "shall provide . . . for emergency allotments to households participating in [SNAP]."  FFCRA § 2302(a)(1) (emphasis added).  "This directive is both mandatory and comprehensive.  The word 'shall' generally imposes a nondiscretionary duty."  *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018) (citing *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)).  Similarly, the phrase "households participating in SNAP" is unambiguous and unqualified—it imposes no eligibility criteria beyond the requirement that States support emergency allotment requests with "sufficient data" to justify the request.  Nor does it authorize USDA to unilaterally establish a disfavored subclass of SNAP households.  *See*, *e.g.*, *United States v. Parcel of Land, Bldgs., Appurtenances & Improvements, Known as 92 Buena Vista Ave., Rumson, N.J.*, 507 U.S. 111, 123 (1993) (agreeing with appellate court determination that the unqualified term "owner" was sufficiently unambiguous to foreclose any contention that it applied only to bona fide purchasers); *In re Cont'l Airlines, Inc.*, 932 F.2d 282, 288 (3d Cir. 1991) (declining to employ the principle of *noscitur a sociis* "to qualify language that Congress has left unqualified, rather than to clarify a facially ambiguous term"); *Smith v. Fid. Consumer Disc. Co.*, 898 F.2d 907, 912 (3d Cir. 1990) ("We believe that considerable mischief would be created if courts abandoned the unqualified language of the statute and attempted to divine, on a case-by-case basis, what loans falling within the literal words of § 501 Congress might not deem worthy of the shelter provided by that section.").  In this Court's view, if Congress had intended to deny any relief under Section 2302(a)(1) to households at the maximum applicable allotment, it would have said so expressly by, for example, including language authorizing "emergency allotments" only to "eligible" SNAP households or, more explicitly, by providing that SNAP households receiving the maximum monthly allotment are not eligible for "emergency allotments."  Congress did not

include such language, and we will not read it into the statute. *See Bostock v. Clayton Cty., Ga.,*
140 S. Ct. 1731, 1738 (2020) ("If judges could add to, remodel, update, or detract from old
statutory terms inspired only by extratextual sources and our own imaginations, we would risk
amending statutes outside the legislative process reserved for the people's representatives.").

Second, USDA's interpretation reads the word "emergency," and the phrase "emergency
allotments," out of the statute or, at minimum, renders them meaningless and superfluous as to
nearly half of Pennsylvania's SNAP households who also happen to be in the most dire need of
emergency assistance. As noted above, FNA defines "allotment" as "the total value of benefits a
household is authorized to receive during each month." 7 U.S.C.A. § 2012(b). In Section
2302(a)(1), however, Congress specifically modified this defined term by prefacing it with the
word "emergency." FFCRA § 2302(a)(1). Because "emergency" is not defined in Section
2302(a) or the FNA, we look to dictionaries and other reference works to ascertain its ordinary
meaning. *See Da Silva*, 948 F.3d at 635 (3d Cir. 2020) ("To ascertain the ordinary meaning of
words, '[w]e refer to standard reference works such as legal and general dictionaries.'" (quoting
*United States v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008) (using dictionary definitions to find
that a term is unambiguous)).) Black's Law Dictionary defines "emergency" as "[a] sudden and
serious event or an unforeseen change in circumstances that calls for immediate action to avert,
control, or remedy harm" or "[a]n urgent need for relief or help." Black's Law Dictionary (11th
ed. 2019); *see also* Merriam-Webster Online Dictionary,
https://www.merriamwebster.com/dictionary/emergency (last visited Sept. 9, 2020) (defining
"emergency" as "an unforeseen combination of circumstances or the resulting state that calls for
immediate action"). Based on the statutory and commonly understood definitions noted above,

Congress unambiguously intended an "emergency allotment" to be distinct from, and not limited to, an "allotment."

