**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LATOYA GILLIAM** and **KAYLA McCROBIE,** individually and on behalf of all others similarly situated, : : : : : | |
| Plaintiffs, : | Case No. 2:20-cv-03504-JMY |
| v. : : | |
| **UNITED STATES DEPARTMENT OF AGRICULTURE** and **GEORGE ERVIN PERDUE III**, in his official capacity as Secretary of the United States Department of Agriculture, : : : : : : | |
| Defendants. : : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

October 26, 2020

John P. Lavelle, Jr. (PA I.D. No. 54279)
Kenneth M. Kulak (PA I.D. No. 75509)
Timothy J. Geverd (PA I.D. No. 324802)
Adina D. Bingham (PA I.D. No. 89860)
Caitlin McKenna (PA I.D. No. 309397)
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA  19103-2921
Tel: (215) 963-5000
Fax: (215) 963-5001
john.lavelle@morganlewis.com
ken.kulak@morganlewis.com
timothy.geverd@morganlewis.com
adina.bingham@morganlewis.com
caitlin.mckenna@morganlewis.com

Louise Hayes (PA I.D. No. 78581)
Amy Hirsch (PA I.D. No. 42724)
**COMMUNITY LEGAL SERVICES OF
PHILADELPHIA**
1410 W. Erie Avenue
Philadelphia, PA 19140
Telephone: (215) 227-2400
Facsimile: (215) 227-2435
LHayes@clsphila.org
AHirsch@clsphila.org

Elizabeth Soltan (PA I.D. No. 327510)
**COMMUNITY LEGAL SERVICES OF
PHILADELPHIA**
1424 Chestnut Street
Philadelphia, PA 19102
Telephone: (215) 981-3700
Facsimile: (267) 765-6481
ESoltan@clsphila.org

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................. 3

    A.   Congress Intends That SNAP Safeguard the Health and Well-Being of America's Low-Income Households ................................................................. 3

    B.   The COVID-19 Public Health Emergency Has Increased Food Insecurity .......... 5

    C.   Congress Responds to Increased Food Insecurity Caused by the COVID-19 Public Health Emergency by Requiring USDA to Provide SNAP Households With "Emergency Allotments" ......................................................... 7

    D.   USDA's Guidance Implementing Section 2302 of the FFCRA Denies "Emergency Allotments" to Households Receiving Maximum SNAP Benefits ............................................................................................................... 8

    E.   USDA Relied on Its Guidance to Deny Pennsylvania's Request to Provide Plaintiffs "Emergency Allotments" to Meet Their Temporary Food Needs ......... 9

    F.   Plaintiffs Challenge USDA's Guidance ............................................................. 10

    G.   The Court Awarded Plaintiffs' Requested Preliminary Injunctive Relief .......... 11

    H.   Pennsylvania's Two Requests to Provide "Emergency Allotments" Pursuant to the Court's September 11 Order ................................................... 12

III. LEGAL STANDARD ......................................................................................... 12

IV.  ARGUMENT ...................................................................................................... 13

    A.   USDA's Interpretation of Section 2302 Is Contrary to Congress's Unambiguously Expressed Intent ..................................................................... 13

        1.   USDA's Interpretation of Section 2302 is Contrary to Section 2302's Plain Text ........................................................................... 14

        2.   USDA's Interpretation of Section 2302 Is Incompatible with The Purpose of the SNAP Statutory Scheme ............................................ 15

        3.   USDA's Interpretation of Section 2302 Renders Certain Terms of Section 2302 Meaningless and Reads Other Terms Into Section 2302 .................................................................................................. 17

        4.   The Court Should Declare That Plaintiffs Are Entitled to Retroactive "Emergency Allotments" ................................................ 19

    B.   USDA's Guidance is Arbitrary and Capricious ................................................. 20

        1.   USDA Did Not Provide a Reasoned Basis for Its Action ...................... 21

        2.   USDA Failed to Consider an Important Aspect of the Problem Presented in Implementing Section 2302 ............................................. 23

## TABLE OF CONTENTS
(continued)

**Page**

C.     The Court Should Vacate the Unlawful Portions of USDA's Guidance ............. 23

D.     Plaintiffs Are Entitled to Permanent Injunctive Relief ......................................... 24

V.     CONCLUSION ............................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001) ............................................................13

*Bintz v. Fed. Emergency Mgmt. Agency*,
    413 F. Supp. 3d 349 (D. Del. 2019) ......................................................13

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ........................................................................19, 20

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ........................................................................13, 22

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*,
    964 F.3d 56 (D.C. Cir. 2020) ...............................................................22

*City of Phila. v. Atty. Gen. of the U.S.*,
    916 F.3d 276 (3d Cir. 2019) ................................................................14

*In re Cont'l Airlines, Inc.*,
    932 F.2d 282 (3d Cir. 1991) ................................................................15

*Council for Urological Interests v. Burwell*,
    790 F.3d 212 (D.C. Cir. 2015) .............................................................21

*Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*,
    975 F.3d 300 (3d Cir. 2020) ................................................................24

*Da Silva v. Att'y Gen. United States*,
    948 F.3d 629 (3d Cir. 2020) ................................................................18

*Dep't of Army v. Blue Fox, Inc.*,
    525 U.S. 255 (1999) .............................................................................20

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ...................................................................20, 23

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) .............................................................................15

*Geisinger Cmty. Med. Ctr. v. Sec'y U.S. Dept. of Health & Hum. Servs.*,
    794 F.3d 383 (3d Cir. 2015) ................................................................17

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Gen. Motors Corp. v. Ruckelshaus*,
  742 F.2d 1561 (D.C. Cir. 1984) ............................................................................22

*Gilliam v. U.S. Dep't of Agric.*,
  --- F. Supp. 3d ----, 2020 WL 5501220 (E.D. Pa. Sept. 11, 2020) .................................. *passim*

*Hall v. United States*,
  132 S. Ct. 1882 (2012)..........................................................................................15

*La. Forestry Ass'n v. Solis*,
  889 F. Supp. 2d 711 (E.D. Pa. 2012) ......................................................................13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Ins. Co.*,
  463 U.S. 29 (1983)...............................................................................................13

*Pharm. Res. & Mfrs. of Am. v. United States*,
  138 F. Supp. 3d 31 (D.D.C. 2015).........................................................................15

*Physicians for Soc. Responsibility v. Wheeler*,
  956 F.3d 634 (D.C. Cir. 2020)...............................................................................13

*Prometheus Radio Project v. Fed. Commc'ns Comm'n*,
  939 F.3d 567 (3d Cir. 2019), *cert. granted* --- S. Ct. ----, 2020 WL 5847134
  (U.S. Oct. 2, 2020)...............................................................................................20

*S.E.C. v. Chenery Corp.*,
  318 U.S. 80 (1943)...............................................................................................23