Moreover, if, as USDA contends, an "emergency allotment" cannot increase a household's regular "allotment" beyond "the applicable maximum monthly allotment for the household size," (*see* April 21 Guidance), the term "emergency allotment" is substantially meaningless in a statute that, as noted above, is expressly intended to provide emergency relief to *all* SNAP households.  In other words, as to the 40 percent or more of Pennsylvania's SNAP households whose pre-COVID "allotment" was already at the "applicable maximum monthly allotment," the term "emergency allotment" is illusory and superfluous.  *See, e.g., Geisinger Cmty. Med. Ctr. v. Sec'y U.S. Dep't of Health & Human Servs.,* 794 F.3d 383, 392 (3d Cir. 2015) ("One of our 'most basic interpretive canons' is that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)); *Massie v. U.S. Dep't of Hous. & Urban Dev*., 620 F.3d 340, 352 (3d Cir. 2010) ("[A] core tenet of statutory interpretation [is] 'that no provision shall be superfluous, void, or insignificant.'" (quoting *In re Phila. Newspapers, LLC*, 599 F.3d 298, 330 (3d Cir. 2010)).)  Absent any evidence that Congress intended such a result, we will not construe Section 2302(a)(1) in violation of a cardinal principle of statutory interpretation.

Third, Defendants ignore the express statutory language directing that emergency allotments be provided to address "temporary food needs."  Defendants essentially ask this Court to construe Section 2302(a)(1) as authorizing emergency allotments only if they address "temporary loss of income"—a phrase that is conspicuously absent from the statute.  Examples of this dubious argument abound.  For example, both of USDA's Guidance documents appear to

impose eligibility requirements under which a State requesting "emergency allotments" must confirm that its "residents have experienced economic impacts due to job suspensions or losses." (*See* March 20 Guidance; April 21 Guidance.)  In their Opposition to Plaintiffs' Motion, Defendants argue that "[u]nder USDA's position, all SNAP beneficiaries may potentially receive emergency allotments bringing their aggregate benefits up to the allotment cap on the assumption that the pandemic has widely impacted income levels." (Opp. at 19 (emphasis added); *see also id*. at 7 (arguing that under USDA's Guidance, "a household that initially received only partial SNAP benefits could now quickly secure emergency assistance if, for example, it has suffered a loss of income due to the pandemic.").)  Finally, at the hearing on Plaintiffs' Motion, Defendants' counsel argued that Congress's objective in enacting Section 2302(a)(1) "was to cover the people who ended up having a depreciation in income and to bring them up to the maximum level."  (Hr'g Tr. at 10.)  The text of Section 2302(a)(1) is devoid of any basis to support USDA's argument that Congress expressly provided for "emergency allotments to address temporary food needs," when it actually meant to address only "temporary loss of income."   Moreover, USDA's interpretation on this issue leads to an illogical result under which SNAP households whose regular allotments are below the applicable maximum will receive an "emergency allotment" up to the applicable maximum, regardless of whether they, in fact, suffered any loss of income.

Finally, Defendants' implementation of Section 2302(a)(1) is inconsistent with the statutory directive requiring USDA to provide State-requested emergency allotments supported by "sufficient data (as determined by the Secretary through guidance)."  This language evinces Congress's intent to employ a data-driven process to allow state-by-state consideration of all SNAP households' "temporary food needs."  However, USDA's interpretation of § 2302 reads

this approach out of the act entirely, replacing it with an across-the-board "topping off" of households receiving less than the maximum regular allotment.  Under USDA's Guidance, approval or denial of "emergency allotments" is not based on the sufficiency of a requesting State's supporting "data," as that term is commonly understood.  *See* Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/data (last visited Sept. 9, 2020 (defining "data" as "facts or information used usually to calculate, analyze, or plan something").  USDA's Guidance and accompanying waiver forms do not provide for consideration of the varying impact of COVID-19 and resulting "temporary food needs" across different States, or for the overall fluctuating and unpredictable impact of the pandemic.  Instead, USDA automatically denies any emergency allotments to a substantial percentage of SNAP households solely because, pre-COVID, they received the maximum applicable allotment.