*SAS Inst. Inv. v. Iancu*,
  138 S. Ct. 1348 (2018)..........................................................................................14

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947)..............................................................................................21

*Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*,
  783 F.3d 156 (3d Cir. 2015)...................................................................................14

*Smith v. City of Jackson, Miss.*,
  544 U.S. 228 (2005)..............................................................................................16

*Smith v. Fid. Consumer Disc.*,
  898 F.2d 907 (3d Cir. 1990)...................................................................................15

*Sorensen Commc'ns. Inc. v. F.C.C.*,
  755 F.3d 702 (D.C. Cir. 2014)...............................................................................24

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Parcel of Land, Bldgs., Appurtenances & Improvements, Known as 92 Buena Vista Ave, Rumson, N.J.,*
507 U.S. 111 (1993) ...................................................................................................15

*United Steel v. Mine Safety & Health Admin.,*
925 F.3d 1279 (D.C. Cir. 2019) .................................................................................23

*Zellous v. Broadhead Assocs.,*
906 F.2d 94 (3d Cir. 1990) .........................................................................................20

**Statutes**

5 U.S.C. § 702 ...............................................................................................................19, 24

7 U.S.C. § 2011 ...............................................................................................................3, 16

7 U.S.C. § 2012(b) ..............................................................................................................17

7 U.S.C. § 2014(h)(3)(A) ...............................................................................................3, 16

7 U.S.C. § 2017(a) ..............................................................................................................16

7 U.S.C. § 2023(b) ..............................................................................................................20

**Rules**

7 C.F.R. § 273.10(e)(1)(ii)(A) ............................................................................................4

7 C.F.R. § 273.12(c) ...........................................................................................................19

7 C.F.R. § 273.17(a)(2) .......................................................................................................20

**Other Authorities**

Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 178
(Mar. 18, 2020) ............................................................................................... *passim*

## I.      INTRODUCTION

The only determination the Court needs to make on summary judgment is whether USDA's guidance implementing Section 2302 of the Families First Coronavirus Response Act ("FFCRA") is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Under the Administrative Procedure Act ("APA"), the entire case is a question of law at summary judgment.  The Court correctly has found "that USDA's interpretation of, and Guidance regarding, Section 2302(a)(1) is contrary to law." *Gilliam v. U.S. Dep't of Agric.*, --- F. Supp. 3d ----, 2020 WL 5501220, at *15 (E.D. Pa. Sept. 11, 2020).  Plaintiffs' entitlement to relief therefore is clear and the Court should grant Plaintiffs' motion for summary judgment.

Plaintiffs are Pennsylvanians who receive maximum monthly SNAP benefits.[1]  They are dependent on Supplemental Nutrition Assistance Program ("SNAP") benefits to purchase food as, after accounting for necessary expenses, they have no disposable income left to meet their households' monthly food needs.  In ordinary times, maximum SNAP benefits are insufficient to meet a household's monthly food needs.  These, however, are not ordinary times.  The COVID-19 pandemic has caused disruptions to America's food supply chains that have increased the price of food, and restrictions on travel and the operation of businesses have limited its availability altogether.  These impacts have decreased the purchasing power of already inadequate SNAP benefits and SNAP households, like Plaintiffs', have been even less able to meet their monthly food needs.

Recognizing the plight of SNAP households, on March 18, Congress – in Section 2302 of the FFCRA – directed USDA to provide all SNAP households "emergency allotments" by

---

[1] The putative Plaintiff class also includes households receiving slightly less than the maximum SNAP benefit, who received "emergency allotments" insufficient to meet their temporary food needs, pursuant to USDA's unlawful guidance.

approving properly-supported "emergency allotment" requests so long as public emergency declarations are in effect at both the federal level, from the Secretary of the Department of Health and Human Services ("HHS"), and in the requesting state.  Since the passage of the FFCRA, however, USDA has shirked its responsibility to America's neediest households.

Following enactment of the FFCRA, USDA issued guidance authorizing "emergency allotments" only "to bring all households up to the maximum benefit" and denying "emergency allotments" to households already receiving maximum SNAP benefits – i.e., America's poorest households.  Pennsylvania requested authorization to provide all Pennsylvania SNAP households – including Plaintiffs' – emergency subsistence benefits equal to 50 percent of the maximum SNAP benefit.  Relying on its erroneous interpretation of Congress' directive, however, USDA denied Pennsylvania's request to the extent it would authorize issuance of "emergency allotments" that, when combined with regular SNAP allotments, would exceed the maximum benefit for a household's size.  As a result, Plaintiffs did not receive "emergency allotments" to which they are entitled.  In response, Pennsylvania expressed, and has continued to express, its disagreement with USDA's interpretation of Section 2302 and has made clear its intent to provide "emergency allotments" to all SNAP households if permitted to do so.  USDA, however, has refused to reconsider its unlawful interpretation of Section 2302.  To date, Plaintiffs have received no "emergency allotments" to which they have been entitled for the period from March 18, 2020 forward.

For the reasons set forth below, Plaintiffs are entitled to summary judgment.  The Court therefore should vacate the unlawful portions of USDA's guidance interpreting "emergency allotments" authorized under Section 2302 and permanently enjoin Defendants from implementing guidance or denying properly supported Pennsylvania requests for "emergency

allotments" based upon their unlawful interpretation of "emergency allotments" authorized

under Section 2302.[2]

## II.   BACKGROUND

### A.   Congress Intends That SNAP Safeguard the Health and Well-Being of America's Low-Income Households

Recognizing that America's low-income households possess "limited purchasing power"

which "contributes to hunger and malnutrition among members" of those households, Congress

implemented the SNAP statutory scheme to increase the "food purchasing power" of those

households and enable the members of those households "to obtain a more nutritious diet

through normal channels of trade" and "alleviate . . . hunger and malnutrition." Pls.' Statement

of Undisputed Material Facts ("SUMF") ¶ 3. Congress increases the "food purchasing power" of

America's low-income households through benefits – referred to as "allotments" – redeemable

for SNAP-eligible foods at SNAP-eligible retailers. *Id.* ¶ 4.

It is well established that a nutritious and adequate diet is essential to healthy living and

child development, and SNAP benefits contribute to preserving recipients' overall health. *Id.* ¶

5. SNAP participation reduces food insecurity among children; birth weight is higher among

infants born to mothers receiving SNAP, compared to infants of similar mothers who do not; and

SNAP receipt is associated with better child health and reduced child hospitalizations. *Id.* ¶¶ 7-

9. As the primary means of promoting food security for low-income people, SNAP benefits play

a crucial role in protecting the nation's health. *Id.* ¶ 6.