> c.       Other Statutory Construction Principles Do Not Salvage
> Defendants' Interpretation of Section 2302(a)(1)

Although the foregoing statutory analysis is dispositive as to the invalidity of USDA's Guidance, we will nonetheless briefly address Defendants' remaining arguments.

> (i)       The Thrifty Food Plan

Defendants contend that if Congress had intended to provide benefits in excess of the existing SNAP current maximum monthly allotment, it would have altered the "thrifty food plan" and increased the maximum allotment cap, which it did not.  This contention is entirely unsupported, particularly given the circumstances of the FFCRA's enactment.  It is undisputed that there is no legislative history regarding the FFCRA in general, or Section 2302(a)(1) in particular.  (Hr'g Tr. at 11-12.)   Moreover, as Plaintiff's counsel noted, and Defense counsel did not dispute, the FFCRA "was passed in the heat of an emergency and this is not a situation where

the statute was the subject of committee hearings or lengthy discussions in the halls of Congress. It was passed in an emergency fashion to provide emergency relief." (*Id.*)

Where, as here, Congress enacted a provision that is unambiguous, even though hurriedly crafted in the midst of an unprecedented crisis, there is no basis to disturb the statutory language based on speculation. However, it is possible that Congress simply chose not to alter the "thrifty food plan" when enacting Section 2302(a)(1). This provision was enacted in the early stages of the pandemic, when the impact and duration of the crisis were unknown and unpredictable. Given this circumstance, it is equally likely that Congress deliberately chose to temporarily increase all SNAP allotments through temporary "emergency allotments," rather than by increasing the "thrifty food plan" or maximum allotment on a long-term or permanent basis that could only later be altered by a further amendment to the statute. Moreover, we note that, by definition, "emergency allotments to address temporary food needs" are intended to address emergencies and only on a temporary basis. In the context of an unprecedented pandemic of varying geographic severity and unknown duration, it would be illogical to treat either "emergency allotments" or "temporary food needs" as static concepts immutably capped at a nationally uniform "thrifty food plan" established when neither the emergency nor the temporary food needs existed.

(ii)    D-SNAP

The USDA contends that its interpretation of Section 2302(a)(1) is consistent with its implementation of the disaster relief provisions of the FNA, and that Congress intended USDA's D-SNAP Guidance to apply to § 2302(a)(1). This assertion finds no support in the record or the language of Section 2302(a)(1).

First, there is no evidence that Congress considered USDA's D-SNAP Guidance. Moreover, courts are not required to assume Congress's awareness of an administrative interpretation that does not result from notice and comment rulemaking.  *See Rabin v. Wilson-Coker*, 362 F.3d 190, 197 (2d Cir. 2004).

Second, if Congress did consider the D-SNAP guidance and intended to adopt it in § 2302, why didn't Congress use USDA's D-SNAP terminology that Defendants claim applies to the disputed provisions here?  For example, why didn't Congress write § 2302(a)(1) to provide for "emergency supplements" or "supplemental benefits" to "address temporary food needs not greater than the applicable maximum monthly allotment"?  Or even more explicitly, Congress could have expressly stated that "the Secretary shall provide, at the request of a State agency . . . the supplemental benefits authorized by FNA § 2014(h)(1) to address temporary food needs of households affected by COVID-19."  To borrow a phrase from the Supreme Court's majority opinion in *Bostock*, 140 S. Ct. at 1740, "Congress could have taken a more parsimonious approach" and written the statute in one of the above-noted ways if it intended USDA's interpretation to apply.  But Congress did neither.  Section 2302(a)(1) makes no reference to the "supplements" or "replacements" described in USDA's D-SNAP Guidance.  Instead, it provided for "emergency allotments."