To be eligible to receive any SNAP benefits, a household's net income must generally be

at or below the federal poverty level. *Id.* ¶ 10. Monthly allotments for eligible households are

---

[2] With Defendants' consent, Plaintiffs are simultaneously filing an Amended Complaint to clearly set out the relief they seek, including retroactive relief dating back to enactment of the FFCRA.

equal to "the maximum SNAP allotment for the household's size reduced by 30 percent of the household's net monthly income."  *Id.* ¶ 11.  A SNAP household's "net monthly income" is the household's "gross monthly income earned by all household members" less eligible expense deductions for basic necessities other than food. *Id.* ¶ 12.  Accordingly, households receiving maximum monthly SNAP benefits have zero net income after deducting expenses for necessities other than food.  Put differently, without SNAP benefits, households receiving maximum monthly SNAP benefits have no money to buy food unless they forgo other necessities.  *Id.* ¶ 13.

From October 1, 2019 through September 30, 2020, the maximum monthly allotment for an individual was $194.  SUMF ¶ 14.  As the household size increases, so does the maximum monthly allotment, as illustrated in the table below:

| Family Size | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Each Additional |
|---|---|---|---|---|---|---|---|---|---|
| Maximum | $194 | $355 | $509 | $646 | $768 | $921 | $1,018 | $1,164 | Add $146 |

However, even in normal times, it is widely understood that maximum SNAP benefits are inadequate to meet monthly food needs.  *Id.* ¶ 15.  SNAP allotments are based on the Thrifty Food Plan (TFP), a calculation of the cost of a "market basket" of food items using the Consumer Price Index.  *Id.* ¶ 16.  Although the value of allotments is limited to the TFP, even USDA has determined "that *the median weekly amount that <u>food secure</u> families spend on food is <u>31% higher than the maximum amount of TFP</u>*."  *Id.* ¶ 18.  Indeed, USDA found even the most food insecure households spent 8 percent more than the maximum TFP allotment.  *Id.* ¶ 19. Since food is more expensive in Pennsylvania relative to the rest of the country, the maximum SNAP benefit based on the TFP has even less purchasing power in Pennsylvania.  *Id.* ¶¶ 20.

That SNAP households' monthly food needs exceed the TFP is unsurprising.  An individual receiving the maximum SNAP benefit of $194 for a 31-day month has only $6.25 to

spend on food per day and only $2.08 to spend per meal.  As family size increases, the spending power of maximum SNAP benefits decreases.  Thus, a household of five receiving the maximum SNAP benefit of $768 for a 31-day month has only $4.95 to spend on food per day for each member of the household and only $1.65 to spend per meal for each household member.

Given the inadequacy of SNAP benefits, households receiving maximum SNAP benefits have turned to several strategies to maximize the purchasing power of those benefits.  These include: (1) comparison shopping for the best prices; (2) reducing the quality and size of meals, skipping meals in order to feed their children, or not eating for a whole day; (3) not paying other essential bills, such as rent or utility bills, which may lead to other forms of severe hardship such as eviction or utility shutoffs, or forgoing needed medical care; (4) seeking emergency food, despite its poor quality and the stigma of doing so; and (5) use of other food programs, including school meals for children, WIC for pregnant women and children under five, and meals offered at some child care centers and senior centers.  *Id.* ¶ 21.

**B.      The COVID-19 Public Health Emergency Has Increased Food Insecurity**

The COVID-19 public health emergency and its attendant economic consequences have exacerbated the inadequacy of SNAP benefits.  *Id.* ¶¶ 22-24.  In April 2020, the price of groceries grew 2.6% according to the Bureau of Labor Statistics, which was the biggest increase in grocery prices from one month to the next since 1974.  *Id.* ¶ 25.  Food insecurity among all households, and among children, remains at unprecedented levels.  *Id.* ¶ 26.  Households receiving maximum SNAP benefits, which already were diverting money from necessities to meet their monthly food needs, have been forced to forgo further necessities to meet their monthly food needs in the midst of the global pandemic.  *Id.* ¶ 31.

Recent nationally representative surveys conducted since the onset of the pandemic consistently have found dramatic increases in food insecurity, with rates of food insecurity

having effectively doubled.  *Id.* ¶ 32.  Overall, studies find household food insecurity rates above 20 percent; more than one in three households with children are food insecure.  *Id.* ¶ 33.  In addition, 17.4 percent of mothers with children 12 and under reported their children were experiencing food insecurity, a 460 percent increase from 2018.  *Id.* ¶ 34.  In June and July, rates of very low food security among children worsened, increasing from 16.4 percent in the first week of June to 19.0 percent by the third week of July.  *Id.* ¶ 29.  This evidence suggests today's food insecurity rates are higher than at any point in the Great Recession.  *Id.* ¶ 34.

In Pennsylvania, COVID-19 spread rapidly throughout the state after the first presumptive positive cases were reported on March 6, 2020.  *Id.* ¶¶ 56, 60.  On that same day, Governor Wolf issued a Proclamation of Disaster Emergency for the Commonwealth of Pennsylvania.  *Id.* ¶ 57.  Shortly thereafter, Pennsylvania began implementing measures to mitigate the spread of COVID-19.  *Id.* ¶ 58.  These measures included the mandatory shuttering of non-essential businesses, a statewide stay-home order, requiring Pennsylvania residents to shelter in place other than for essential travel, and reduced public transportation availability.  *Id.* Governor Wolf most recently renewed Pennsylvania's Proclamation of Disaster Emergency on August 31 and it is in effect until December 1, 2020.  *Id.* ¶ 59.

COVID-19 also increased food insecurity in Pennsylvania.  Researchers at Penn State estimated that one in three Pennsylvanians was food insecure at the end of March 2020.  *Id.* ¶ 35. The COVID Impact Study found in May 2020 that 15 percent of Pittsburgh households were food insecure, meaning "the food that we bought just didn't last, and we didn't have money to get more," and that one in five Pittsburgh households were "worried our food would run out before we got money to buy more."  *Id.* ¶ 36.  Between May and July, on average 19.7 percent of all households in Pennsylvania, and 28.7 percent of households with children, were characterized

by food insecurity. Rates of food insecurity were particularly high among Black (39.4 percent) and Hispanic (40.7 percent) households with children.  *Id.* ¶¶ 37-38.

These fundamental changes in Pennsylvanians' daily lives have forced SNAP households to alter their shopping habits and to abandon many strategies employed to conserve their SNAP benefits.  *Id.* ¶ 40.  These same changes have led to a dramatic increase in the need for emergency food resources, at the same time that many local pantries – frequently run by elderly volunteers – have shut their doors.  *Id.* ¶ 41.

### C.   Congress Responds to Increased Food Insecurity Caused by the COVID-19 Public Health Emergency by Requiring USDA to Provide SNAP Households With "Emergency Allotments"

Congress recognized that, amidst the COVID-19 public health emergency and its attendant effects on the price of food, regular SNAP benefits would be inadequate to meet SNAP households' monthly food needs.  Therefore, on March 18, Congress passed Section 2302 of the FFCRA, directing USDA to provide SNAP households emergency subsistence benefits for SNAP households referred to as "emergency allotments."  *Id.* ¶¶ 43-44.