Third, why did Congress enact a new provision with § 2302(a)(1) if it intended COVID-19 related "emergency allotments" to be awarded in the same manner as under D-SNAP?  If Congress had intended to provide COVID-19 relief under the auspices of D-SNAP, it could have simply enacted a provision stating that the COVID-19 public health emergency is deemed a "disaster" within the meaning of FNA 2014(h)(1).

Finally, even if we were to speculate, as USDA does, that Congress considered FNA § 2014(h)(1) and USDA's Guidance regarding that provision, the fact that Congress used different terminology—providing for "emergency allotments" *not* "supplements"—suggests that Congress deliberately *did not* intend to import USDA's D-SNAP interpretation into § 2302(a)(1).

Based on the above analysis, the Court finds that USDA's interpretation of, and Guidance regarding, Section 2302(a)(1) is contrary to law. Accordingly, Plaintiffs have demonstrated a likelihood of success on the merits. *See* 5 U.S.C. § 706(2).[12]

### C.   Irreparable Harm to Plaintiffs

 "[T]o show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno*, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotation marks and citation omitted). The harm must be "likely" to occur "in the absence of an injunction." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 217 n.11 (3d Cir. 2014) (emphasis omitted); *see also Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (The preliminary injunction "must be the only way of protecting the plaintiff from harm.").

Plaintiffs contend they will continue to suffer irreparable harm because USDA's guidance "denies them subsistence benefits necessary for them to meet their monthly food needs

---

[12] Because we grant a preliminary injunction based on Plaintiffs' second claim for relief under the APA, the Court need not address Plaintiffs' arbitrary and capricious claim. *See ICENY USA, LLC v. M & M's, LLC*, 421 F. Supp. 3d 204, 218 (D. Md. 2019) ("To the extent that ICENY also claims that the Lanham Act protects against the unauthorized use of other unregistered but proprietary artwork and business methods within the ICENY System, the Court need not address this issue because, as discussed above, the Court finds that ICENY has shown a likelihood of success on the merits of its claim that the use of such information constitutes a breach of contract."); *see also Am. Coll. of Obstetricians and Gynecologists v. United States Food and Drug Admin.*, No. 20-cv-1320, 2020 WL 3960625, at *29 (D. Md. July 13, 2020) (declining to address equal protection clause claim because the court previously found a likelihood of success on the merits of a due process claim).

during the unprecedented crisis occasioned by the COVID-19 pandemic." (Mot. at 28.)
Specifically, Plaintiffs assert that they "have had to go without food during the pandemic
because they did not receive emergency allotments." (*Id*.; *see also* Decl. of Kayla McCrobie ¶¶
7, 10, ECF No. 4-13 ("Every Friday I get supplemental food from a local open food pantry. This
food pantry used to be able to supply fresh produce, milk, eggs, and ground meat, but since the
pandemic started, its sources from restaurants have dried up. Now all I can get there are cans
and other shelf-stable foods. Because of the pandemic, I cannot buy all the food I need for
proper nutrition. I sometimes don't have enough food, and skip meals."); *see also* Decl. of
Latoya Gilliam ¶¶ 6, 9, ECF No. 4-8 ("The prices at the supermarket have gone up since the
pandemic. This makes it even harder for my son and me to eat nutritious food on our SNAP
benefit. I need extra SNAP so my son and me can get by during [the] pandemic.").)

      Given Plaintiffs' economic circumstances, coupled with the exacerbating economic and
public health impact of the COVID-19 crisis, the denial of emergency allotments to such
individuals unquestionably constitutes irreparable harm. *See*, *e.g.*, *Haskins v. Stanton*, 794 F.2d
1273, 1276-77 (7th Cir. 1986) (holding that "the deprivation of food [resulting from the denial of
food stamps] is extremely serious and is quite likely to impose lingering, if not irreversible,
hardships upon recipients"); *Maldonado v. Houstoun*, 177 F.R.D. 311, 333 (E.D. Pa. 1997) ("[A]
reduction in subsistence benefits constitutes irreparable harm to persons on the margin of
subsistence.") (internal quotation marks and citation omitted); *Abreu v. Callahan*, 971 F. Supp.
799, 821 (S.D.N.Y. 1997) (denial of SSI benefits and food stamps "almost universally has been
regarded as irreparable injury because welfare recipients depend upon them not merely as a
convenient medium of exchange, but to sustain life"); *Garnett v. Zeilinger*, 313 F. Supp. 3d 147,
157-58 (D.D.C. 2018) ("forgoing food or other necessities [is] clearly irreparable in nature"). As