Congress instructed that USDA "shall provide . . . emergency allotments" to all SNAP households in order "to address temporary food needs" of SNAP households upon receipt of a state's properly supported request.  *Id.* ¶ 44.  Congress authorized states to request "emergency allotments" after (1) the Secretary of HHS declares a public health emergency and (2) the requesting state issues an emergency or disaster declaration based on a COVID-19 outbreak.  *Id.*

The "emergency allotments" authorized under Section 2302 are meant "to support families and the most vulnerable" by providing "funding and flexibility for emergency nutritional aid for senior citizens, women, children, and low-income families."  *Id.* ¶ 45. Therefore, Congress left USDA little discretion with respect to issuing "emergency allotments." While Section 2302 authorizes USDA to issue guidance determining what data is necessary to

support a request for "emergency allotments," it does not authorize USDA to determine which

SNAP households receive "emergency allotments" and which do not.  It directs USDA to

provide all SNAP households "emergency allotments" sufficient in value to meet their

"temporary food needs," as supported by data states provide with their requests pursuant to

USDA guidance.  The only limitation Congress placed on its directive was that the value of

"emergency allotments" could not exceed the value of the maximum monthly benefit for a given

households' size.  *Id.* ¶ 44.

      **D.**    **USDA's Guidance Implementing Section 2302 of the FFCRA Denies
"Emergency Allotments" to Households Receiving Maximum SNAP Benefits**

Despite Congress's directive, USDA issued guidance denying "emergency allotments" to

SNAP households receiving maximum monthly SNAP benefits.  On March 20, USDA issued

guidance stating, without explanation, that "emergency allotments" were authorized only "to

bring all households up to the maximum benefit."  *Id.* ¶ 50.  Then, on April 11, USDA issued a

memorandum stating that "emergency allotments" authorized under Section 2302 of the FFCRA

"are supplements to a household's SNAP benefits, similar to supplements authorized during

disasters under Sec. 5(h)(3)(A) of the Food and Nutrition Act of 2008 (FNA)," that "are added

on to a household's monthly benefit so the total household benefit amount may equal the

maximum benefit amount for their household size."  *Id.* ¶ 51.  Thus, households already

receiving "the maximum benefit for their household size may not receive an additional

emergency allotment."  *Id.*   On April 21, USDA issued updated guidance reiterating that

"emergency allotments" could not "increase the current monthly household SNAP benefit

allotment beyond 'the applicable maximum monthly allotment for the household size'" and that

SNAP households already receiving maximum benefits "are not eligible for ['emergency

allotments']."  *Id.* ¶ 52.

Collectively, USDA's guidance denies "emergency allotments" to the poorest SNAP households receiving maximum monthly benefits and, instead, targets emergency subsistence benefits toward SNAP households with substantially more disposable income to devote to food needs. A household of one person with an entire food budget of $2.08 per meal received no emergency subsistence benefits, while a household of one person with considerably higher income qualifying for the minimum SNAP benefit of $16 per month received $178 per month in emergency subsistence benefits.

### E.     USDA Relied on Its Guidance to Deny Pennsylvania's Request to Provide Plaintiffs "Emergency Allotments" to Meet Their Temporary Food Needs

On January 31, 2020, the Secretary of Health and Human Services declared a public health emergency for the entire United States based on the COVID-19 outbreak. *Id.* ¶ 54. The Secretary of HHS has since renewed this declaration of public health emergency and it is currently in effect through January 20, 2021. *Id.* ¶ 55. On March 6, Governor Wolf issued a Proclamation of Disaster Emergency based on the COVID-19 outbreak within Pennsylvania. *Id.* ¶ 57. As noted above, Governor Wolf has renewed Pennsylvania's disaster proclamation twice and it currently is in effect until December 1, 2020. *Id.* ¶ 59.

On March 13, Pennsylvania submitted a waiver request to USDA requesting the ability to provide all SNAP households benefits equal to 50 percent of the maximum SNAP allotment for their household size. *Id.* ¶ 61. After USDA issued its first guidance document setting forth its interpretation of "emergency allotments," Governor Wolf sent USDA a letter urging the agency to reconsider its interpretation of the FFCRA, explaining that the FFCRA "authorizes USDA to provide an *additional* emergency allotment to all households, up to the maximum benefit for their household size" and Pennsylvania's concern "that the poorest households, particularly those with very young children, would not be eligible to receive anything under [USDA's]…reading of

the law." *Id.* ¶ 62.  On March 31, Pennsylvania submitted a second waiver request, conforming to USDA's guidance while reiterating its disagreement with USDA's narrow interpretation of "emergency allotments" available under Section 2302 of the FFCRA.  *Id.* ¶ 63.

USDA granted Pennsylvania's March 31 waiver request on April 2, permitting issuance of "emergency allotments" only to bring all SNAP households up to the maximum regular allotment for their household size.  *Id.* ¶ 64.  On April 10, USDA denied *en masse* all state requests, like Pennsylvania's original request, that would result in "[p]roviding emergency allotments that exceed the maximum benefit for a household's size."  *Id.* ¶ 65.  In response, on April 27, Governor Wolf again wrote to USDA disagreeing with its interpretation of the FFCRA, noting that USDA's interpretation leaves the approximately 40% of Pennsylvania SNAP households who already receive the maximum SNAP benefit "unable to fill their pantries as recommended."  *Id.* ¶ 66; *see also id.* ¶ 68.

Pennsylvania issued "emergency allotments" to SNAP households receiving less than maximum SNAP benefits for the months of March through September and is issuing such "emergency allotments" for October.  *Id.* ¶ 67.  During this time, households of one receiving the minimum benefit of $16 have received "emergency allotments" of $178 per month, bringing them up to the maximum benefit of $194, pursuant to USDA's guidance.  Far poorer households already receiving the maximum allotment have received no "emergency allotments."

### F.      Plaintiffs Challenge USDA's Guidance

On July 16, Plaintiffs filed a complaint for declaratory and injunctive relief challenging USDA's guidance implementing Section 2302 on the grounds that the guidance was not in accordance with law and was arbitrary and capricious.  *Id.* ¶ 70.  On July 27, Plaintiffs filed a motion to preliminarily enjoin USDA from relying on its unlawful guidance.  *Id.* ¶ 71.

USDA opposed Plaintiffs' motion for preliminary injunction on August 10.  *Id.* ¶ 72.  In

its opposition, USDA set forth several arguments to defend USDA's interpretation of Section

2302 consistent with Congress's intent, which are addressed in more detail below.  In addition,

USDA disclaimed that Section 5(h)(3)(A) of the FNA – which USDA identified as the basis for

its interpretation of Section 2302 in its April 11 memorandum – provided the basis for its

guidance, asserting that Section 5(h)(3)(A) "provides little guidance on the proper interpretation

of section 2302."  *Id.* ¶ 73.  USDA instead argued that its guidance was based solely on its "legal

interpretation of section 2302."  *Id.* ¶ 74.