Plaintiffs explain in their declarations, their regular SNAP allotments do not put the same amount of food on the table during these extraordinary times and other sources of food (*i.e.*, community food pantries and emergency food sites) are under enormous strain, meaning fewer resources overall are available to Plaintiffs to meet their food needs during this crisis.

The Defendants do not disagree.  Instead, they rehash their redressability argument that "Plaintiffs may only secure emergency allotments upon a favorable ruling if Pennsylvania takes the necessary steps to apply for, and distribute, emergency allotments that ultimately benefit Plaintiffs," and contend that Plaintiffs have not submitted concrete evidence indicating that Pennsylvania would indeed re-apply for emergency allotments.  (Opp. at 24.)  The Court disagrees.  Without repeating the evidence detailed above (*see* Section IV.A., *supra*), the Commonwealth has unambiguously expressed its intent to "issue [e]mergency [a]llotments for all Pennsylvania SNAP households, including the poorest SNAP households who receive the maximum regular SNAP allotment because of their very low income."  (ECF No. 22 at 6 (emphasis in original).)

Here, the denial of a preliminary injunction will deprive Plaintiffs—along with others comprising the approximately 40 percent of, and poorest among, Pennsylvania SNAP households—of any emergency allotments to address their temporary food needs resulting from the COVID-19 crisis.  This harm easily qualifies as irreparable.

**D.        Balance of Equities and the Public Interest**[13]

The Court also finds that the balance of equities tips decidedly in Plaintiffs' favor.  As

discussed above, Plaintiffs will likely suffer serious irreparable harm if the requested relief is

denied.  On their side of the equities scale, Defendants speculate that "Plaintiffs' requested relief

would be detrimental to all SNAP beneficiaries in the long-run.  USDA, like other federal

agencies, operates with only the funds appropriated by Congress . . . Plaintiffs' reading of

[S]ection 2302 [] would thus rapidly deplete relevant SNAP resources, potentially forcing USDA

to soon discontinue further emergency allotments altogether."  (Opp. at 25 (citing Decl. of David

Burr ¶ 17, ECF No. 23-1.)  However, the injunction sought by Plaintiffs does not impose on

USDA any additional burden beyond that imposed by the FFCRA—they merely seek to compel

USDA to fulfill its existing obligations under the law (*i.e.*, to issue emergency allotments to

Pennsylvania SNAP households if requested by the Commonwealth and supported by sufficient

data).  Further, to the extent that the injunction may cause USDA to incur additional expenses or

expend appropriations at a quicker pace, the Court concludes that these concerns are clearly

outweighed by the public interest in providing immediate assistance to low-income SNAP

households that would otherwise be eligible for relief but have not received much needed

emergency allotments.  *See*, *e.g.*, *Wilson v. Heckler*, 622 F. Supp. 649, 655 (D. N.J. 1985), *aff'd

in part and vacated in part*, ("Faced with such a conflict between financial concerns and

preventable human suffering, we have little difficulty concluding that the balance of hardships

tips decidedly in plaintiffs' favor." (internal quotation marks and citation omitted)); *Blanco v.*

---

[13] The Court consolidates its analysis of the last two factors because "[w]here the government is a party, the last two factors in the preliminary injunction analysis, namely the balance of the equities and the public interest, merge."  *City of Phila. v. Sessions*, 28 F. Supp. 3d 579, 657 (E.D. Pa. 2017); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).