During the Court's hearing on Plaintiffs' motion, counsel for USDA again denied that

Section 5(h)(3)(A) of the FNA supplied the basis for USDA's guidance.  *Id.* ¶¶ 76-77.

Specifically, counsel asserted that USDA issued "only two formal guidance documents" – one on

March 20 and one on April 21 – and "USDA references Section 5(h)(3)(A) zero times" in those

documents.  *Id.* ¶ 76.  Counsel explained further that USDA referenced Section 5(h)(3)(A) in an

attempt "to illuminate [Section] 2302" in a "Q and A document."  *Id.* ¶ 77.  In doing so, counsel

for USDA stated: "I'm not here to deny and we did not dispute it in our response brief and I'm

not disputing it here, that that is not the most effective way to illuminate the operation of 2302."

*Id.*  Counsel for USDA argued that the only ground invoked for USDA's action in the "guidance

documents" was USDA's interpretation of  "the plain text of [Section] 2302."  *Id.* ¶ 76.

### G.    The Court Awarded Plaintiffs' Requested Preliminary Injunctive Relief

Following the hearing on Plaintiffs' motion for preliminary injunction and the parties'

submission of supplementary evidence, the Court issued a Memorandum and Order on

September 11 granting Plaintiffs' requested preliminary injunction.  *Id.* ¶ 78.  The Court found

"that USDA's interpretation of, and Guidance regarding, Section 2302(a)(1) is contrary to law."

*Id.* ¶ 79.  The Court thus enjoined USDA from denying any request for "emergency allotments"

from Pennsylvania based on its "unlawful guidance provisions" and ordered USDA to "approve or deny such requests in accordance with the statutory directive of Section 2302(a)(1) as construed by th[e] Court . . . ."  *Id.* ¶ 80.  The Court later clarified that its Preliminary Injunction Order applied only prospectively, but did not rule on whether Plaintiffs ultimately are entitled to retroactive benefits should they prevail on the merits.  *Id.* ¶ 81.

### H. Pennsylvania's Two Requests to Provide "Emergency Allotments" Pursuant to the Court's September 11 Order

Following the Court's entry of its September 11 Order granting Plaintiffs' preliminary injunction, Pennsylvania submitted two requests to provide "emergency allotments."  *Id.* ¶ 82. Pennsylvania submitted the first of these requests on September 22, seeking authorization to provide "emergency allotments" for the period of March 2020 through October 2020 equal to 50 percent of the maximum SNAP benefit for SNAP households that had not previously received "emergency allotments."  *Id.* ¶ 83.  Pennsylvania submitted the second of these requests on September 30, seeking authorization to provide "emergency allotments" for the period of March 2020 through October 2020 for SNAP households that had previously received "emergency allotments" in an amount less than 50 percent of their regular monthly SNAP benefit.  *Id.* ¶ 84. Following Pennsylvania's submission of its September 22 request, USDA requested information regarding the estimated costs and number of households that would receive "emergency allotments" pursuant to the request, which Pennsylvania provided.  *Id.* ¶ 85.  USDA also requested additional information regarding financial reporting periods, which Pennsylvania also provided.  *Id.* ¶ 85.

## III. LEGAL STANDARD

In APA cases, "[s]ummary judgment is the 'mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent

with the APA standard of review.'" *Bintz v. Fed. Emergency Mgmt. Agency*, 413 F. Supp. 3d

349, 360 (D. Del. 2019) (quoting *La. Forestry Ass'n v. Solis*, 889 F. Supp. 2d 711, 720 (E.D. Pa.

2012)) (internal citation omitted). The "customary summary judgment standard" of determining

whether there exist disputes of material fact, however, "does not apply." *Id.* (citations omitted).

"The entire case on review is a question of law." *E.g.*, *Am. Bioscience, Inc. v. Thompson*, 269

F.3d 1077, 1083 (D.C. Cir. 2001) (citation omitted).

The Court's task, therefore, is to determine whether USDA's guidance is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." *Bintz,* 413 F. Supp.

3d at 360. Under this standard, the Court "must reject administrative constructions" of statutes

"which are contrary to clear congressional intent" and ensure that USDA "articulate[d] a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made." *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843

n.9 (1984) (collecting cases); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Ins. Co.*,

463 U.S. 29, 43 (1983) (quotation omitted); *see also Physicians for Soc. Responsibility v.*

*Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) ("It is axiomatic that the APA requires an agency to

explain its basis for a decision.").

Plaintiffs are entitled to summary judgment because (1) USDA's interpretation of

"emergency allotments" authorized under Section 2302 set forth in its guidance is contrary to

Congress's unambiguously expressed intent and (2) USDA's guidance implementing Section

2302 is arbitrary and capricious.

## IV.   ARGUMENT

### A.   USDA's Interpretation of Section 2302 Is Contrary to Congress's Unambiguously Expressed Intent

This Court already has concluded that the text of Section 2302 and Congress's intent in

enacting Section 2302 "are unambiguous." *Gilliam,* 2020 WL 5501220, at \*10.  The "statutory language" of Section 2302 and the overall "purpose of the SNAP statutory scheme" instruct (1) USDA to provide "emergency allotments" to all SNAP households and (2) make clear that "emergency allotments" are payments separate from, and not reduced by, SNAP households' regular SNAP benefits.  *See id.* at \*10-14.  USDA's interpretation of "emergency allotments" authorized under Section 2302 as limited to bringing SNAP households up to the maximum monthly benefit and unavailable to SNAP households already receiving maximum monthly benefits contravenes Congress's unambiguously expressed intent and is therefore invalid. *Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*, 783 F.3d 156, 167 (3d Cir. 2015).

> ### 1.       USDA's Interpretation of Section 2302 is Contrary to Section 2302's Plain Text

Ascertaining Congress's intent begins with "the text of the statute."  *City of Phila. v. Atty. Gen. of the U.S.*, 916 F.3d 276, 284 (3d Cir. 2019) (citation omitted).  The plain text of Section 2302 instructs that USDA – after the Secretary of HHS declares a public health emergency – "shall provide . . . for emergency allotments to households participating in [SNAP] . . .  to address temporary food needs not greater than the applicable maximum monthly allotment for the household size" upon a properly supported request of a state in which an "emergency or disaster declaration" has been issued.  *Gilliam,* 2020 WL 5501220, at \*10.  The word "shall" imposes a "nondiscretionary duty" on USDA to provide "emergency allotments" upon a state's properly supported request.  *Id.* at \*12; *see also SAS Inst. Inv. v. Iancu*, 138 S. Ct. 1348, 1354 (2018).