*Anderson*, 39 F.3d 969, 973 (9th Cir. 1994) (finding that lack of resources is no excuse for failing to provide the plaintiffs their statutory entitlements under the Food Stamp Act). Moreover, as noted above (*see* Section IV.A .n.8, *supra*), there is no evidence that the requested relief will, in fact, bankrupt the available SNAP appropriations, lead to an across-the-board reduction in allotments, or otherwise harm all SNAP households. In fact, as is also discussed above (*see* Section II.B.1. n.3, *supra*), the evidence here indicates that Congress has never failed to provide additional appropriations to meet the needs of the SNAP program when requested by USDA.

Defendants do not argue that an injunction is against the public interest. Nevertheless, the Court notes that ordering USDA to comply with the terms and intent of Section 2302(a)(1) will advance social welfare by ensuring that low-income SNAP households receive assistance necessary to meet the basic and essential food needs of themselves and their families during this once-in-a-generation public health crisis. *See* 7 U.S.C. § 2011 (Congress enacted SNAP "to promote the general welfare and [to] safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households); *see also Booth*, 830 F. Supp. 2d at 1045 ("[T]he express statutory language makes clear that the food stamp program was designed to serve and promote the public interest. It therefore stands to reason that an injunction requiring compliance with the Act and its implementing regulations would serve those goals."). Accordingly, the Court finds that the public interest favors this preliminary injunction.

## V.  REMEDY

Having found that all factors favor the granting of Plaintiffs' motion, the Court must now craft a remedy. "Although district courts are afforded substantial discretion in fashioning injunctive relief, it should not be broader than required to provide a full remedy to the injured

party." *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464 (3d Cir. 2011).  Moreover,

"injunctive relief should be no more burdensome to the defendant than necessary to provide

complete relief to the plaintiff."  *SEC v. Gentile*, 939 F.3d 549, 560 (3d Cir. 2019) (citing

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)).

During the hearing, the Court asked Plaintiffs' counsel "[w]hat does winning look like to

you?"  (Hr'g Tr. At 54.)  In response, counsel requested that USDA be required to assess

Pennsylvania's requests for emergency allotments, to determine whether such requests are

supported by sufficient data, and if USDA concludes they are, to provide the requested

emergency allotments without regard to the amount of a household's regular SNAP allotment.

(*See generally id.*)  The Court is also mindful of the skepticism regarding the increased issuance

of nationwide injunctions.[14]  In his recent concurrence granting a stay of a nationwide injunction,

Justice Gorsuch addressed "the increasingly common practice of trial courts ordering relief that

transcends the cases before them."  *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600

(2020).  He explained, "these orders share the same basic flaw—they direct how the defendant

must act toward persons who are not parties to the case[,]" but "[e]quitable remedies, like

---

[14] *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2424-25 (2018) ("'[U]niversal' or 'nationwide' injunctions . . . have become increasingly common.  District courts . . . have begun imposing universal injunctions without considering their authority to grant such sweeping relief.  These injunctions are beginning to take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and the Executive Branch."); *see also New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 88 (2nd Cir. 2020) ("The issuance of unqualified nationwide injunctions is a less desirable practice, where, as here, numerous challenges to the same agency action are being litigated simultaneously in district and circuit courts across the country. . . [W]e encourage district courts to consider crafting preliminary injunctions that anticipate the possibility of conflict with other courts and provide for such a contingency.  Such approaches could take the form of limiting language providing that the injunction would not supersede contrary rulings of other courts, an invitation to the parties to return and request modification as the situation changes, or the limitation of the injunction to the situation of particular plaintiffs or to similarly situated persons within the geographic jurisdiction of the court.").

remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit." *Id.*

Based on the submissions in this case and the arguments made by counsel at the hearing, the Court finds it appropriate to grant preliminary injunctive relief limited to Pennsylvania SNAP households, as this would be narrowly tailored to avoid irreparable harm to the named Plaintiffs and the proposed putative class in this action—"all persons living in Pennsylvania who are, were or will be eligible for SNAP benefits during the period for which Congress has authorized the issuance of emergency allotments during the COVID-19 emergency and who were not provided an emergency allotment[.]" (Compl. ¶ 20.) Put another way, the scope of relief afforded to Plaintiffs will be limited statewide in order to remedy the specific alleged harms that have occurred in the Commonwealth. This is appropriate given that Plaintiffs have only offered evidence demonstrating how USDA's guidance has impacted SNAP households in the Commonwealth, and more specifically, what actions the Commonwealth will take on their behalf in the event that the Court grants the requested injunction. (*See* ECF Nos. 4-4 through 4-10, and 4-12 through 4-16.)

The Court is also especially mindful that Rule 65(d) provides that "[e]very order granting an injunction and every restraining order *must* state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B), (C) (emphasis added). "These requirements are not mere technicalities. They 'relate[] to the court's awesome civil and criminal contempt powers. Persons may not be placed at risk of contempt unless they have been given specific notice of the norm to which they must pattern their conduct.'" *Hope v. Warden of York Cty. Prison*, No. 20-1784, 2020 WL 5001785, at *5 (3d Cir.

2020) (quoting *Inmates of Allegheny Cty. Jail v. Wecht*, 754 F.2d 120, 129 (3d Cir. 1985)).  With this in mind, the Court will order as follows:

> To the extent that the Department of Human Services of the Commonwealth of Pennsylvania submits requests, in accordance with Section 2302(a)(1) of the Families First Coronavirus Response Act ("Section 2302(a)(1)"), for emergency allotments, supported by sufficient data (as determined by the Secretary through guidance), to address the temporary food needs of Pennsylvania households participating in the supplemental nutrition assistance program under the Food and Nutrition Act of 2008:
>
> (a)  Defendants are **PRELIMINARILY ENJOINED** from implementing, or denying such requested emergency allotments based upon, their unlawful guidance provisions, most recently updated as of April 21, 2020, stating that "[a] household's [emergency allotment] cannot increase the current monthly household SNAP benefit allotment beyond 'the applicable maximum monthly allotment for the household size[,]' and that SNAP households that already receive the maximum monthly allotment for their household size are not eligible for [emergency allotments]"; and
>
> (b)  Defendants **SHALL** approve or deny such requests in accordance with the statutory directive of Section 2302(a)(1) as construed by this Court in the Memorandum issued concurrently herewith.

Finally, the Court has also considered whether the imposition of a bond is appropriate in this case.  "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The Third Circuit Court of Appeals has acknowledged "on several occasions, that there may be instances in which a strict reading of Rule 65(c) would be inappropriate."  *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991).  Specifically, an exception to Rule 65(c) is warranted when posting a bond would impose a burden on the movant that outweighs any "possible loss to the enjoined party[,]" and when movants seek "to enforce important federal rights or public interests, arising out of comprehensive . . . welfare statutes."  *Id*. at 220 (internal quotation marks and citation omitted).  Here, the Court specifically finds that the instant case represents a "rare exception" to the rule

and will not require Plaintiffs to post a bond in this case, given their financial position, and the

fact that Defendants have failed to allege any true harm they would sustain as a result of the

injunction.  *See id*. at 219 n.26 (citing *Wayne Chem. v. Columbus Agency Serv. Corp*., 567 F.2d

692 (7th Cir. 1977) (no bond requirement from indigent plaintiff)); *see also Zambelli Fireworks*

*Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) (court can excuse bond required for

injunction only on "specific finding" that "rare exception" applies).

## VI.    CONCLUSION

For the reasons discussed above, the Court will grant Plaintiffs' Motion for Preliminary

Injunction, and an appropriate Order will follow.

**IT IS SO ORDERED.**

BY THE COURT:

 /s/ John Milton Younge
**Judge John Milton Younge**