The duty imposed on USDA is to provide "emergency allotments to households participating in [SNAP]" without qualification or limitation.  Such language does not permit

USDA to disqualify SNAP households receiving maximum monthly benefits from receiving the "emergency allotments" Congress directed USDA to provide.  *Gilliam*, 2020 WL 5501220, at *12; *see, e.g.*, *United States v. Parcel of Land, Bldgs., Appurtenances & Improvements, Known as 92 Buena Vista Ave, Rumson, N.J.*, 507 U.S. 111, 123 (1993); *In re Cont'l Airlines, Inc.*, 932 F.2d 282, 288 (3d Cir. 1991); *Smith v. Fid. Consumer Disc.*, 898 F.2d 907, 912 (3d Cir. 1990).

If Congress intended to delegate to USDA the authority to determine which SNAP households received "emergency allotments" and which SNAP households did not, "it did not so provide in" Section 2302.  *Cf. Hall v. United States*, 132 S. Ct. 1882, 1893 (2012).  Congress could have instructed USDA to provide "emergency allotments" to bring "households participating in [SNAP]" up to the maximum benefit for their household size.  It did not. Congress also could have instructed USDA to provide "emergency allotments to households participating in [SNAP]" that receive less than the maximum monthly benefit.  *Gilliam,* 2020 WL 5501220, at *10.  Again, it did not.  And it is not for USDA or the Court to "rewrite the statute."  *Hall*, 566 U.S. at 523; *see also Pharm. Res. & Mfrs. of Am. v. United States*, 138 F. Supp. 3d 31, 53 (D.D.C. 2015) ( "[I]t is simply not for [this Court] to rewrite the statute." (citation omitted) (second alteration in original)).

### 2.      USDA's Interpretation of Section 2302 Is Incompatible with The Purpose of the SNAP Statutory Scheme

A "fundamental canon of statutory construction" is "that the words of a statute must be read in their context and with a view of their place in the overall statutory scheme."  *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal citation omitted).  Courts "must therefore interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an [sic] harmonious whole."  *Id.* (internal citations omitted).

"By its terms," Section 2302 "is indisputably part of the overall SNAP statutory scheme established under the FNA." *Gilliam,* 2020 WL 5501220, at *11; *see also* FFCRA § 2302 (codified at 7 U.S.C. 2011 note).  The declared purpose of SNAP is to "rais[e] the levels of nutrition among low-income households."  7 U.S.C. § 2011.  Congress thus designed SNAP to provide the most benefits to households with the least income.  *See id.* § 2017(a) ("The value of the allotment which State agencies shall be authorized to issue any households certified as eligible to participate in [SNAP] shall be equal to the cost to such households of the thrifty food plan reduced by an amount equal to 30 per centum of the household's income . . . .").

USDA's interpretation of Section 2302, however, turns the declared purpose and design of SNAP on its head.  It provides SNAP households with the least income no emergency subsistence benefits while providing SNAP households with relatively higher incomes the highest emergency subsistence benefits.

USDA's interpretation of "emergency allotments" authorized under Section 2302 also is *inconsistent* with its interpretation of the same phrase in another provision of the SNAP statutory scheme.  Section 2014(h)(3)(A) instructs USDA to "provide … for emergency allotments to eligible households to replace food destroyed in a disaster."  Under this authority, USDA administers its D-SNAP program through which it provides SNAP households replacement benefits – i.e., "emergency allotments" – that are separate from, and not reduced by, those households' regular SNAP benefits.  SUMF ¶¶ 46-47.  The D-SNAP program also authorizes supplements, *in addition to emergency allotments*, that bring SNAP households up to the maximum monthly benefit.  *Id.* ¶¶ 47-48.  Courts presume that "when Congress uses the same language in two statutes having similar purposes . . . Congress intended that text to have the same meaning in both statutes."  *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005)

(citation omitted).  And Congress's deliberate choice to use the phrase "emergency allotments" in Section 2302 indicates that "Congress deliberately *did not* intend" USDA to only provide SNAP households "supplements."  *See Gilliam*, 2020 WL 5501220, at *15 (emphasis in original).

### 3.  USDA's Interpretation of Section 2302 Renders Certain Terms of Section 2302 Meaningless and Reads Other Terms Into Section 2302

Another basic canon of statutory interpretation is that Courts should construe statutes "so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Geisinger Cmty. Med. Ctr. v. Sec'y U.S. Dept. of Health & Hum. Servs.*, 794 F.3d 383, 392 (3d Cir. 2015) (internal citation omitted).

As discussed above, Section 2302 is part of the SNAP statutory scheme. Under SNAP, an "[a]llotment" means "the total value of benefits a household is authorized to receive during each month."  7 U.S.C. § 2012(b).  "'[B]enefit' means the value of supplemental nutrition assistance provided to a household . . . ."  *Id.* § 2012(d).  Thus, standing alone, an "allotment" is the value the supplemental nutrition assistance provided to SNAP households each month.

USDA's reading of Section 2302 to cap "emergency allotments" at the total maximum monthly benefit renders the word "emergency" and, in turn, the "phrase 'emergency allotments' . . . meaningless and superfluous to nearly half of Pennsylvania's SNAP households who also happen to be in the most dire need of emergency assistance."  *Gilliam*, 2020 WL 5501220, at *12.  As this Court correctly recognized, Congress in Section 2302 deliberately modified the defined term "allotment" with the word "emergency."  *Id.*  The word "emergency" must mean something.

While the SNAP statutory scheme does not define "emergency," its ordinary meaning as set forth in "standard reference works such as legal and general dictionaries" makes clear

Congress's intent.  *See Da Silva v. Att'y Gen. United States*, 948 F.3d 629, 635 (3d Cir. 2020) (internal citation omitted).  An "emergency" is a "sudden" and "unforeseen" change in or combination of "circumstances" that require "immediate action to avert, control, or remedy harm."  *See Emergency*, Black's Law Dictionary (11th ed. 2019) ("A sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm."); *Emergency*, Merriam-Webster Online Dictionary ("[A]n unforeseen combination of circumstances or the resulting state that calls for immediate action"), *available at* https://www.merriam-webster.com/dictionary/emergency (last visited Oct. 26, 2020).

Reading the statutorily defined term "allotment" together with the ordinary meaning of "emergency," Congress clearly intended that "emergency allotments" authorized under Section 2302 be "benefits a household is entitled to receive during each month "to avert, control, or remedy harm" occasioned by an "unforeseen change in" or "combination of circumstances" that are separate from, and not reduced by, a SNAP household's regular SNAP allotment. *Gilliam*, 2020 WL 5501220, at *12 ("Based on the statutory and commonly understood definitions noted above, Congress unambiguously intended an 'emergency allotment' to be distinct from, and not limited to, an 'allotment.'").

USDA's interpretation of Section 2302 also reads the phrase "temporary food needs" out of the statute.  "[T]he express statutory language direct[s] that emergency allotments be provided to address 'temporary food needs.'"  *Id.* at *13.  USDA reads Section 2302 as providing "emergency allotments" to address "temporary loss of income."  Putting aside that SNAP households receiving maximum SNAP benefits could experience "temporary loss of income" amidst the COVID-19 public health emergency just like any other SNAP household, the phrase "'temporary loss of income' . . . is conspicuously absent from the statute."  *Id.*  In addition,

Congress and USDA long have provided for SNAP benefits to be quickly adjusted upwards when a household's income falls.  State agencies must take "prompt action on all changes to determine if the change affects the household's eligibility or allotment." 7 C.F.R. § 273.12(c).  Changes, such as the loss of a job, that result in an increase in SNAP benefits must be processed "no later than the first allotment issued 10 days after the date the change was reported." *Id.* § 273.12(c)(1)(i).

Congress unambiguously instructed USDA to provide SNAP households "emergency allotments . . . to address" those households' "temporary food needs."  The economic impacts of the COVID-19 pandemic have increased the cost of food.  As a result, all SNAP households – not just those that have lost income – have increased "temporary food needs."  But USDA's reading of Section 2302 renders the phrase "temporary food needs" superfluous as to households already receiving maximum monthly SNAP benefits.

### 4.    The Court Should Declare That Plaintiffs Are Entitled to Retroactive "Emergency Allotments"

The Court should declare Plaintiffs' entitlement to retroactive "emergency allotments" upon a properly supported Pennsylvania request to provide such "emergency allotments."  The APA authorizes courts to award plaintiffs "relief other than money damages." 5 U.S.C. § 702.  The Supreme Court has "long recognized the distinction between an action at law or for damages – which are intended to provide a victim with monetary compensation for an injury . . . – and an equitable action for specific relief – which may include an order providing . . . for the recovery of specific property or *monies* . . . ." *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (emphasis in original) (internal citation omitted).  Thus, where, as here, the monies sought are "funds to which a statute allegedly entitles" plaintiffs, plaintiffs seek "specific remedies" not

"money damages." *Zellous v. Broadhead Assocs.*, 906 F.2d 94, 97-98 (3d Cir. 1990) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988)).

Plaintiffs here do not seek, as USDA has suggested, "substitute" rather than "specific relief." Defs.' Mot. for Clarification, at 6, Dkt. 37.  "Substitute relief" is relief sought that is not identical to the benefit to which a plaintiff is entitled, such as a subcontractor seeking to collect monies from the government through assertion of "an equitable lien on certain funds held by the" government as a substitute for monies owed from an insolvent prime contractor.  *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 256-57 (1999).  By contrast, Plaintiffs request "the very thing to which they" have been entitled under Section 2302 since March 2020, but were wrongfully denied due to USDA's unlawful guidance.  *See Bowen*, 487 U.S. at 895.  They "seek to enforce" their right to the funds to which Section 2302 entitles them "both prospectively and retrospectively," which is appropriate – and indeed contemplated – under the APA.  *See Zellous*, 906 F.2d at 98.[3]

### B.    USDA's Guidance is Arbitrary and Capricious

Even if USDA's guidance were not contrary to Congress's unambiguously expressed intent – it is – the guidance still would be invalid because USDA utterly failed to explain the bases for its interpretation of "emergency allotments."  Agency action stands or falls on "the grounds that the agency invoked when it took the action."  *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (citation omitted).  An agency must engage in reasoned decisionmaking that "articulate[s] a satisfactory explanation for its action" and demonstrate that it considered "important aspect[s] of the problem" presented.  *Prometheus*

---

[3] The SNAP statutory scheme expressly provides for the retroactive issuance of benefits upon a court's finding that such benefits "have been wrongfully withheld . . . ."  7 U.S.C. § 2023(b); *see also* 7 C.F.R. § 273.17(a)(2).

*Radio Project v. Fed. Commc'ns Comm'n*, 939 F.3d 567, 577, 585 (3d Cir. 2019) (internal

citations omitted), *cert. granted*  --- S. Ct. ----, 2020 WL 5847134 (U.S. Oct. 2, 2020).

### 1.    USDA Did Not Provide a Reasoned Basis for Its Action

As an initial matter, the bases for USDA's guidance regarding "emergency allotments"

are not clear from the administrative record.  The only basis evident in the administrative record

is that USDA viewed "emergency allotments" as "supplements to a household's SNAP benefits,

similar to supplements authorized during disasters under Sec. 5(h)(3)(A) of the [FNA]."  SUMF

¶ 51.  As set forth in Plaintiffs' preliminary injunction papers, however, USDA's conclusory

invocation of Section 5(h)(3)(A) does not provide a reasoned basis for its guidance.  Pls.' Mot.

for Prelim. Inj. at 15-16, Dkt. 4-1.  This much USDA now concedes, having disavowed that

Section 5(h)(3)(A) is the basis for its guidance regarding "emergency allotments."  SUMF ¶¶ 73-

74, 76-77.

At oral argument on Plaintiffs' motion for preliminary injunction, counsel for USDA

offered an alternative basis for USDA's guidance, asserting "that USDA based its interpretation

on the plain text of [Section] 2302."  *Id.* ¶ 76.  But this purported explanation for USDA's

guidance fares no better than USDA's invocation of Section 5(h)(3)(A) for two reasons.

***First***, arbitrary and capricious review "look[s] to what the agency said at the time of [its

action] – not to its lawyers' post-hoc rationalizations."  *Council for Urological Interests v.

Burwell*, 790 F.3d 212, 223 (D.C. Cir. 2015) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196

(1947)).  Neither USDA's March 20 guidance document nor its April 21 guidance document –

the two documents USDA's counsel identified as USDA's "formal guidance documents"[4] –

contain any explanation for USDA's "interpretation" of Section 2302.

---

[4] Plaintiffs do not agree with USDA that the March 20 and April 21 guidance documents are the
only "formal guidance documents" USDA issued regarding "emergency allotments."  USDA has

The March 20 guidance states that the guidance does "not have the force and effect of law" and "is intended only to provide clarity to the public regarding existing requirements under the law or agency policies."  SUMF ¶ 50.  This recital seeks to avoid the formalities of "notice-and-comment" rulemaking.  *See, e.g.*, *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc) (observing that an "agency's own label" for its action is "relevant," but "not dispositive" on the issue of whether it the action represents a "legislative and nonlegislative rule[]") (citations omitted).  It is not an explanation for USDA's "emergency allotments" guidance.

The April 21 guidance similarly contains no explanation for USDA's interpretation of Section 2302.  Rather, the guidance does nothing more than assert USDA's interpretation of "emergency allotments" and parrot the language of Section 2302.  It states in conclusory fashion that "emergency allotments" under Section 2302 "cannot increase the current monthly household SNAP benefit allotment beyond 'the applicable maximum monthly allotment for the household size.'"  SUMF ¶ 52.  But a purported "explanation" that "does little more than parrot the governing statutory language" does not satisfy the APA's requirement that agencies engage in reasoned decisionmaking.  *See, e.g.*, *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 964 F.3d 56, 64 (D.C. Cir. 2020).

***Second***, even if USDA's guidance documents had explained its interpretation of Section 2302, "[t]he judiciary" – not administrative agencies – "is the final authority on issues of statutory construction . . . ."  *Chevron*, 467 U.S. at 843 n.9 .  USDA's interpretation of Section 2302 is contrary to Congress's unambiguously expressed intent.  And where, as here, agency

---

issued at least five guidance documents relating to "emergency allotments" authorized under Section 2302 of the FFCRA.  SUMF ¶ 49.

"action is based upon a determination of law," as opposed to an exercise of administrative

judgment, the action "may not stand if the agency has misconceived the law." *See S.E.C. v.

Chenery Corp.*, 318 U.S. 80, 94 (1943).

### 2.     USDA Failed to Consider an Important Aspect of the Problem Presented in Implementing Section 2302

USDA's guidance also fails to consider an important aspect of the problem Congress

sought to address through Section 2302.  Section 2302 "is indisputably part of the overall SNAP

statutory scheme," which seeks to "rais[e] levels of nutrition among low-income households."

*Gilliam,* 2020 WL 5501220, at *11, *17.  Therefore, an "important aspect" of the problem before

USDA in implementing Section 2302 was raising the "levels of nutrition among low-income

households" amidst the COVID-19 public health emergency.  USDA's guidance, however,

deprives the lowest-income households of emergency subsistence benefits, while providing

emergency subsistence benefits to households with relatively higher incomes.  In doing so,

USDA's guidance frustrates the purpose and goals of SNAP without so much as a reference to

SNAP's purpose, much less an explanation of how USDA considered the problem of raising the

"levels of nutrition among low-income households" in issuing its guidance.  USDA's utter

failure "to consider [this] important aspect of the problem" presented  "alone renders [its

guidance] arbitrary and capricious."  *Dep't of Homeland Sec.,* 140 S. Ct. at 1913.

### C.     The Court Should Vacate the Unlawful Portions of USDA's Guidance

"The ordinary practice is to vacate unlawful agency action."  *E.g.*, *United Steel v. Mine

Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).  Because "USDA's

interpretation of, and Guidance regarding, Section 2302(a)(1) is contrary to law," *Gilliam*, 2020

WL 5501220, at *15, and the portion of its guidance setting forth that interpretation of

"emergency allotments" is arbitrary and capricious, the Court should vacate those portions of the

USDA's guidance that interpret the scope of "emergency allotments."[5]

### D.     Plaintiffs Are Entitled to Permanent Injunctive Relief

Plaintiffs are entitled to a permanent injunction enjoining USDA from implementing guidance or denying Pennsylvania requests for "emergency allotments," including retroactive "emergency allotments," based upon its unlawful interpretation of, and guidance regarding, "emergency allotments" under Section 2302.  A party is "entitled to a permanent injunction as a matter of discretion" where it prevails on the merits and shows that "(1) it has suffered irreparable injury; (2) there is no adequate remedy at law; (3) the balance of hardships tips in its favor; and (4) granting an injunction would not be against the public interest."  *Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 317 (3d Cir.  2020) (citations omitted).  Here, all four factors establish Plaintiffs' entitlement to permanent injunctive relief.

*First*, Plaintiffs already have been denied emergency subsistence benefits to which they are entitled.  *See id.*  Such denial of subsistence benefits to which Plaintiffs are entitled constitutes irreparable harm.  *See Gilliam,* 2020 WL 5501220, at *16  (collecting cases). *Second*, there is no adequate remedy at law for Plaintiffs because they are entitled only to equitable relief under the APA.  5 U.S.C. § 702.  *Third*, the balance of the hardships tips in Plaintiffs' favor because any hardship that befalls Defendants as a result of a permanent injunction flows not from the injunction, but from the FFCRA itself.  *See Gilliam,* 2020 WL 5501220, at *16.  *Fourth*, a permanent injunction will advance the public interest "by ensuring that low-income SNAP households receive assistance necessary to meet the basic and essential

---

[5]The portions of USDA's guidance interpreting "emergency allotments" are severable from those portions specifying what "data" state agencies must submit with their requests for emergency allotments because the provisions are independent of each other, meaning that USDA's guidance can "function sensibly without" the "emergency allotment" provisions.  *See, e.g.*, *Sorensen Commc'ns. Inc. v. F.C.C.*, 755 F.3d 702, 710 (D.C. Cir. 2014) (internal citation omitted).

food needs of themselves and their families during this once-in-a-generation public health crisis." *Id.* at 17.

## V.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment, vacate the unlawful portions of USDA's guidance interpreting "emergency allotments" authorized under Section 2302, and permanently enjoin Defendants from implementing guidance or denying properly supported Pennsylvania requests for "emergency allotments" based upon their unlawful interpretation of "emergency allotments" authorized under Section 2302.

October 26, 2020                           Respectfully submitted,

                                            */s/ John P. Lavelle, Jr.*
                                            John P. Lavelle, Jr. (PA I.D. No. 54279)
                                            Kenneth M. Kulak (PA I.D. No. 75509)
                                            Timothy J. Geverd (PA I.D. No. 324802)
                                            Adina D. Bingham (PA I.D. No. 89860)
                                            Caitlin McKenna (PA I.D. No. 309397)
                                            **MORGAN, LEWIS & BOCKIUS LLP**
                                            1701 Market Street
                                            Philadelphia, PA  19103-2921
                                            Tel: (215) 963-5000
                                            Fax: (215) 963-5001
                                            john.lavelle@morganlewis.com
                                            ken.kulak@morganlewis.com
                                            timothy.geverd@morganlewis.com
                                            adina.bingham@morganlewis.com
                                            caitlin.mckenna@morganlewis.com

                                            Louise Hayes (PA I.D. No. 78581)
                                            Amy Hirsch (PA I.D. No. 42724)
                                            **COMMUNITY LEGAL SERVICES OF PHILADELPHIA**
                                            1410 W. Erie Avenue
                                            Philadelphia, PA 19140
                                            Telephone: (215) 227-2400
                                            Facsimile: (215) 227-2435
                                            LHayes@clsphila.org
                                            AHirsch@clsphila.org

Elizabeth Soltan (PA I.D. No. 327510)
**COMMUNITY LEGAL SERVICES OF PHILADELPHIA**
1424 Chestnut Street
Philadelphia, PA 19102
Tel: (215) 981-3700
Facsimile: (267) 765-6481
Esoltan@clsphila.org

*Attorneys for Plaintiffs*